John W. BULL, et al., Plaintiffs,

v.

The UNITED STATES, Defendant.

No. 01–56 C.

United States Court of Federal Claims.

Sept. 27, 2005.

David L. Kern, El Paso, TX, for plaintiffs. Mark Louis Greenwald, San Antonio, TX, of counsel.

Christian J. Moran, with whom were Peter D. Keisler, Assistant Attorney General, David M. Cohen, Director, and Mark A. Melnick, Assistant Director, United States Department of Justice, Civil Division, Commercial Litigation Branch, Washington, DC, for defendant. Robert Humphries and Christopher J. Duncan, Department of Homeland Security, United States Customs and Border Protection, El Paso, TX, of counsel.

## OPINION AND ORDER

HEWITT, Judge.

Plaintiffs, who are approximately sixty canine enforcement officers (CEOs) now or formerly employed by the United States Department of Homeland Security, Customs and Border Protection Service (Customs or defendant), seek unpaid overtime compensation under the Fair Labor Standards Act, 29 U.S.C. §§ 201–219 (2000) (FLSA).[1] Plaintiffs specifically allege in their six-count complaint that defendant failed to pay for six categories of overtime work: (1) "time worked ... transport[ing] and laundering ... training towels during off[-]duty time;" (2) "time worked ... caring for and training drug sniffing dogs during off[-]duty time;" (3) "time worked ... transport[ing], buying

and/or acquiring ... the necessary building materials and time spent building the necessary training aids required to be used for training drug sniffing dogs during off[-]duty time;" (4) "time worked ... cleaning and maint[aining] ... weapons and [engaging] in weapons training during off[-] duty time;" (5) "time worked ... while engaged in training in the Academy;"[2] (6) "other time worked ... without compensation while 'off-the-clock;'" and "other violations of the FLSA to be determined during the course of discovery in this matter." Plaintiffs' Second Amended Complaint (complaint or Compl.) at 4, ¶ XI.

## I. Introduction

With the concurrence of the parties and further to the court's November 16, 2004 Order, the parties designated six plaintiffs for trial. See Pls.' Designation of Representative Plaintiffs (Pls.' Designation); Def.'s Identification of Trial Plaintiffs (Def.'s Identification); accord 11/16/04 Order at 1, ¶ 1 (instructing plaintiff and defendant to designate three trial plaintiffs to support the presentation of each party's best case). Plaintiffs selected as their designated plaintiffs David J. Bailey, Edward Kruzel and Claudia Monistrol. See generally Pls.' Designation. Defendant selected as its designated plaintiffs John Leuth, Jose Rivera and Todd Stuble. See generally Def.'s Identification.

### A. The Designated Plaintiffs' Claims

Plaintiffs, all of whom are current or former CEOs, received substantially similar basic training at either the Canine Enforcement Training Center (CETC or, generally, the Academy) in Fort Royal, Virginia or the Federal Law Enforcement Training Center (FLETC or, generally, the Academy) in Glencoe, Georgia. See, e.g., Transcript of Trial (Tr.) at 35 (Bailey); id. at 717 (Newcombe); accord Ex. 11 (8/23/02 Canine En-

---

1. The court has previously decided that the FLSA, not the Customs Officer Pay Reform Act (COPRA), governs the overtime compensation claims in this case, see Bull v. United States, 63 Fed.Cl. 580 (Fed.Cl.2005), and that plaintiffs' claims are not preempted by the parties' collective bargaining agreement, see Bull v. United States, 65 Fed.Cl. 407 (Fed.Cl.2005).

2. In this Opinion, the term "Academy" refers to either the Canine Enforcement Training Center (CETC) in Front Royal, Virginia, or the Federal Law Enforcement Training Center (FLETC) in Glencoe, Georgia, as the context may require.

forcement Program Customs Directive) (8/23/02 CEP Directive) at 2, § 5.2 ("All Customs canine enforcement teams (officers and dogs) must receive formal training and certification through a recognized course of instruction at the CETC."). The representative plaintiff CEOs were certified to handle passive and/or positive response dogs[3] trained in the detection of either currency or narcotics. *Cf.* Ex. 13 (February 1996 Canine Enforcement Training Handbook) (2/96 CEO Handbook) at 218, § 1.7 ("The CEO has the responsibility and authority for enforcement of laws administered by the Customs Service. These include enforcement of federal dangerous drug laws, currency laws, and export laws. However, due to the nature of this position, the CEO's primary duty is the interdiction of narcotics or the interception of outbound currency.").

While more similarities than differences appear to exist among plaintiffs' experiences as CEOs, certain factors have affected individual plaintiffs' on-the-job experiences and have impacted their abilities to perform their full range of job-related tasks during the workday. For example, plaintiffs have been stationed at various ports, including Detroit, Miami and El Paso. Each location's unique characteristics, such as the existence of a "sand blowing season" in El Paso, Tr. at 321 (Kruzel), has affected plaintiffs' experiences as CEOs, *e.g., id.* at 321–23 (Kruzel describing the challenges posed during sand-blowing season: "It can be difficult to breathe if you are facing into the wind, or it almost feels like rubbing sandpaper on you. You come home ... [with] black soot-like sand in your ears, eyes[,] ... throughout your uniform [and] inside the weapon itself.... If large grains of sand get inside your weapon, [it is]

the quickest way to get a jam."); *id.* at 1154 (Luby) ("It's hot [in El Paso, and] sometimes very windy. It's a dirty, dusty environment."); *id.* at 625 (Leuth testifying that the sand-blowing season lasts approximately "two to three months"); *cf. id.* at 1233–34 (Lopez testifying that the "windy season" in El Paso lasts "about two or three months," but that during this season, "one, maybe two" sandstorms occurred per week, each lasting "[a] few hours"). Other distinctions among plaintiffs' on-the-job experiences have stemmed from the level of cleanliness at the work site. For example, some plaintiff-CEOs worked inside airports searching passengers, whereas others worked outdoors searching cargo. *E.g.,* Tr. at 420 (Monistrol) ("I work a lot with cargo and fish.... It's a very dirty environment."); *id.* at 977 (Raleigh) ("[I]t is possible to get dirty in Miami, especially if you work at the sea port .... [T]hat is our worst area to work."). In addition, a plaintiff's personal traits, such as detail-orientation or prior professional or military experience, may have impacted his or her ability efficiently to perform duties. Finally, plaintiffs' experiences with management at the different ports have also varied.

Plaintiff David J. Bailey seeks overtime compensation for non-towel-washing activities for an average of 3.25 hours per week (hrs./wk.) from January 1, 1999 to July 31, 2004, when he was employed as a CEO in Detroit and Buffalo. *See* Tr. at 117 (claiming overtime compensation for constructing training aids 2[4] hrs./wk.; for cleaning his weapon .75 hrs./wk.; and for proficiency training .5 hrs./wk.). Mr. Bailey also seeks compensation for 4 hrs./wk. spent washing towels off-duty while stationed in Detroit be-

---

3. "[P]assive [response] dog[s] ... search[ ] for contraband on people," Tr. at 512 (Rivera), whereas "positive response dogs search ... cargo ... [and] luggage," *id.* at 64 (Bailey). Because of their different work environments, passive and positive response dogs respond quite differently when they detect contraband:

 [A]s the dog comes into the odor [of the contraband], the dog will alert, [which] is the technical response when the dog first detects the odor. It will alert, and then ... the handler will read that alert and respond to it by allowing the dog to follow [the odor]. The dog will follow it out to the source of the odor, and then

he will either aggress, biting and scratching [which is a positive response], ... or he will sit, which is a passive response.

*Id.* at 1091–92 (Luby); *accord id.* at 64 (Bailey) ("If a vehicle [containing contraband] continues to move, the [positive response] dog will go to the source and move with it, whereas a passive dog would ... sit and the car would drive away.").

4. For purposes of brevity and convenience, the court uses numerals, rather than numbers spelled out, when referring to time worked by CEOs.

tween January 2, 1999 and April 12, 2003. *See* Tr. at 113, 116–17. Finally, Mr. Bailey seeks compensation for 8 hrs./wk. spent studying off-duty while attending the Academy between September 12 and October 21, 2000. *See* Tr. at 118. Mr. Bailey alleges that he was not compensated for a total of 1443 hours of off-duty work and seeks $51,083.99. Ex. 139 (Bailey Damages Spreadsheet) at 6.

Plaintiff Edward Kruzel seeks overtime compensation for an average of 8 hrs./wk. from September 6, 1997 to July 3, 2004, when he was employed as a CEO in El Paso. *See* Tr. at 314, 362 (claiming overtime compensation for washing towels 2 hrs./wk. and for cleaning his weapon 2.5 hrs./wk.); *id.* at 364–65 (claiming overtime compensation for constructing training aids 1.25 hrs./wk. and for proficiency training 2.25 hrs./wk.). Mr. Kruzel also seeks compensation for between 1 and 2 hours per day for off-duty studying in March and April 2001, when he was a student at the FLETC, *see id.* at 367, and for a total of 140 to 150 hours for off-duty study time at the CETC in 2000, *id.* at 368. Mr. Kruzel alleges that he was not compensated for 2667 hours of off-duty work and seeks $86,533.26. *Id.* at 365; Ex. 952 (Kruzel Damages Spreadsheet) at 7.

Plaintiff Claudia Monistrol has worked at the Miami International Airport since 1999. Tr. at 410. Ms. Monistrol seeks compensation for an average of 4 hrs./wk. for time spent engaged in off-duty towel laundering and processing from September 4, 1999 to July 3, 2004. *Id.* at 437. Ms. Monistrol seeks additional compensation for an average of 10 hrs./wk. for time engaged in other off-duty tasks from September 4, 1999 to September 18, 2004. *See* Tr. at 437–42 (claiming overtime compensation for cleaning her weapon 1 hr./wk.; for proficiency training .5 hrs./wk.; for constructing training aids 2.5 hrs./wk.; for grooming her canine 2 hrs./wk.; and for maintaining equipment, vacuuming, car washing, and report writing 4 hrs./wk.). Ms. Monistrol also seeks compensation for an average of 1.75 hrs./wk. for off-duty time spent studying and performing training-re-

lated activities during her tenure at the Academy from May 8 through August 28, 1999. *Id.* at 441. Ms. Monistrol alleges that she was not compensated for 3570.25 hours of off-duty work and seeks $102,085.71. *Id.* at 365; Ex. 1172 (Monistrol Damages Spreadsheet) at 7.

Plaintiff John Leuth seeks compensation for an average of 3.42 hrs./wk. from September 6, 1997 to October 2001, while employed as a CEO in El Paso. *See* Tr. at 617 (Leuth) (claiming overtime compensation for laundering towels 2.5 hrs./wk.); *id.* at 620 (claiming overtime compensation for constructing "25 to thirty [training] aids a week"); *accord* Ex. 990 (Leuth Damages Summary) (claiming overtime compensation for constructing training aids .17 hrs./wk.); Tr. at 623 (claiming overtime compensation for cleaning his weapon .75 hrs./wk.). Mr. Leuth alleges that he was not compensated for 667.57 hours of off-duty work and seeks $16,382.46. Tr. at 643; Ex. 990 (Leuth Damages Spreadsheet) at 5.

Plaintiff Jose Rivera seeks compensation for an average of 2.5 hrs./wk. from October 3, 1998 to July 31, 2004, when he was employed as a CEO at the Miami International Airport. *See* Tr. at 496, 529 (claiming overtime compensation for laundering towels 2 hrs./wk.); *id.* at 498, 500 (claiming overtime compensation for cleaning his weapon .5 hrs./wk.). Mr. Rivera alleges that he was not compensated for 721 hours of off-duty work and seeks $19,988.15. *Id.* at 503; Ex. 1370 (Rivera Damages Spreadsheet) at 7.

Plaintiff Todd Stuble seeks compensation for an average of 3.25–3 .75 hours per week from September 1997 to July 2004, while employed as a CEO in El Paso. *See* Tr. at 578–79 (claiming overtime compensation for laundering towels 2.5 hrs./wk.; cleaning his weapon .5 hrs./wk.; and engaging in proficiency training .75 hrs./wk. initially and .25 hrs./wk. after his wife fell ill in January 2003). Mr. Stuble alleges that he was not compensated for 1242.50 hours of off-duty work and seeks $34,198.44. *Id.* at 583; Ex. 1551 (Stuble Damages Spreadsheet) at 8.[5]

---

**5.** In addition to the unpaid overtime compensation detailed for each representative plaintiff, plaintiffs also ask the court to award "an additional equal amount as liquidated damages[,] . . .

## B. The Witnesses

Between May 3 and May 10, 2005, the court conducted a five-day trial in Washington, D.C. During trial, the court heard testimony from the six designated plaintiffs and from seventeen other witnesses,[6] and re-

reasonable attorneys fees and costs[,] ... as well as pre- and post-judgment interest." Compl. at 5, ¶¶ XII–XIII.

6. For convenient reference, the name and a description of each witness upon whose live testimony the court relies in this Opinion follows:

Sheila H. Brown has served as the Director of Labor Relations for Customs since 2000. Tr. at 1640. In this capacity, she "provide[s] oversight [and] develop[s] strateg[ies and] policies for ... Customs." *Id.* at 1641. Ms. Brown's responsibilities include "administer[ing] the collective bargaining agreements for ... unions involved with the agency." *Id.* Before assuming her present position, Ms. Brown served as "director [of] the labor relations field operations section" for the Social Security Administration, *id.* at 1641.

Oran Clemons testified for plaintiffs "as an expert in investigating and analyzing the factual bases for violations, or possible violations, of the Fair Labor Standards Act." Tr. at 905. Plaintiffs retained Mr. Clemons to testify regarding "[d]efendant's violations of wage and hour laws and the resulting damages to [p]laintiffs." *Id.* at 846. Mr. Clemons' relevant experience includes twenty-eight years as a wage and hour investigator for the Department of Labor (DOL). *See id.* at 852. He presently is a self-employed wage and hours consultant. *See* Tr. at 855–57; Trial Exhibit (Ex.) 134 (Mr. Clemons' Curriculum Vitae) at 1. Mr. Clemons provided an Expert Report summarizing his findings in this matter. *See generally* Ex. 133 (Expert Report of Oran Clemons) (Clemons Rep.).

William Gernaat has been a Supervisory Canine Enforcement Officer (SCEO or supervisor) in Miami since April 2003. Tr. at 1659. Mr. Gernaat also served as a CEO in Houston from 1992 through 1996, *id.* at 1657, and as a CEO in Miami from 1996 to 2003, *id.* at 1658. As a CEO, Mr. Gernaat worked with positive narcotic, passive response narcotic, and passive response currency dogs. *See id.* at 1658–59.

Edward Howard Hoisington, Jr. has served as the "assistant senior watch officer in the Department of Homeland Security's Operations Center located in Washington, D.C." since 2003. Tr. at 1762. From 1996 to 2003, Mr. Hoisington was a supervisory instructor at the CETC, where his "primary duty ... consisted of teaching both academics and practical techniques on maintaining[,] ... training and troubleshooting [narcotics, currency and explosives] detector dogs." *Id.* at 1762–63. From 1991 to 1996, he served as a CEO in Arizona and Texas. *See id.*

Ricardo Lopez worked as the "firearms range officer supervisor ... [and] was in charge of the firearms training and tactical section" at the port of El Paso from approximately September 2002 until his retirement from Customs. Tr. at 1204; *accord id.* at 1205 (referring to this position as "supervisory range officer"). During his career with Customs in El Paso, which began in 1991, Mr. Lopez served as a range officer, firearms instructor, customs inspector, supervisory customs inspector, and "supervisor in the passenger processing area." *See id.* at 1199–1204.

Frederick Luby has spent his entire career with Customs in the Canine Enforcement program. From 1971 to 1974, Mr. Luby served as a CEO in New Jersey. *See* Tr. at 1058. In 1974, he was "promoted to canine supervisor, and ... was the first ... canine supervisor ... in the New York region." *Id.* at 1065. From 1983 to 1994, Mr. Luby served as a "canine enforcement manager" in Riyadh. *Id.* at 1067. In 1994, he "was reassigned to [the] Port of El Paso as canine enforcement supervisor," the position he presently holds. *Id.* at 1068.

Devon Luse has been stationed at the port of El Paso for all but a few months of his career with Customs. *See* Tr. at 1605–06. Mr. Luse worked as a CEO from 1989 until approximately 1994, when he was promoted to SCEO, his present position. *See id.* at 1606–08. In 2002, Mr. Luse was stationed at Customs headquarters in Washington, D.C., where he served for "90 or 120 days" as a temporary program officer. *Id.* at 1608.

John Makolin has worked for Customs since 1978. *See* Tr. at 1361. From 1978 to 1984, he worked as a CEO with a positive narcotics dog in Chicago, and from 1984 to 1992, he worked as a CEO with a positive narcotics dog in Miami. *See id.* at 1361–62. Mr. Makolin served as the "District Supervisor [CEO]" in Miami from 1992 to 1995, and as the "Area [SCEO]" in San Diego from 1995 to 1998. *Id.* at 1363. In 1998, Mr. Makolin assumed the position of Chief of the El Paso canine program, a position he held until 2001. *See id.* at 1363–64. From 2001 to 2002, he served as a "Program Officer to the canine program in Washington, D.C.," and from 2002 until 2004, he served as the "Supervisory Course Developer Instructor" at the CETC. *Id.* at 1366–67. As Supervisory Course Developer Instructor, Mr. Makolin "ran the support functions of training," but was not responsible for curriculum development or instruction. *Id.* In 2004, Mr. Makolin was appointed to his present position of National Canine Program Manager. *See* Tr. at 1367–68. In this capacity, he and his staff of three establish "procedures [and] creat[e] new policies for" Customs, and also "do[] a lot of international training and training for state and local officers." *Id.* at 1368.

Kenneth Molidor has been a Canine Instructor at the CETC since 1996. Tr. at 1512. In this capacity, Mr. Molidor "train[s] officers [in] how to train their dogs[] to search vehicles, luggage, passengers, [and] crate[s; has] developed some training courses; [and is] the primary firearms officer." *Id.* Prior to serving as an instructor,

ceived seventy-nine exhibits in evidence. In addition to the record of trial, the court has reviewed deposition testimony from eleven witnesses,[7] *see generally* Ex.1900 (Deposition

Mr. Molidor served as a CEO with a passive response dog for six years. *See id.* at 1511.

Carl Newcombe served as National Program Manager for Customs' Canine Enforcement Program from July 2000 until his retirement on December 31, 2004. *See* Tr. at 706, 708. From 1989 to 2000, Mr. Newcombe served as a supervisory instructor at the CETC, and from 1992 to 2000, he also served as the director of the CETC. *Id.* at 706–07. While serving as director of the CETC, Mr. Newcombe participated in the creation of the Canine Enforcement Handbook. *See id.* at 710 (Newcombe) (discussing Ex. 13 (February 1996 Canine Enforcement Handbook) (2/96 CEO Handbook) and testifying: "I either had direct input in work on the document or I was making recommendations. This kind of handbook is sort of like a work in progress.").

Donald Perryman testified for defendant as an expert in the cleaning of the Glock 17, the weapon carried by plaintiffs. *See* Tr. at 1439. Mr. Perryman has served as an "Inspector/Course Developer Instructor" for firearms courses at the Academy since approximately 1993, *see id.* at 1402, and "became Team Leader for the [A]cademy firearms training team" in 2002, *id.* at 1402–03. Mr. Perryman has taught the firearms portion of CEO training since approximately 2000. *Id.* at 1403.

Dwight Raleigh appeared as a witness for both parties in this case. *See* Tr. at 969 (Pls.' case-in-chief); *id.* at 1796 (Def.'s case-in-chief). Mr. Raleigh has worked for Customs since 1999 as a "canine branch chief" and is "assigned to the Tactical Operations Unit at Miami service port." *Id.* at 969–70. In this capacity, he "oversee[s] all of the canine operations in Miami." *Id.* at 970. From 1995 to 1999, he worked as an area SCEO. *See id.* Mr. Raleigh also served as a SCEO from 1991 to 1995, and as a CEO from 1986 to 1991. *See id.* at 970–71.

Ronnell Lynn Rotterman has been the "[D]irector of [P]osition [C]lassification and [C]ompensation for [C]ustoms and [B]order [P]rotection" since 1998. Tr. at 1843. In this capacity, she supervises "position classification specialist[s]," *id.* at 1848, and is "responsib[le] for program oversight in terms of proper classifications of our positions under Title V and [for] correct[ ] compensat[ion of Customs] employees according to all applicable statutes and regulations," *id.* at 1844. Ms. Rotterman has worked in Customs' Office of Human Resources since 1988. *See id.*

David Smiertka worked for Customs from 1971 until his retirement in 2002 and was stationed at the port of Detroit "the entire time." *See* Tr. at 1782, 1785. Mr. Smiertka began his career at Customs as an inspector, and advanced to the positions of "[s]upervisory customs inspector and then ... chief inspector." *Id.* at 1783. During Mr. Smiertka's latter years as a chief inspector, he also held the position of "chief of enforcement." *See id.* at 1786–87. Although Mr. Smiertka never served as a CEO, *see id.* at

1787, his duties as chief of enforcement included the oversight of SCEOs stationed at the port of Detroit, *see id.* at 1786. To prepare for this responsibility, Mr. Smiertka familiarized himself with the CEO Handbook and attended a week-long " 'noncanine supervisory oversight administrator' " course at the Academy. *See id.* at 1787.

Angela Smith was a SCEO stationed at the port of Miami. *See* Tr. at 1523. Before assuming this position in 1999, *id.*, Ms. Smith served as a CEO in Houston from 1993 to 1995, working with a passive response narcotic dog, *see id.* at 1521, and as a CEO in Miami from 1995 to 1999, working with passive and positive response narcotic dogs and passive and positive response currency dogs, *see id.* at 1522.

Gordon Summers has worked for Customs since 1987, and presently serves as the "supervisor of firearms and tactical training in Miami." Tr. at 1270–71. Mr. Summers worked as a Customs inspector in Texas from 1987 to 1988. *See id.* at 1271. From 1988 to 1998, he worked at the port of Miami as a customs inspector on the Contraband Enforcement Team (CET), a unit consisting of both customs inspectors and CEOs. *See id.* at 1272. Mr. Summers "became a firearms inspector in 1995," *id.*, and was promoted to supervisory customs inspector in 1998, *see id.* at 1273. From 1999 to 2000, he served as the supervisor for the CET, and oversaw teams of four to twenty-five customs inspectors and CEOs. *See id.* at 1274. Mr. Summers assumed his present position in 2002. *Id.* at 1275. As supervisor of firearms, he serves as a supervisory firearms instructor, *see id.* at 1276, and "ensure[s] that ... [there are adequate] staffing materials [and] range time [for Customs personnel and that] ... the schedule is developed and disseminated throughout ... south Florida," *id.* at 1275.

Lee Titus has worked for Customs as the "Director of Canine for [the] Office of Field Operations" since 2002. Tr. at 952–53. Prior to serving as Director, Mr. Titus worked as a "supervisor instructor at the Canine Training Center," and as a CEO. *Id.* at 953.

7. The parties offered into evidence excerpts from eleven depositions. *See generally* Ex.1900 (Deposition Transcripts). For convenient reference, the name and a description of each deposition witness upon whose testimony the court relies in this Opinion follows:

Christopher Anaya has "been a firearms instructor since 1996," and has served as the "primary firearms instructor in the Detroit Metropolitan area" since 2000. Ex.1900, Tab 3 (Anaya Dep.) at 3:21–24. "[A]s a primary firearms instructor, [Mr. Anaya] train[s] primarily the armed Customs officers ... includ[ing] Canine Enforcement Officers ... in the use of the Glock 17[,] ... the weapon ... that the Customs Service requires Canine Enforcement Officers to use

Transcripts), and has had the opportunity to consider extensive post-trial briefing filed by the parties, *see generally* Plaintiffs' Post–Trial Brief (Pls.' Br.); Defendant's Post–Trial Brief (Def.'s Br.); Plaintiffs' Response to Defendant's Post–Trial Brief (Pls.' Resp.); Defendant's Post–Trial Reply Brief (Def.'s Reply).

The court found the testimony of all of the witnesses before it to be given in good faith. Of particular assistance to the court was the testimony of the current and former SCEOs who appeared both live and by deposition. Most of these individuals began their careers at Customs as CEOs. Some testified that, as CEOs, they performed many of the uncompensated off-duty tasks for which plaintiffs seek compensation in this case. The SCEOs testified generally that performance of these duties off the clock was part of the job of a CEO. Although several supervisors admitted actual knowledge of their subordinates' off-

duty activities, most denied such knowledge. Some testified that plaintiffs had sufficient on-duty time to complete many of the tasks for which plaintiffs seek overtime compensation and that plaintiffs voluntarily chose to perform these tasks while off duty. Other SCEOs testified that it was necessary for plaintiffs to accomplish these tasks off-the-clock. The supervisors who testified held varying opinions concerning the frequency with which CEOs should reasonably engage in each of the uncompensated activities, if at all, as well as the amount of time and attention each activity should reasonably require.

Of less assistance to the court was the testimony of plaintiffs' expert, Oren Clemons. Mr. Clemons testified that defendant generally was liable to plaintiffs for the time spent by plaintiffs performing the off-duty activities listed above, *see supra*, Part I.A., and that plaintiffs' claims represent a "reasonable approximation of the overtime compensation

in connection with their official duties." *Id.* at 4:21–5:21.

George Anton has served as a "supervisor for the CEO program ... [for the] explosive canine section[, a.k.a.] ... the bomb dogs" since 2000. Ex.1900, Tab 6 (Anton Dep.) at 6:16–8:1. Between 1996 and 2000, Mr. Anton served as a SCEO "for the narcotic dogs." *Id.* at 10:15. From 1986 to 1996, Mr. Anton served as a CEO. *See id.* at 6:20. Mr. Anton has spent his entire career with Customs stationed in El Paso, and has worked at all five ports of entry in the El Paso area. *See id.* at 7:3–20.

Roderick Blanchard began his full-time career at Customs in 1985 as an inspector stationed at the port of Detroit. *See* Ex.1900, Tab 7 (Blanchard Dep.) at 6:3–6. Mr. Blanchard supervised CEOs at the port of Detroit from May 2000 to September 2000. *See id.* at 24:19–24.

Stefany Currey is a plaintiff in this case. *See* Ex.1900, Tab 16 (Currey Dep.) at 3:19–21. Ms. Currey "started work[ing][at] Customs in January 1997," *id.* at 8:8–10, and attended the Academy in either January or February of that year, *id.* at 8:13–17. She served as a CEO at the port of Detroit, *see id.* at 10:23–11:24, until July 2001, when she "w[as] reassigned and no longer [worked as] a CEO," *id.* at 5:20–23.

Armando Johnson is a SCEO at the port of Miami. Ex.1900, Tab 8 (Johnson Dep.), at 3:18–19, 4:12–13. Mr. Johnson has worked for Customs since 1983. *Id.* at 5:2–6. During his career, he has served 7 years as a CEO at and 13 years as a SCEO. *Id.* at 6:3–22. Mr. Johnson has worked at both the Miami Airport and Miami Seaport. *Id.* at 8:14–16.

John Kruczek presently serves as the Border Security Coordinator for the port of Detroit. *See*

Ex.1900, Tab 5 (Kruczek Dep.) at 6:25–7:2. Between 2000 and 2004, Mr. Kruczek served as an Operations Specialist at the Customs field office in Detroit. *See id.* at 6:16–23. As an Operations Specialist, Mr. Kruczek was responsible for overseeing the "[m]ission, direction and focus of the Canine [Enforcement] program" in Detroit. *Id.* at 7:25–8:4. Although Mr. Kruczek was not trained as a CEO, he was familiar with the task related training (TRT) and non-task related training (NTRT) that CEOs accomplished with their canines on a daily and weekly basis. *See id.* at 8:24–9:25.

Tommy Ramirez has served as a CEO at the port of Detroit since 1996, *see* Ex.1900, Tab 18 (Ramirez Dep.) at 8:10–13, and has worked at both the land border and the airport, *see id.* at 16:8–17:10. Mr. Ramirez learned of this lawsuit "[t]hrough [his] supervisor[,] David Bailey," *id.* at 9:11–12, and joined as a plaintiff in this matter in July 2002, *see id.* at 10:6–23.

Richard Rowley has served as an SCEO since 1999. Ex.1900, Tab 12 (Rowley Dep.) at 3:15–17, 5:16–17. From 1991 through 1993 and from 1995 through 1999, Mr. Rowley served as a CEO. *See id.* at 5:13–19. From 1999 through 2003 Mr. Rowley served as a "team leader, which was a non-supervisory ... training officer." *Id.* at 18–19. In 2003, Mr. Rowley assumed his present position of SCEO at the port of Detroit. *See id.* at 7:9–13.

Joseph D. Wood has served as a SCEO in El Paso since 1991, Ex.1900, Tab 14 (Wood Dep.) at 7:16–18, and has worked at all five ports in El Paso. *See id.* at 7:24–8:13. Before assuming his current position El Paso, Mr. Wood worked as a CEO. *See id.* at 15:14–16. Mr. Wood presently supervises nine CEOs. *Id.* at 9:5.

that is owed to each of the[m]," Tr. at 896 (Clemons). During cross-examination, however, counsel for defendant elicited testimony revealing that, when formulating his opinion, Mr. Clemons "accepted . . . at face value" the number of overtime hours claimed by individual plaintiffs in their sworn declarations and did not question, investigate, or attempt to reconcile discrepancies among the number of hours individual plaintiffs claimed were required to perform a given task. *See* Tr. at 935–36 (Clemons) ("It seemed reasonable to me. . . . Given the different lengths of time it takes different people to do things, I did not find [that the reasonableness of] any of [plaintiffs'] sworn statements . . . needed . . . [to be] questioned]. . . . [S]ome people take longer to do things than others."); *accord id.* at 931 (Clemons testifying that he did not independently investigate the length of time required to perform each task, and that he "used the sworn statements of the [CEOs]" as a basis for this information). Mr. Clemons also revealed during cross-examination that he did not "visit[ ] any physical location where the work was allegedly being performed," *id.* at 931 (Clemons), did not "visit the kennels where the dogs are kept," *id.* at 932 (Clemons), did not "speak to any [p]laintiff directly at the time [he] rendered [his] opinion in this case," *id.*, and did not observe "any [p]laintiffs [performing] any activity for which they're claiming compensation in this lawsuit," *id.* at 935 (Clemons).

## II. The Law: Overtime Claims Under the FLSA

Section 207 of Title 29 of the United States Code, which sets out the overtime provisions of the FLSA, requires employers to pay employees overtime compensation for work performed in excess of a forty-hour workweek "at a rate not less than one and one-half times the regular rate at which [an employee] is employed." 29 U.S.C. § 207. Compensable work under the FLSA includes work that is "suffer[ed] or permit[ted]." 29 U.S.C. § 203(g) (defining "employ[ment]" to include work "suffer[ed] or permit[ted]" to be performed); *Armour & Co. v. Wantock,* 323 U.S. 126, 132, 65 S.Ct. 165, 89 L.Ed. 118 (1944) (stating that the overtime provisions of the FLSA "apply only to those who are

'employees' and to 'employment' in excess of the specified hours" and that, as defined under the Act, the term " 'employ' includes to suffer or permit to work") (quoting 29 U.S.C. § 203(g)).

■ To prevail on a FLSA claim for an overtime activity suffered or permitted to be performed, plaintiffs must carry their burden of proof on all of the elements of the particular claim. *See Anderson v. Mt. Clemens Pottery Co.,* 328 U.S. 680, 686–87, 66 S.Ct. 1187, 90 L.Ed. 1515 (1946) ("An employee who brings suit under [section] 16(b) of [FLSA] for . . . unpaid overtime compensation, together with liquidated damages, has the burden of proving that he performed work for which he was not properly compensated."). First, plaintiffs must establish that each activity for which overtime compensation is sought constitutes "work." For an activity to constitute work, plaintiffs must prove that the activity was (1) undertaken for the benefit of the employer, *e.g., Tenn. Coal, Iron, & R.R. Co. v. Muscoda Local No. 123,* 321 U.S. 590, 599, 64 S.Ct. 698, 88 L.Ed. 949 (1944); *Reich v. N.Y. City Transit Auth.,* 45 F.3d 646, 650 (2d Cir.1995); *Adams v. United States,* 65 Fed.Cl. 217, 221 (2005); 5 C.F.R. § 551.401(a) (2005); (2) known or reasonably should have been known by the employer to have been performed, *e.g.,* 5 C.F.R. § 551.104; *accord Holzapfel v. Town of Newburgh,* 145 F.3d 516, 524 (2d Cir.1998), *rev'd in part on other grounds,* 145 F.3d 516 (1998); *Forrester v. Roth's I.G.A. Foodliner, Inc.,* 646 F.2d 413, 414 (9th Cir.1981); and (3) controlled or required by the employer, *e.g.,* 5 C.F.R. § 551.402(a); 29 C.F.R. § 785.13 (2005); *accord Mt. Clemens Pottery,* 328 U.S. at 691, 66 S.Ct. 1187; *N.Y. City Transit,* 45 F.3d at 651; *Forrester,* 646 F.2d at 414.

■ Second, plaintiffs must establish that the hours of work performed are actually, rather than theoretically, compensable. For work to be compensable, the quantum of time claimed by plaintiffs must not be de minimis, *e.g., Mt. Clemens Pottery,* 328 U.S. at 693, 66 S.Ct. 1187; *Bobo v. United States* 136 F.3d 1465, 1468 (Fed.Cir.1998) (*Bobo II*); *Adams,* 65 Fed.Cl. at 222, and must be reasonable in relation to the principal activity,

*e.g., Mt. Clemens Pottery,* 328 U.S. at 688, 66 S.Ct. 1187; *Amos v. United States,* 13 Cl.Ct. 442, 449 (1987). If an employer has kept accurate records, a plaintiff's burden of establishing the reasonableness of the time claimed is easily discharged; where, as here, the employer's records are inaccurate or inadequate, the employee need only produce "sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference." *Mt. Clemens Pottery,* 328 U.S. at 687, 66 S.Ct. 1187. Unless the employer can then produce sufficient evidence to negate the reasonableness of this inference, the court may award plaintiff approximate damages, *id.* at 688, 66 S.Ct. 1187, in "the amount of . . . their unpaid overtime compensation," plus "reasonable attorneys' fee[s] . . . and costs," 29 U.S.C. § 216(b). Plaintiffs also may be entitled to "an additional equal amount as liquidated damages" under certain circumstances described below. *Id.*

When analyzing a FLSA claim, the court generally utilizes a two-year statute of limitations. *See generally* 29 U.S.C. § 255. However, the statute of limitations may be extended by one year if plaintiffs demonstrate that the employer's violation of the FLSA was "willful." *Id.*

### A. Plaintiffs Must Have Performed "Work"

#### 1. Background

To satisfy their burden of proof, plaintiffs must establish, as an initial matter, that they performed uncompensated overtime "work." *E.g., N.Y. City Transit,* 45 F.3d at 651 ("Employees are entitled to compensation only for 'work.' "). Because Congress "did not define the contours of the type of 'work' or 'employment' that merited . . . compensation" under the FLSA, the scope of the term "work" was initially delineated by the United States Supreme Court. *Id.* at 649. In *Tennessee Coal v. Muscoda,* the Supreme Court looked to the "commonly used" meaning of "work" and determined that, for FLSA purposes, work is any activity: (1) involving "physical or mental exertion (whether burdensome or not)"; (2) "controlled or required by the employer"; and (3) "pursued necessarily and primarily

for the benefit of the employer and his business." 321 U.S. 590, 598, 64 S.Ct. 698, 88 L.Ed. 949 (1944) (citations omitted). The Court broadened its definition of "work" two years later in *Mt. Clemens Pottery,* interpreting the FLSA to provide compensation for activities such as walking from the factory gate to the work bench and changing into work clothes. *See* 328 U.S. at 691–92, 66 S.Ct. 1187.

The expansive interpretation of "work" in *Mt. Clemens Pottery* prompted Congress to amend the FLSA in 1947 by passing the Portal–to–Portal Act, 29 U.S.C. §§ 251–262 (2000). *See* 29 U.S.C. § 251(a) ("The Congress finds that the [FLSA] . . . has been interpreted judicially in disregard of long-established customs, practices, and contracts between employers and employees, thereby creating wholly unexpected liabilities, immense in amount and retroactive in operation, upon employers with the results that, if said Act as so interpreted or claims arising under such interpretations were permitted to stand, . . . (5) there would occur the promotion of increasing demands for payment to employees for engaging in activities no compensation for which had been contemplated by either the employer or employee at the time they were engaged . . . ."). One purpose of the Portal–to–Portal Act was to "relieve employers from liability from preliminaries, most of them relatively effortless, that were thought to fall outside the conventional expectations and customs of compensation." *N.Y. City Transit,* 45 F.3d at 649. Accordingly, the Portal–to–Portal Act revised the definition of "work" to focus on the distinction between "principal activities," on the one hand, and "preliminary" and "postliminary activities," on the other:

> [N]o employer shall be subject to any liability or punishment under the [FLSA] . . . [for] failure of such employer to pay an employee . . . [for] activities which are preliminary to or postliminary to said principal activity or activities, which occur either prior to the time on any particular workday at which such employee commences, or subsequent to the time on any particular

workday at which he ceases, such principal activity or activities.

29 U.S.C. § 254(a)(2).

Although this provision could possibly be read to bar claims for compensation for all activities performed by an employee prior to or following the employee's work shift, the Supreme Court has interpreted the terms "principal" activities and "preliminary" and "postliminary" activities to permit compensation for activities performed by an employee "before or after the regular work shift . . . if those activities are an integral and indispensable part of the principal activities for which [the employee is] employed and are not specifically excluded" by the statute. *Steiner v. Mitchell,* 350 U.S. 247, 256, 76 S.Ct. 330, 100 L.Ed. 267 (1956) (concluding that health concerns made showering and changing clothes before and after work shifts at a battery plant integral and indispensable to employment and awarding compensation for those activities). The *Steiner* Court determined that activities " 'made necessary by the nature of the work performed,' " which "fulfill 'mutual obligations,' " between employers and employees and " 'are so closely related to other duties performed' " are principal activities. *Id.* at 252, 76 S.Ct. 330 (quoting the trial court). "Principal . . . activities . . . [therefore] embrace[ ] all activities which are an 'integral and indispensable part of the principal activities,' " even when those activities technically fall before or after the daily work shift. *Id.* at 252–53, 76 S.Ct. 330; *see also Mitchell v. King Packing Co.,* 350 U.S. 260, 263, 76 S.Ct. 337, 100 L.Ed. 282 (1956) (finding that employee time spent sharpening knives while off duty was an "integral part of and indispensable to the various butchering activities for which they were principally employed" because the maintenance of sharp knives was a condition of employment); 5 C.F.R. § 551.412(b) ("A preparatory or concluding activity that is not closely related to the performance of the principal activities is considered a preliminary or postliminary activity[, which is] . . . excluded from hours of work and is not compensable.").

### 2. Elements of "Work"

The modern understanding of the preliminary and postliminary work that warrants compensation under the FLSA emerged from *Tennessee Coal,* as initially expanded by *Mt. Clemens Pottery* and ultimately circumscribed by the Portal–to–Portal Act. In *Bobo II,* the United States Court of Appeals for the Federal Circuit adopted the approach articulated by the United States Court of Appeals for the Second Circuit for defining overtime "work" under the FLSA and for implementing the Supreme Court's "integral and indispensable" standard:

> "The more the preliminary (or postliminary) activity is undertaken for the employer's benefit, the more indispensable it is to the primary goal of the employee's work, and the less choice the employee has in the matter, the more likely such work will be found to be compensable. . . . The ability of the employer to maintain records of such time expended is a factor."

*Bobo II,* 136 F.3d at 1467 (quoting *N.Y. City Transit,* 45 F.3d at 650); *accord Adams,* 65 Fed.Cl. at 226–28 (discussing *N.Y. City Transit* and the Federal Circuit's approval of *N.Y. City Transit* in *Bobo II*). For plaintiffs to prove that the overtime activities for which compensation is sought are "an 'integral and indispensable part of the principal activities,' " for which plaintiffs are compensated, *Steiner,* 350 U.S. at 253, 76 S.Ct. 330, plaintiffs must establish that each task (1) was undertaken for the benefit of the employer; (2) was known or reasonably should have been known by the employer to have been performed; and (3) was controlled or required by the employer.

### a. The Activity Must Benefit the Employer

For an overtime activity to constitute "work" under the FLSA, it must be undertaken by the employee for the benefit of the employer. *E.g., Tenn. Coal,* 321 U.S. at 599, 64 S.Ct. 698 (finding that time spent by iron ore miners traveling underground in mines to and from the site where the miners drilled and loaded ore constituted work because "the travel time is spent for the benefit of [the employers] and their iron ore mining operations"); *Mt. Clemens Pottery,* 328 U.S. at 693, 66 S.Ct. 1187 ("[The activities are] pursued necessarily and primarily for the em-

ployer's benefit.... There is nothing in such activities that partakes only of the personal convenience or needs of the employees. Hence they constitute work."); *see also Bobo II,* 136 F.3d at 1467–68; *Adams,* 65 Fed.Cl. at 226–27. To benefit the employer, an activity need not be "productive"—rather, it must be necessary to the accomplishment of the employee's principal duties to the employer. *Tenn. Coal,* 321 U.S. at 599, 64 S.Ct. 698 ("It matters not that ... [the miners'] travel [from the drilling site to the loading site] is, in a strict sense, a non-productive benefit. Nothing in the statute or in reason demands that every moment of an employee's time devoted to the service of his employer shall be directly productive."). Further, the activity need not occur during the "main body of the workday" to benefit the employer. *N.Y. City Transit,* 45 F.3d at 650. As the Second Circuit explained:

> If the concept of principal activity were [so] narrow ... then an employer could impose significant, time-consuming duties on the employee to be performed at home, before and after the main body of the workday, as well as during the commute, and be exempted from payment for those duties because they were not sufficiently related to the employee's principal duties .... [S]uch an interpretation would exaggerate the effect of the Portal–to–Portal exemptions, and would substantially under-

mine the purposes of the [FLSA] by creating loopholes capable of significant abuse.

> The Portal–to–Portal exemptions properly protect employers from responsibility for ... relatively trivial, non-onerous aspects of preliminary preparation, maintenance and clean up. Congress's undertaking to exempt such conventionally unpaid preliminaries (and postliminaries) from compensation in no way suggests, however, that real work assignments are exempt from compensation, just because they occur outside the confines of the main part of the workday.

*N.Y. City Transit,* 45 F.3d at 650–51. The Federal Circuit has adopted the requirement articulated in *New York City Transit* that a task must be undertaken for the benefit of the employer to constitute work.[8] *Bobo II,* 136 F.3d at 1468 ("We agree with the interpretation of the Portal–to–Portal Act set forth in *Reich [v. New York City Transit Authority]* ....").

### b. The Activity Must Be Known by the Employer

It is not enough that the preliminary or postliminary activity for which compensation is sought be undertaken for the employer's benefit. Regulations promulgated by the Department of Labor (DOL) and the Office of Personnel Management (OPM)[9] make

---

8. Courts in other circuits also follow New York City Transit when analyzing whether an overtime activity is "necessary to the [employer's] business and is performed by the employees, primarily for the benefit of the employer, in the ordinary course of that business." *Dunlop v. City Elec., Inc.,* 527 F.2d 394, 400–01 (5th Cir.1976) (footnote omitted); *see also Republican Publ'g Co. v. Am. Newspaper Guild,* 172 F.2d 943, 945 (1st Cir.1949) (stating that the "crucial question" was whether, in pertinent part, the "performed services were for the benefit of the employer," and concluding that a theater editor's time spent watching films and plays in order to review them was compensable); *Treece v. City of Little Rock,* 923 F.Supp. 1122, 1127 (E.D.Ark.1996) (noting that the test is not whether the employer is the "sole beneficiary," but rather whether the employer derives a significant benefit from the activity) (citing *Henson v. Pulaski County Sheriff Dep't,* 6 F.3d 531, 533 (8th Cir.1993)); *Dooley v. Liberty Mut. Ins. Co.,* 307 F.Supp.2d 234, 247 (D.Mass.2004) (citing *N.Y. City Transit,* 45 F.3d at 651–52); *Graham v. City of Chicago,* 828 F.Supp. 576, 581 (N.D.Ill.1993) (" '[T]he activity

is employment under the Act if it is down at least in part for the benefit of the employer, even though it may also be beneficial to the employee.' ") (quoting *Sec'y of Labor v. E.R. Field, Inc.,* 495 F.2d 749, 751 (1st Cir.1974)).

9. While DOL determines the scope of the FLSA exemptions for private sector employees, OPM administers and interprets the FLSA exemptions for federal employees. See 29 U.S.C. § 204(f) ("[T]he Director of the Office of Personnel Management is authorized to administer the provisions of [the FLSA]."); *Zumerling v. Devine,* 769 F.2d 745, 750 (Fed.Cir.1985) (pointing to the legislative history of the FLSA as evidence that "OPM has been given the power to interpret the statute."). OPM promulgates regulations supplementing and implementing the FLSA, which must be read in conjunction with the FLSA. *See* 5 C.F.R. § 551.101(b). However, the OPM regulations must be consistent with the FLSA itself and with the standards set by the DOL for the private sector. *See Lanehart v. Horner,* 818 F.2d 1574, 1578 (Fed.Cir.1987). While the OPM regulations are controlling and are entitled to great defer-

clear that, for an activity performed by an employee off-the-clock to constitute compensable work, "the employee's supervisor [must] know[ ] or ha[ve] reason to believe that the work is being performed and [must] ha[ve] an opportunity to prevent the work from being performed." 5 C.F.R. § 551.104(OPM) (defining "suffered or permitted work"); *accord* 29 C.F.R. § 785.12(DOL) ("[I]f the employer knows or has reason to believe that ... work is being performed [on or away from the work site], [the employer] must count the time as hours worked."). This actual or constructive knowledge must be attributable to someone with the authority to bind the government. *See OPM v. Richmond,* 496 U.S. 414, 420, 110 S.Ct. 2465, 110 L.Ed.2d 387 (1990).

The Federal Circuit and its "sister circuits have interpreted [the definition of 'work' under the FLSA] [to] requir[e] ... that an employer 'knows or has reason to believe the employee is continuing to work' ...." *Doe v. United States,* 372 F.3d 1347, 1361 (Fed.Cir. 2004) (quoting *Mumbower v. Callicott,* 526 F.2d 1183, 1188 (8th Cir.1975) (internal quotations and citations omitted)). Accordingly, the Circuit Courts of Appeals have uniformly adopted the knowledge requirement. *E.g., Doe v. United States,* 372 F.3d at 1361 & n. 7 (" 'Work not requested but suffered or permitted is work time. For example, an employee may voluntarily continue to work at the end of the shift. He may be a pieceworker, he may desire to finish an assigned task or he may wish to correct errors, paste work tickets, prepare time reports or other records. The reason is immaterial. The employer knows or has reason to believe that he is continuing to work and the time is working time.' ") (quoting 29 C.F.R. § 785.11); *Holzapfel,* 145 F.3d at 524 (citing 29 C.F.R. §§ 785.11–.12); *Davis v. Food Lion,* 792 F.2d 1274, 1276–77 (4th Cir.1986) (finding that the employer's actual or constructive knowledge of the employee's off-duty activities was an element of the case to be proven by plaintiffs,

that lack of knowledge was not an affirmative defense, and that plaintiffs could prove actual or constructive knowledge by establishing a pattern or practice of employer acquiescence); *Karr v. City of Beaumont,* 950 F.Supp. 1317, 1323 (E.D.Tex.1997) (finding that in order for an employee to "employed" during off-duty hours, he or she must establish that the employer had actual or constructive knowledge that the employee was working); *In re Food Lion Scheduling Litig.,* 861 F.Supp. 1263, 1272 (E.D.N.C.1994), *aff'd sub nom. Royster v. Food Lion, Inc.,* 151 F.3d 1029 (4th Cir.1998).

### c. The Activity Must be Controlled or Required by the Employer

For an activity to constitute "work" under the FLSA, it must not only benefit the employer and be actually or constructively known by the employer, but also must be "controlled or required" by the employer. *Mt. Clemens Pottery,* 328 U.S. at 693, 66 S.Ct. 1187 ("[The activities] involve exertion of a physical nature, controlled or required by the employer and pursued necessarily and primarily for the employer's benefit.... Hence they constitute work."). OPM imposes a duty on employers to "exercis[e] appropriate controls to assure that only that work for which it intends to make payment is performed." 5 C.F.R. § 551.402(a). DOL imposes an analogous "duty [on] ... management to exercise its control and see that the work is not performed if [management] does not want it to be performed. [Management] cannot sit back and accept the benefits without compensating for them." 29 C.F.R. § 785.13. Courts recognize and apply the "controlled or required" standard when adjudicating overtime claims under the FLSA. *E.g., N.Y. City Transit,* 45 F.3d at 651 ("[C]ourts have found that compensable work can occur despite absence of exertion, where, for example, employees have been required to stand by and wait for the employer's

---

ence, *see Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965), the court also may consider DOL regulations. *See Am. Fed'n of Gov't Employees v. OPM,* 821 F.2d 761, 769–71 (D.C.Cir.1987); *Aamold v. United States,* 39 Fed. Cl. 735, 739 n. 4 (1997); *accord Bates v. United States,* 60 Fed.Cl. 319, 321 n. 3 (2004) ("While

caution dictates against simply importing DOL-created standards into the federal sector without any conscious rulemaking at either DOL or OPM, we believe it is appropriate to look to them for persuasive guidance where the OPM regulations are unclear.") (citing *Adams,* 40 Fed.Cl. at 306–07).

benefit."); *Reich v. Dep't of Conservation & Natural Res.,* 28 F.3d 1076, 1082 (11th Cir. 1994) (" '[A]n employer's knowledge is measured in accordance with his 'duty ... to inquire into the conditions prevailing in his business.' '") (quoting *Gulf King Shrimp Co. v. Wirtz,* 407 F.2d 508, 512 (5th Cir.1969) (quoting *People ex rel. Price v. Sheffield Farms–Slawson–Decker Co.,* 225 N.Y. 25, 121 N.E. 474, 476 (1918))); *Forrester,* 646 F.2d at 414 ("[A]n employer cannot stand idly by and allow an employee to perform overtime work without proper compensation ...."), quoted in *Newton v. City of Henderson,* 47 F.3d 746, 748 (5th Cir.1995); *Mumbower,* 526 F.2d at 1188 ("The employer who wishes no such work to be done has a duty to see it is not performed. He cannot accept the benefits without including the extra hours in the employee's weekly total for purposes of overtime compensation. If the employer has the power and desire to prevent such work, he must make every effort to do so.") (citing 29 C.F.R. § 785.13); *Karr,* 950 F.Supp. at 1323 ("Although the Plaintiffs may not have submitted overtime forms for this work, Defendants ... had knowledge of this overtime work because they approved and required that it be done."); *Truslow v. Spotsylvania County Sheriff,* 783 F.Supp. 274, 278 (E.D.Va.1992), *aff'd,* 993 F.2d 1539 (4th Cir.1993) (Table) ("The employer bears the burden of preventing overtime work when such work is not desired."); Food Lion, 861 F.Supp. at 1271 ("If the employer has knowledge that off-the-clock work is occurring, the employer has an obligation to stop the practice. A policy prohibiting the practice alone is insufficient.") (citing 29 C.F.R. § 785.13).

## B. The Work Performed by Plaintiffs Must be Actually Compensable

Even if plaintiffs establish that the activities for which overtime pay is sought constitute work under the FLSA, plaintiffs are not automatically entitled to compensation. Satisfying the "work" requirement makes the activity compensable only in theory. *E.g., Bobo II,* 136 F.3d at 1467 (" '[W]here the compensable preliminary work is truly minimal, it is the policy of the law to disregard it.' ") (quoting *N.Y. City Transit,* 45 F.3d at

650); *Adams,* 65 Fed.Cl. at 228 (referring to preliminary and postliminary activities that constitute "work" under the FLSA as "potentially compensable"). To recover compensation for overtime work under the FLSA, plaintiffs must establish that (1) the amount of time claimed for performing an activity is not de minimis, and (2) the amount of time claimed is reasonable in relation to the principal activity.

### 1. Time Claimed by Plaintiffs Must Not be De Minimis

To establish that preliminary or postliminary work is compensable, plaintiffs first must show that the time spent engaged in the activity was not so "insubstantial and insignificant" as to bar recovery under the "de minimis doctrine." *Mount Clemens Pottery,* 328 U.S. at 693, 66 S.Ct. 1187 ("It is appropriate to apply a de minimis doctrine so that insubstantial and insignificant periods of time spent in preliminary activities need not be included in the statutory workweek."); accord *Bobo II,* 136 F.3d at 1468 ("[W]e accept as true that the restrictions placed upon the INS Agents' commutes are compulsory, for the benefit of the [employer], and closely related to the [employer's] principal work activities. However, the burdens alleged are insufficient to pass the de minimis threshold."); *Adams,* 65 Fed.Cl. 217, 222 (Fed.Cl.2005) ("Even if a preliminary or postliminary activity would be compensable under the ... 'integral and indispensable' standard, inconsequential daily amounts of time in this compensable category of activities will not create FLSA liability."). The de minimis doctrine limits FLSA liability for overtime activities that consume negligible amounts of time. As the Supreme Court explained,

> a few seconds, or minutes, of work beyond the scheduled working hours ... may be disregarded. Split-second absurdities are not justified by the actualities of working conditions or by the policy of the [FLSA]. It is only when an employee is required to give up a substantial measure of his time and effort that compensable working time is involved.

*Mt. Clemens Pottery,* 328 U.S. at 692, 66 S.Ct. 1187; accord *Dunlop v. City Elec., Inc.,*

527 F.2d 394, 400–01 (5th Cir.1976); *Carter v. Pan. Canal Co.,* 314 F.Supp. 386, 392 (D.D.C.1970); *Nardone v. Gen. Motors, Inc.,* 207 F.Supp. 336, 340–41 (D.N.J.1962).

The Federal Circuit utilizes a three-part test to determine whether otherwise compensable time is de minimis: (1) the administrative difficulty of recording the additional time; [10] (2) the aggregate amount of compensable time; [11] and (3) the regularity with which the work was performed.[12] *Bobo II,* 136 F.3d at 1468 (adopting the factors set forth in *Lindow,* 738 F.2d at 1062–63); *Adams,* 65 Fed.Cl. at 222; *accord Bobo II,* 136 F.3d at 1468 ("The other asserted burdens, such as the need to make stops for the dogs to exercise and relieve themselves and the requirement to sign on to the radio, do not pass the de minimis threshold either. Taken as alleged, they are infrequent, of trivial aggregate duration, and administratively impracticable to measure. Accordingly, as a matter of law, they do not give rise to

a valid or even triable claim for compensation under the FLSA."); *Riggs v. United States,* 21 Cl.Ct. 664, 672 (1990).

OPM limits the application of the de minimis doctrine to periods of 10 minutes or less per day. 5 C.F.R. § 551.412(a)(1) ("If … a preparatory or concluding activity is closely related to an employee's principal activities and is indispensable to the performance of the principal activities, and … the total time spent in that activity is more than 10 minutes per workday, the agency shall credit all of the time spent in that activity, including the 10 minutes, as hours of work."). Adopting the OPM standard, "[d]ecisions of this court construing the FLSA have developed a rule of thumb that [10] minutes of preliminary or postliminary work that would otherwise be compensable because it is closely related to principal activities will nonetheless be treated as non-compensable if it totals less than [10] minutes per day." [13] *Riggs,* 21 Cl.Ct. at

---

**10.** The administrative difficulty of recording the additional time takes into account, among other things, (1) whether there is a "wide variance in the amount of time spent" by different employees to accomplish the same task, *Lindow v. United States,* 738 F.2d 1057, 1063–64 (9th Cir.1984); accord *Bobo I,* 37 Fed.Cl. at 702 ("[A]mong the plaintiffs who take their dogs on relief breaks, the amount of time that these sessions take is minimal and wide ranging—spanning from five to 15 minutes per occurrence. Creating a reliable system to chart these relief breaks would pose great administrative difficulties to the INS."), aff'd, *Bobo II,* 136 F.3d at 1468; and (2) whether "the task of recording the time spent [on certain occasional overtime activities], when they arise, … exceed[s] the time expended in performance of the duties," *N.Y. City Transit,* 45 F.3d at 653 (concluding that time spent caring for dogs during handlers' commutes was not compensable due to the "administrative difficulty of establishing a reliable system for recording the time spent in such care during commutes, the irregularity of the occurrence, and the tiny amount of aggregate time so expended").

**11.** The aggregate amount of compensable time takes into account, "the amount of time per occurrence dedicated to the activity in question." *Bobo I,* 37 Fed.Cl. at 701 (noting that "duties … [which are] conducted … for minimal periods of time per occurrence and in the aggregate" are not compensable), aff'd, *Bobo II,* 136 F.3d at 1468; accord *Lindow,* 738 F.2d at 1063 ("In addition, we will consider the size of the aggregate claim."). "Courts have granted relief for claims that might have been minimal on a daily basis but, when aggregated, amounted to a sub-

stantial claim." *Lindow,* 738 F.2d at 1063. However, even if "plaintiffs' aggregate claim may be substantial, … [it will nonetheless be deemed] *de minimis*" where it is administratively difficult to record the time spent performing the task and where the task is not performed on a regular basis. *Id.* at 1064; *Riggs,* 21 Cl.Ct. at 672 (quoting same).

**12.** *See Bobo I,* 37 Fed.Cl. at 702 ("[P]laintiffs interrupt their commutes for canine relief breaks anywhere from never, to whenever they need to, to every trip back and forth from work. This evidence hardly constitutes regular occurrences."), aff'd, *Bobo II,* 136 F.3d at 1468.

**13.** Other jurisdictions have similarly held that periods of 10 minutes or less per day are de minimis. *See, e.g., Lindow,* 738 F.2d at 1062 (finding that periods of 10 minutes or less per day are de minimis even though the activities themselves might otherwise be compensable); *E.I. Du Pont De Nemours & Co. v. Harrup,* 227 F.2d 133, 136 (4th Cir.1955) (finding that periods of less than ten minutes expended by cashiers to transfer money and share information when changing shifts was de minimis); *Frank v. Wilson & Co.,* 172 F.2d 712, 716 (7th Cir.1949), cert. denied, 337 U.S. 918, 69 S.Ct. 1159, 1160, 93 L.Ed. 1727 (1949) ("[E]ven though walking time might amount to 6.2 minutes daily, and preliminary activities to 3 minutes daily—in the case of many plaintiffs a total of 9.2 minutes per day—all this was covered by the de minimis rule."); *Carter v. Pan. Canal Co.,* 314 F.Supp. 386, 392 (D.D.C.1970) ("[T]he Court feels that the time required to look for and place a check mark by a

682 (citing *Amos,* 13 Cl.Ct. at 450) (footnote added); *Int'l Bus. Invs., Inc. v. United States,* 11 Cl.Ct. 588, 593 (1987); *Whelan Sec. Co. v. United States,* 7 Cl.Ct. 496, 499 (1985); and *Graham v. United States,* 3 Cl.Ct. 791, 796 (1983); *accord Cobra Constr. Co. v. United States,* 14 Cl.Ct. 523, 531 (1988) ("[The employer] argues that 15–20 minutes of extra work performed as part of a continuing work regimen is *de minimis.* The case law holds otherwise."); *Abrahams v. United States,* 1 Cl.Ct. 305, 311 (1982) ("[P]laintiffs ... must show that they performed some significant work .... In addition, the work must involve a substantial period of time of at least 10 minutes or more.").

### 2. Time Claimed by Plaintiffs Must be Reasonable

Once it is established that the time worked is not de minimis, plaintiffs must then establish the amount of time worked. Employees are generally entitled to compensation for actual hours worked. *See Mt. Clemens Pottery,* 328 U.S. at 689, 66 S.Ct. 1187; *Skipper v. Superior Dairies,* 512 F.2d 409, 419 (5th Cir.1975). "Where the employer has kept proper and accurate records [of hours worked] the employee may easily discharge his burden by producing those records." *Mt. Clemens Pottery,* 328 U.S. at 687, 66 S.Ct. 1187. In the absence of such records, the employees must "produce[ ] sufficient evidence to show the amount and extent of [hours worked] as a matter of just and reasonable inference." *Id.* at 688, 66 S.Ct. 1187. The burden then shifts to the employer "to [negate] the reasonableness of the inference to be drawn from the employee's evidence." *Id.*

Where an employee successfully discharges the burden of producing records of hours worked, that employee is entitled to overtime compensation only where the amount of time claimed is reasonable in relation to the principal activity. As this court explained in *Amos:*

> Plaintiffs are not necessarily entitled to payment for all of the time they each spent [performing certain preliminary and postliminary tasks and walking to and from their work stations,] ... but only for that amount of time reasonably required [to accomplish these tasks] .... To rule otherwise would run the risk of rewarding plaintiffs for lack of diligence in getting and returning the equipment and in walking to and from this work station and conversely, penalizing those of the plaintiffs who may have taken less than a reasonable amount of time in doing these activities.

13 Cl.Ct. at 450.

Courts in other jurisdictions have adopted and endorsed the reasonableness requirement articulated in *Amos. E.g., Reich v. IBP,* 820 F.Supp. 1315, 1324 (D.Kan.1993) ("Employees are entitled to compensation for reasonable time (rather than actual time) required."), *aff'd and remanded,* 38 F.3d 1123, 1127 (10th Cir.1994) ("[T]he district court concluded that the workers should be paid on the basis of a reasonable time to conduct these activities, not to include 'wait and walk time,' rather than the actual time taken. We believe reasonable time is an appropriate measure in this case.") (citation omitted); *see also Albanese v. Bergen County, N.J.,* 991 F.Supp. 410, 424 (D.N.J.1998) ("[E]mployees must show that the overtime hours they worked must be reasonable in order for those hours to be compensable.") (citing, *inter alia, Amos,* 13 Cl.Ct. at 449); *Hellmers v. Town of Vestal,* 969 F.Supp. 837, 844 (N.D.N.Y.1997) ("[I]n order for an activity to be an integral and indispensable part of the principal activities ... the amount of overtime an employee claims to have spent must be reasonable in relation to the principal activity itself.") (citations omitted); *Holzapfel v. Town of Newburgh, NY,* 950 F.Supp. 1267, 1273–74 (S.D.N.Y.1997) ("[I]f a [canine] officer's specific exertions, even though of a type that would generally be compensable, exceed reasonable limits, they cannot be considered integral and necessary and therefore do not constitute work.... [I]n order to be compensable, the amount of overtime an employee

name on the assignment board and walk to a duty station (2 to 15 minutes) is negligible and

not compensable.").

claims to have spent on efforts related to the employee's principal activities must be reasonable."). These courts have found that the reasonableness requirement articulated in *Amos* "makes intuitive sense." *Hellmers*, 969 F.Supp. at 844. Indeed,

> [i]n situations where the claim for overtime compensation involves off[-]the[-]clock time, the reasonableness requirement ensures that plaintiffs are actually serving their employers' benefit rather than padding their hours or shirking their responsibilities. Moreover, if the Court does not adopt the reasonableness standard, it will have to adopt plaintiffs' guess of how many hours they worked because they do not know the exact number of hours that they worked. Thus, although the Court recognizes that plaintiffs have worked overtime hours for which they have not received compensation, they will not receive compensation for hours that are unreasonable.

*Albanese*, 991 F.Supp. at 424 (quoting and citing *Hellmers*, 969 F.Supp. at 844); *cf. Holzapfel*, 145 F.3d at 523–24 ("[I]f time was expended primarily to inflate the employee's earnings, then the time ... is not compensable.").

### C. Determining the Applicable Statute of Limitations for FLSA Claims

 The statute of limitations for bringing an FLSA claim is governed by Section 255 of the Portal–to–Portal Act. 29 U.S.C. § 255.[14] Generally, the statute of limitations for a FLSA action is two years. *Id.* However, if a plaintiff's claim arises out of an employer's "willful" violation of FLSA, a three-year statute of limitations applies. *Id.* In contrast to the good faith and reasonableness that must be proved by the employer to avoid the payment of liquidated damages, "the employee bears the burden of proving the willfulness of the employer's FLSA violations." *Adams*, 350 F.3d at 1229 (citing *Bankston v. Illinois*, 60 F.3d 1249, 1253 (7th Cir. 1995)("[T]he plaintiffs bore the burden of showing that the defendants' conduct was willful for purposes of the statute of limitations.")). To determine whether an employer committed a willful violation of the FLSA, the court examines whether "the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute." *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133, 108 S.Ct. 1677, 100 L.Ed.2d 115 (1988), *quoted in Adams*, 350 F.3d at 1229.

### D. Damages for Violations of the FLSA

If plaintiffs carry their burden of proving that the overtime activities for which they seek compensation are compensable work under the FLSA, plaintiffs are entitled to "the amount of ... their unpaid overtime compensation" as damages. 29 U.S.C. § 216(b). Moreover, the court may award plaintiffs "an additional equal amount as liquidated damages," *id.*, although a determination "that the plaintiffs are entitled to recover overtime pay ... do[es] not automatically entitle plaintiffs to liquidated damages," *Beebe v. United States*, 226 Ct.Cl. 308, 640 F.2d 1283, 1295 (1981). The court is then required, "in addition to any judgment awarded to the plaintiff or plaintiffs, [to] allow a reasonable attorney's fee to be paid by the defendant, and costs of the action." [15] 29 U.S.C. § 216(b).

---

14. Section 255 states in pertinent part:

> Any action commenced ... after May 14, 1947 to enforce any cause of action for ... unpaid overtime compensation, or liquidated damages, under the Fair Labor Standards Act of 1938, as amended[,] ... [on a] cause of action [that] accrues ... after May 14, 1947—may be commenced within two years after the cause of action accrued, and every such action shall be forever barred unless commenced within two years after the cause of action accrued, except that a cause of action arising out of a willful violation may be commenced within three years after the cause of action accrued.

29 U.S.C. § 255(a).

15. Citing section 216(b), plaintiffs allege in their complaint that they are "entitled to a recovery of reasonable attorneys fees and costs ... as well as pre– and post-judgment interest." Compl. at 5, ¶ XIII. The court notes, however, that section 216(b) does not provide for the payment of interest. *See* 29 U.S.C. § 216(b) ("Any employer who violates the provisions of section ... 207 of this title shall be liable to the employee or employees affected in the amount of ... their unpaid overtime compensation, ... and in an additional equal amount as liquidated damages.... The court in such action shall, in addition to any judgment awarded to the plaintiff or plaintiffs, allow a reasonable attorney's fee to be paid by the defendant, and costs of the action.").

### 1. Liquidated Damages

Section 260 of the Portal–to–Portal Act sets out the framework for awarding and declining to award liquidated damages for FLSA violations:

> [I]f the employer shows to the satisfaction of the court that the act or omission giving rise to [the violation of the FLSA] ... was in good faith and that [the employer] had reasonable grounds for believing that [its] act or omission was not a violation of the [FLSA], as amended, the court may, in its sound discretion, award no liquidated damages or award any amount thereof not to exceed the amount specified in section 216 of this title.

29 U.S.C. § 260.

"The burden rests on the government to establish its good faith and the reasonable grounds for its decision." *Adams v. United States*, 350 F.3d 1216, 1226 (Fed.Cir.2003) (citing § 260) (footnote omitted); *accord Laffey v. Northwest Airlines, Inc.*, 567 F.2d 429, 464–65 (D.C.Cir.1976) (describing this burden as "substantial"). "The 'good faith' referred to in section 260 means 'an honest intention to ascertain what the [FLSA] requires and to act in accordance with it.'" *Beebe*, 640 F.2d at 1295 (quoting *Addison v. Huron Stevedoring Corp.*, 204 F.2d 88, 93 (2d Cir.1953)). Whether an honest intention existed involves a subjective inquiry. *Id.* (citing *Addison*, 204 F.2d at 93, and *Laffey v. Northwest Airlines, Inc.*, 567 F.2d 429, 464 (D.C.Cir.1976)). The "reasonable grounds" requirement in section 260 "calls for a determination as to whether the employer had reasonable grounds for believing that his act or omission was in compliance with the Act, and this is a requirement that involves an objective standard." *Id.* (citing *Laffey*, 567 F.2d at 464). "Proof that the law is uncertain, ambiguous or complex may provide reasonable grounds for an employer's belief that he is in conformity with the Act, even though his belief is erroneous." *Id.* (citing *Laffey*, 567 F.2d at 466, and *Kelly v. Ballard*, 298 F.Supp. 1301 (S.D.Cal.1969)). However, "[i]f ... the employer does not show to the satisfaction of the court that he has met the two conditions mentioned above, the court is given no discretion by the statute, and it continues to be the duty of the court to award liquidated damages." 29 C.F.R. § 790.22(b) (2005).

### 2. Attorneys' Fees and Costs

"[W]here an employee prevails on a FLSA claim, the award of attorneys' fees under § 216(b) is mandatory." *Slugocki v. United States*, 816 F.2d 1572, 1579 (Fed.Cir.1987) (citing *Beebe*, 640 F.2d at 1295); *see also Weisel v. Singapore Joint Venture, Inc.*, 602 F.2d 1185, 1191 (5th Cir.1979) ("Reasonable attorneys fees are mandatory."); *Nitterright v. Claytor*, 454 F.Supp. 130, 141 (D.D.C.1978) ("In suits brought under the [FLSA], an award of attorneys' fees and costs is mandatory."). However, plaintiffs are only entitled to recover attorneys' fees to the extent of plaintiffs' success at trial. For example, "[i]f plaintiffs do not prevail on the claim for liquidated damages, they will not be entitled to recover any attorneys' fees or costs which are incurred in connection with or are attributable to the trial and resolution of that issue." *Beebe*, 640 F.2d at 1295. "The amount to be allowed as attorneys' fees shall be determined by the trial [court] ... taking into account various pertinent factors." *Id.* (citing *Rau v. Darling's Drug Store, Inc.*, 388 F.Supp. 877, 887 (W.D.Pa.1975) ("Factors to

---

"Interest on a claim against the United States shall be allowed in a judgment by the United States Court of Federal Claims only under a contract or Act of Congress expressly providing for payment thereof," 28 U.S.C. § 2516(a) (2000), or where a "judgment against the United States [has been] affirmed by the Supreme Court after review on petition of the United States," 28 U.S.C. § 2516(b). Because section 216(b) of the FLSA does not provide for the recovery of pre-or post-judgment interest on a claim against the United States, the court DENIES plaintiffs' request for such relief. *Accord Library of Cong. v. Shaw*, 478 U.S. 310, 314, 106 S.Ct. 2957, 92 L.Ed.2d 250 (1986) ("In the absence of express congressional consent to the award of interest separate from a general waiver of immunity to suit, the United States is immune from an interest award."); *Adams*, 350 F.3d at 1229 ("We have held that '[t]he FLSA does not waive immunity for suits against the Government for interest.'") (quoting *Doyle v. United States*, 931 F.2d 1546, 1551 (Fed.Cir.1991)); *Zumerling v. Marsh*, 783 F.2d 1032 (Fed.Cir.1986) ("[T]he general remedial character of the FLSA is not enough to require post-judgment interest against the United States where Congress has not provided it.").

be considered in arriving at a fair award for attorney's fees are: the amount of the overtime compensation award, the nature and complexity of the issues involved, and the efforts of the Plaintiff's counsel in obtaining the award.")).

III. Background to Plaintiffs' Claims

A. The Typical Work Shift of a Canine Enforcement Officer

CEOs begin their assigned shifts by reporting to the kennels where their dogs are housed. *See* Tr. at 460 (Monistrol); *id.* at 510 (Rivera); *id.* at 588 (Stuble); *id.* at 1096 (Luby); *id.* at 1530 (Smith); Ex.1900, Tab 18 (Ramirez Dep.) at 18:18–19:3. At the kennel, CEOs clean their dogs, feed their dogs, remove any messes from the dogs' kennels, and allow their dogs a break. *See* Tr. at 511–12 (Rivera); *id.* at 1096 (Luby); Ex.1900, Tab 18 (Ramirez Dep.) at 19:23–20:25. Plaintiffs also pick up training aids, which are stored at the kennel. *E.g.,* Tr. at 1121–22 (Luby). The CEOs then drive their dogs in government-owned vehicles, *e.g.,* Tr. at 519 (Rivera); *id.* at 974 (Titus) ("Miami is one of the few ports in the nation where canine officers have what's called take-home vehicles, meaning that they have a government vehicle issued to them and assigned and they get to drive that vehicle home."); *id.* at 1683 (Gernaat testifying that, as a CEO, he "ha[d] a government-owned vehicle."); Ex.1900, Tab 18 (Ramirez Dep.) at 21:19–21, to the worksite, Tr. at 513 (Rivera), which is a port of entry (POE or port) to the United States, *see id.* at 635 (Leuth).[16] Plaintiffs' commutes from kennel to port vary in duration. *See* Tr. at 1529–30 (Smith testifying that the commute from the kennel to the Miami International Airport, where Mr. Rivera is stationed, may take up to 1 hour); *id.* at 1529 (Smith testifying that Ms. Monistrol's commute from a

different kennel to the Miami International Airport takes 15 to 30 minutes); *id.* at 1095–96 (Luby testifying that "the handlers are at a kennel that's in pretty close proximity [to] their actual work environment," and that the commute from one kennel to one of the five ports in El Paso lasts approximately 5 minutes); *id.* at 1097 (Luby testifying that CEOs working at a different port in El Paso have a 30 to 45 minute drive from kennel to port).

Plaintiffs spend approximately 6 hours of their 8–hour shift at the POE. Depending on the location of the port, plaintiffs and their dogs search airplanes, people, vehicles, luggage, boxes, or other containers for currency, hard drugs[17] or soft drugs.[18] The amount of time a CEO spends searching with the dog varies by location and by dog, *see* Tr. at 1531–32 (Smith), because the dogs tire and require periodic rest breaks throughout the day, *see* Ex.1900, Tab 18 (Ramirez Dep.) at 24:7–12. The number of breaks required by each dog depends on various factors, including climate. *See, e.g.,* Tr. at 1102–03 (Luby testifying that "heat is a huge factor").

CEOs and their dogs generally search for contraband for 30 to 40 minutes per hour. *See* Tr. at 635 (Leuth). In El Paso, dogs spend between 2 and 3 hours per day searching. *See id.* at 1103 (Luby). In Miami, dogs spend between 2 and 4 hours per day searching. *See id.* at 1807 (Raleigh estimating 2 to 3 hours); *cf.* Ex.1900, Tab. 18 (Raleigh Dep.) at 22:19–21 ("What we call a leash time for the dog, it generally is around four hours in a typical day."); Tr. at 459 (Monistrol) (estimating 3 to 4 hours of "actual leash time with the dog."); *id.* at 1662 (Gernaat) (same). The remaining time at the worksite, approximately 3 hours per shift, is used by the CEOs to accomplish other job-related tasks. *See, e.g., id.* at 515–16 (Rivera) (explaining that "when the dog is resting," he "either

---

**16.** Typical POEs include airports, bridges and tunnels at borders, cargo processing facilities, and mailrooms. Plaintiffs worked at the following POEs: in Miami, the Miami International Airport, the seaport, and Port Everglades, Tr. at 1524–25, 39 (Smith); in Detroit, the airport, Ex.1900, Tab 18 (Ramirez Dep.) at 17:3–23, or land-border crossings, Ex.1900, Tab 7 (Blanchard Dep.) at 8:22–9:11, Ex.1900, Tab 18 (Ramirez Dep.) at 16:5–17:2; in El Paso, the Paso del Norte Bridge, the Bridge of the Americas,

and the Ysletta Bridge, see Tr. at 275 (Kruzel); *id.* at 588 (Stuble); *id.* at 1378 (Makolin).

**17.** "Hard drugs" include heroin, cocaine, ecstasy, and methamphetamines. *See* Tr. at 40 (Bailey).

**18.** "Soft drugs" include hashish and marijuana. Tr. at 39 (Bailey).

help[s] ... the team to break down cargo, [or] check out boxes[;][s]et[s] up a training aid for the canine ... to find[;][m]aintain[s] any type of equipment[; or accomplishes] paperwork").

During each work day, CEOs are required to engage their dogs in TRT exercises. *See* Ex. 13 (2/96 CEO Handbook) at 239, § 5.6 ("Task-related training ... must be conducted each work day. A minimum of two training exercises must be conducted during each duty day."); Ex. 14 (August 2002 Canine Enforcement Program Handbook (8/02 CEO Handbook) at 75, § 5.6) ("Task related training ... must be conducted each work day.... It is important to understand that TRT must be done each day."); *cf.* Tr. at 574–75 (Stuble) ("TRT ... happens four days a week and the NTRT, non[-]task related training, happens one day a week."); *id.* at 1172 (Luby) ("[E]very CEO must run ... five TRTs a day ... four days a week."). The purpose of TRTs is to "maintain[ ] the dog's proficiency [in] the work area." Tr. at 747 (Newcombe). As one plaintiff explained, TRT is

> training done in the normal work environment, and include[s] the normal work.... [It is accomplished using] preconstructed [training] aid[ ]s.... When the training starts, [the dogs] learn patterns and the odors [of contraband] very quickly.... The dogs are trained simple to complex. They are trained by memory.... [T]raining [aids and TRT exercises must be] constructed in a similar or like fashion to those [conditions] which the dog will encounter in the normal work environment.

Tr. at 171–72 (Bailey).

Customs also requires CEOs and their dogs to devote "a minimum of [four] hours each week (during regular duty hours)" to NTRT. Ex. 13 (2/96 CEO Handbook) at 240, § 5.7; Ex. 14 (8/02 CEO Handbook) at 75, § 5.7; *accord* Tr. at 173–74 (Bailey) ("[N]on-task[ ]related training ... is a requirement of four hours per week away from the normal working place.... [This is] work done on the clock."); *id.* at 517–18 (Rivera testifying that NTRT takes place "[o]nce a week ... [for][f]our hours"). NTRT allows CEOs and their dogs to hone their skills in a "different

area from the [dog's regular] worksite." Tr. at 518 (Rivera); *accord* Ex. 13 (2/96 CEO Handbook) at 240, § 5.7 ("Non-task related training ... should be conducted at locations other than the dog's normal work environment."); Ex. 14 (8/02 CEO Handbook) at 75 § 5.7 (same); Tr. at 1091 (Luby testifying that "the objective ... [of NTRT] is to give the dog some variation [and] exposure to [different] areas."). For example, if the CEO usually works his or her dog at an indoor cargo facility searching boxes, an NTRT assignment might involve searching automobiles outside. *Accord id.* (Rivera testifying that, because his dog normally works inside the airport searching people, a typical NTRT "might take place at a cargo facility"). NTRT may be accomplished by CEOs either individually or in groups. *See id.* at 1533 (Smith testifying that, in his experience, between one and twelve CEOs "are working together on the NTRT ground"); *id.* at 1091 (Luby) ("Once a week the supervisors take the handlers out on ... NTRT."). The four-hour NTRT period includes both travel time to the NTRT site and, theoretically, time for the CEO to accomplish other job-related duties, such as disinfecting the dog's kennel or cleaning the CEO's vehicle. Tr. at 1092 (Luby); *see also* Tr. at 1534–35 (Smith testifying that because only one CEO at a time can run his dog through an NTRT exercise, the other CEOs could use the time spent waiting their turn to "mak[e] up training aids, ... roll[ ] towels, ... break[ ] towels apart, ... [or] clean[ ] out their vehicle[s].").

CEOs depart the worksite for the kennel one hour before their shifts end, regardless of the distance between the POE and the kennel. *See* Ex.1900, Tab 18 (Ramirez Dep.) at 25:9–16; Tr. at 460 (Monistrol); *id.* at 516 (Rivera). After attending to the dog's needs at the kennel, the CEO may depart without reporting to a supervisor. *See id.* at 460–61 (Monistrol testifying that, upon returning to the kennel, she gives the dog a break, feeds the dog, picks up the dog's food and water bowls, waits twenty minutes for the dog to digest its food, and gives the dog a second break); *id.* at 516–17 (Rivera) (same). CEOs report to work 5 days of every 7–day work

cycle. Tr. at 1088 (Luby). The specific days and hours of each CEO's work shift vary with every two-week pay period. *Id.* at 1089 (Luby).

### B. The Training of Detector Dogs

"The training of a detector dog is a continuous process that begins with formal training at the [Academy] and continues at the port of assignment and throughout the dog's service career." Ex. 13 (2/96 CEO Handbook) at 236, § 5; Ex. 14 (8/02 CEO Handbook) at 72, § 5. CEOs conduct ongoing training of their dogs via daily TRT or NTRT exercises. *See* Ex. 13 (2/96 CEO Handbook) at 239–40 §§ 5.6–5.7; Ex. 14 (8/02 CEO Handbook) at 75–76 §§ 5.6–5.7. To accomplish this required training, CEOs prepare and/or construct training aid containers, training towels, and retrieving towels. *E.g.,* Ex. 13 (2/96 CEO Handbook) at 239, § 5.6.1 ("To ensure odor availability of a trained narcotic substance, pre-constructed training aids must be prepared several hours prior to their use."); Ex. 14 (8/02 CEO Handbook) at 75, § 5.6.1 (same); Ex. 13 (2/96 CEO Handbook) at 241, § 5.9 ("The type of reward a dog receives in responding to a trained odor is a retrieving towel constructed of a terry cloth material."); Ex. 14 (8/02 CEO Handbook) at 76, § 5.9 (same); Ex.1900, Tab 5 (Kruczek Dep.) at 14:12–17 ("[T]he CEOs ... construct[ ] the[ ] [training aid containers] themselves.").

### 1. Training Aids

CEOs are required to create training aid containers for training their detector dogs. *E.g.,* Ex. 14 (8/02 CEO Handbook) at 75, § 5.6.1 ("To ensure odor availability of a (trained) narcotic substance, pre-constructed training aids must be prepared several hours prior to use. The amount of time will vary depending on the type of substance used and the concealment method."); *id.* at 74, § 5.4.2 ("There is no replacement for the preconstruction and preparation of proficiency training aids."); Ex. 13 (2/96 CEO Handbook) at 239, § 5.61; *accord* Tr. at 346 (Kruzel testifying that Customs at the port of El Paso requires CEOs to construct twenty-five training aid containers per week); *id.* at 620 (Leuth testifying that he constructed

"[a]pproximately 25 to 30 aids a week"). Training aid containers mimic luggage and other packages that smugglers might use to hide contraband such as currency, hard drugs, and soft drugs. Simple training aid containers, such as used suitcases, cardboard boxes, and vehicles, require little or no construction efforts by the CEO. See, e.g., Ex.1900, Tab 5 (Kruczek Dep.) at 14:22–15:1; Ex.1900, Tab 7 (Blanchard Dep.) at 37:16–21; Tr. at 345 (Kruzel). However, more complex training aid containers, which are created from polyvinyl chloride (PVC) and metal pipe, wood, metal, tape, plastic bags, metal utility boxes, bubble wrap or foam, require more time to construct. *See, e.g.,* Ex.1900, Tab 18 (Ramirez Dep.) at 57:8–24; Tr. at 228 (Bailey); *id.* at 427 (Monistrol). CEOs initially train their dogs to detect contraband using simple training aid containers, which do little to mask the odor of the contraband. *See* Tr. at 176 (Bailey) ("[Y]ou need to start with simple things that the dog can find."); *id.* at 724 (Newcombe) ("[I]n the basic [training] course we do use a lot of cardboard boxes ... because we're trying to build up the dog's detection capability .... [I]t's easy for the narcotic odor to penetrate a cardboard box."). As the dogs' skills improve, their training involves increasingly complex containers, which mask the odor of contraband more fully. *See* Tr. at 51–53 (Bailey); *id.* at 345–46 (Kruzel); *id.* at 724 (Newcombe).

During training, CEOs must vary both the type of training aid container used and the amount of contraband concealed in each container.

The purpose of "breaking down" and repackaging of ... training aids is two-fold. By using a varying amount of training substance during proficiency training, the level of odor the dog is confronted with reflects the actual situation to which the dog may be exposed. Large loads of trained substances disguised by elaborate smuggling techniques[ ] may emit very little odor, yet small amounts of trained substances poorly concealed may emit strong levels of odor. The goal in varying the scent level during proficiency training is to ensure that the dog will respond to any

trained odor regardless of the amount of odor.

The altering of the packaging of the issued training substances serves an additional purpose. It exposes the dog to the different and various wrappings that are used to contain or disguise the odor of the trained substances. In this way, the detector dog is prevented from associating the odor of a particular wrapping with the odor of the trained substance.....

In addition, proficiency can be maintained by using different material when preparing preconstructed training aids. This exposure is critical, as it will preclude the dog from associating a pattern of odors that are always used with the trained odor.

Ex. 14 (8/02 CEO Handbook) at 73, §§ 5.3–5.3.2; *accord* Ex. 13 (2/96 CEO Handbook) at 237, §§ 5.3–5.3.2 (same); Tr. at 724–25 (Newcombe) ("[W]hat the instructors are emphasizing is that you have to provide a lot of variation to the detector dog.... And so during this process, the training instructors are trying to emphasize to the [CEOs] that when [they] leave the training center, training continues. It continues on a daily basis. It continues on a weekly basis."). "The individual ports that the [CEOs] are assigned to" are "responsible for providing the supplies necessary to create the containers ... for the training aids." *Id.* at 962 (Titus).

All training aids have limited life spans and all eventually must be replaced. *See generally,* Tr. at 348–49 (Kruzel). Some training aid containers are more durable than others and may last for more than one search. *See* Tr. at 229 (Bailey testifying that wooden boxes can "sometimes" be used more than once); *id.* at 309 (Kruzel testifying that metal "electrical boxes ... can be washed and used over and over again. They are very sturdy."). Other training aid containers must be discarded after one use to prevent the cross-contamination of odors. *See id.* at 348–49 (Kruzel) ("[I]f it's a soft material like a piece of luggage that's porous, cloth material, [or] some wood, [then the container cannot be reused because it] ... contain[s] the odor of the animal that's been on it.... About the only thing that's reusable that we have is PVC.... [C]ardboard box[es] ...

[are] absolutely not reusable."); *accord* Ex. 14 (8/02 CEO Handbook) at 72, § 5.2 ("All handling, storage, transportation, and use of marijuana, hashish, currency, methamphetamine, ecstasy, and pseudo narcotic training aids and associated training material (tapes, boxes, string, luggage, etc.) must take into consideration the importance of avoiding cross-contamination."); Ex. 13 (2/96 CEO Handbook) at 236, § 5.2.

The life span of a training aid is also influenced by the type of the dog being trained. Positive response dogs, which typically search cargo or other packages, are trained to tear through the container in order to locate contraband. Accordingly, positive response dogs often destroy the training aid container during TRT and NTRT exercises. Tr. at 179–80 (Bailey testifying that positive response dogs will "shred [the container] apart"). By contrast, passive response dogs, which typically search people, are taught to locate the contraband, sit near the place where the contraband is concealed, and signal the CEO with an alerting response or stare. *See id.* at 180 (Bailey). Passive response dogs do not typically destroy containers during training; however, the container must, at some point, be replaced as a result of normal wear and tear and cross-contamination of scents. *See id.* at 349 (Kruzel).

### 2. Training and Retrieving Towels

Towels fulfill two closely-related purposes in the training of positive and passive response dogs. "Training towels" are utilized to train dogs to recognize certain contraband. *E.g.,* Tr. at 179 (Bailey). "Retrieving towels," are utilized to reward dogs that successfully detect contraband and respond appropriately. *E.g.,* Ex. 13 (2/96 CEO Handbook) at 214, § 5.9; Ex. 14 (8/02 CEO Handbook) at 76, § 5.9.

#### a. The Handling and Use of Training and Retrieving Towels

Training and retrieving towels are "terry cloth towel[s] ... [that are] folded ... [like] bath towel[s] ... in [thirds, and] ... rolled up as tight as possible. [At][e]ach end there is a nylon filament tape to hold [each] towel

together [and] make it a roll." Tr. at 37 (Bailey); *accord* Ex. 58 (Instructor Notes for CEO course titled "Training Aid Construction and Equipment Maintenance") at 1, ¶ II.A.1.a (describing the "[c]onstruction of [n]arcotic [r]etrieving [t]owels"); Tr. at 721–22 (Newcombe) (describing a retrieving towel).

Training towels may be directly scented with the smell of currency, hard drugs or soft drugs,[19] and are hidden from the dog in order to train the dog to recognize the scent. *See* Tr. at 39–40 (Bailey) ("For the odor of hashish or marijuana, ... the towels are rolled [and] placed in [a] barrel [containing the drug]. The odor of the narcotics permeates the terry cloth.... For hard narcotics, we use pseudo[s,] ... chemicals that make up odors that emulate heroin, cocaine, ecstasy and methamphetamines[,] ... [because] the [actual] hard narcotics would kill the dogs."); *id.* at 315 (Kruzel) ("[The training towel] holds other odors like ... narcotics, so we can scent these towels."). However, "[t]he towels don't necessarily need to be scented before use." Tr. at 316 (Kruzel); *accord* Ex. 14 (8/02 CEO Handbook) at 76, § 5.9.1 ("Only pre-scented towels will be placed with the training aid when deemed necessary to maintain the dog's proficiency."). It is more common that an unscented towel is "placed inside of a container ... [or other training] aid[ ] [that] has ... be[en] made in advance," Tr. at 316 (Kruzel), or that a towel is "throw[n] in[to]" a scenario in which the dog locates contraband that was not stored inside a training aid container:

A very common [training] aid[ ] that we use is a small amount of material of a narcotic order placed inside maybe a door seam on a vehicle, or within the gas cap. Now that's a hard surface. There is no way the dog can rip that open. So, as the dog is intently studying that area trying to rip the area open, the handler throws the towel in, bounces it off of that object ... as hard as possible so that it looks like it comes from there, like the dog [h]as won.

*Id.* at 317 (Kruzel). Even if the towel is not pre-scented, it may "inadvertently be[ ] ... saturate[d]" with the odor of the contraband that also is stored in the training aid. *Id.* at 316 (Kruzel).

When the dog finds either the hidden contraband-scented towel or the training aid containing the contraband and responds appropriately,[20] the dog's handler rewards the dog with a game of fetch or tug-of-war using a retrieving towel, which is also known as a "reward" towel.[21] *See id.* at 178–79 (Bailey) ("That's the retrieving towel[ ], the reward towel.... The [dog] chases it and brings it back, gives it to you, and you play the game. That's the reward."); Ex. 13 (2/96 CEO Handbook) at 241, § 5.9 ("The type of reward a detector dog receives for responding to a trained odor is a retrieving towel constructed of terry cloth material."). The reward towel may be the same towel that was concealed in the training aid, or it may be a separate clean towel that is "hidden on [the

---

**19.** Towels so scented are referred to as "currency towels," "hard towels," or "soft towels." *See* Tr. at 47 (Bailey).

**20.** Positive and passive response dogs are trained to respond differently to contraband. For example, when positive response dogs detect scented training towels, they "start digging like they're digging in sand, or they will start to bite on it[ ] and shred it apart[ ] and[,] as they are shredding, they get to the towel and once they get to the towel that's the reward. That's the payment for the work they have done." Tr. at 179 (Bailey). When passive response dogs detect the same towels, they sit next to the person or object in which the towel is hidden. *See id.* at 180 (Bailey). *Accord* Ex. 14 (8/02 CEO Handbook), at 82 § 6.3.4 (providing a taxonomy for evaluating canine responsiveness based upon "biting, scratching, or sitting at the source of the trained odor,"

and describing an "[e]xcellent" response as follows: "The dog unhesitatingly and enthusiastically scratches/bites, or immediately sits at the source. The dog's reaction after identification is swift and positive. The dog displays a frantic determination to either destroy or sit at the source of the odor.").

**21.** "Praise-offs" (rewarding the dog by word and touch), rather than training towels, can occasionally be used as rewards in training exercises, *see* Tr. at 585 (Stuble), but, according to several supervisors, a towel should be used with a training aid between ninety and ninety-five percent of the time, *see, e.g., id.* at 1390 (Makolin). A directive establishing that standard has been in effect in El Paso and it has been Mr. Stuble's personal practice for at least the last 8 years. Tr. at 605 (Stuble).

handler's] person." Tr. at 316 (Kruzel). The dog is taught to associate finding the contraband with the privilege of playing a game with the towel. *See id.* at 179 (Bailey); *accord id.* at 317 (Kruzel) ("You never want to [beat] the dog, you always want the dog to win.").

The relationship between towels and training aid containers in training detector dogs is a close one. As one CEO explained:

> The dog has to learn, and if you start by defeating the dog, the dog will never understand what it's doing, so you start with simple reward towels, retrieving towels with a small bag of narcotics. You throw the towel, the dog chases the towel, grabs the towel. While he is playing with the towel, the dog is smelling the odor of narcotics. That's the basis.
>
> Then you move that towel into an open box where the dog learns if I put my nose in this box and I smell it, ... there is my towel. Then you close the box, and you move the box, and then you move to different—as we progress—luggage that's open to luggage that's closed to [contraband] hidden in the liners .... to different variances ... [like] cardboard[,] ... wood[,] ... vehicles[,] ... [and] scratch boxes.

Tr. at 344–45 (Kruzel).

### b. The Cleaning or Processing of Training and Retrieving Towels

"After each use, the ... towel must be properly cleaned and the handler must use caution to ensure the ... towel is not contaminated with his/her odor[,] ... odors of cleaning detergents," the odor of the contraband, or other odors. Ex. 13 (2/96 CEO Handbook) at 241, § 5.9 ("Retrieving Towel Reward"); *accord* Ex. 14 (8/02 CEO Handbook) at 76, § 5.9 (same); Ex. 15 (Detector Dog Training Manual) at 409 ("[T]he retrieving towel ... must be a type that can be easily cleaned after each use[, such that] the odor of dog saliva and other odors are eliminated prior to reuse."); Ex. 58 (Instructor Notes for CEO course titled "Training Aid Construction and Equipment Maintenance"), at 1, ¶ II.A.1.d ("The towels will need cleaning after each use. This should be done in hot water without detergent and rinsed in cold water. Detergents are *not* to be used, as they will leave an undesirable odor on the towel. The towel must be as free [from] odors as possible."). If a towel inadvertently became cross-contaminated with a second odor, the dog might become "trained on" that second odor, and the integrity of its training vis-a-vis the first odor could be jeopardized. *See* Tr. at 276 (Kruzel). As Mr. Kruzel explained:

> If a dog is trained on another odor, the response, the alert you are looking for ... [would happen each time the dog encountered either the original or new] odor.... If I inadvertently trained [my dog] on another odor, say Oreo cookies, ... [and] if somebody had a bag full of Oreo cookies inside of a suitcase, I would get an alert the same way as I would ... [if the dog encountered a bag of] narcotics.... Cross-contamination is a serious concern.

Tr. at 276–77 (Kruzel); *accord id.* at 49 (Bailey) ("The dog is supposed to be finding narcotics, not Tide."). CEOs "process" the towels to prevent cross-contamination, and "hard" narcotics towels are washed separately from marijuana and hashish-scented towels. Tr. at 274 (Kruzel).

> Usually we make sure [to] wipe[ ] out the bin of the washing machine or put it just in a momentar[y] rinse cycle [before washing the towels]. The big thing is [that] there [be] no soap residue. And then, [we] put it on a short cycle with no detergents, basically a hot water rinse, [to] clean the towels.
>
> ....
>
> After they're [washed], they're in the dryer and [must be] completely dr[ied.] [Y]ou don't want a damp towel ... [because] once you roll it up and it's damp inside, it will start to form mold in there and mold is ... a very heavy contaminant, another odor problem.

*Id.* at 274–75 (Kruzel). To perform their duties, CEOs roll, clean and process between twenty and fifty towels per week. *Id.* at 412 (Monistrol); *accord id.* at 263 (Kruzel testifying that he uses "anywhere from [twenty-five] to maybe [fifty]" towels per week "to keep [his dog] proficient.").

## C. The Jacksta Memo

Because most POEs lacked facilities for laundering towels, e.g., Tr. at 565 (Stuble testifying that there were no laundering facilities at the POE in El Paso); *id.* at 281 (Kruzel, same); *id.* at 144 (Bailey, same, in Detroit); *id.* at 496 (Rivera, same, in Miami), and lacked sufficient materials for constructing training aids, *e.g., id.* at 130, 140–49 (Bailey testifying that the Detroit POE lacked sufficient materials for constructing training aids); *id.* at 427, 455 (Monistrol, same, in Miami); *id.* at 303 (Kruzel, same, in El Paso), CEOs often performed these tasks off duty. However, in early June 2004, Robert Jacksta, Customs' Executive Director of Border Security and Facilitation at the Office of Field Operations (OFO), promulgated a national directive requiring all POEs to provide CEOs sufficient time and means during duty hours to perform their job responsibilities including, but not limited to, laundering training towels and constructing training aids. See generally Ex. 89 (6/4/04 Facsimile of Memorandum from Executive Director, Border Security and Facilitation, Office of Field Operations, Robert Jacksta (Jacksta Memo) at 1–2 (outlining "New Policy and Procedures for OFO Canine Officers")). The Jacksta Memo contained two directives. First, it ordered POEs to take "necessary measures" to ensure that the laundering of training towels was properly executed and accomplished during the CEOs' workday:

As outlined in the Detector Dog Training Manual ... and the [CEO] Handbook ..., the type of reward a legacy Customs detector dog receives for responding to an odor ... is a retrieving towel .... After each use, the retrieving towel must be properly cleaned, and the officer must use caution to ensure that the retrieving towel is not contaminated .... For this reason, it is required that the retrieving towel be washed in plain hot water and rinsed in cold water. Further, paragraph 5.9.2 of the [CEO] Handbook states that "the port management will ensure that only clean towels are utilized." In order to guarantee that this procedure is properly implemented, each Director, Field Operations, shall take the necessary measures to fulfill the requirement to maintain clean retrieving towels used in [the] training of our detector dogs. Necessary measures could include the immediate purchase and setup of a washer and dryer or the use of contract services. If necessary, on a rotating basis, [CEOs] may be directed to spend all or part of a normal duty shift washing and drying training towels consistent with the Handbook requirements, through whatever means are made available by management.

*Id.* at 1.

The second directive of the Jacksta Memo had the effect of ending Customs' liability for off-duty time spent by CEOs performing job-related tasks without prior approval from their supervisors:

[E]ach Port Director is to provide direction to OFO canine officers ... that supervisory approval is required before performing any overtime work, either on or off the work site; and that the performance of any work-related tasks, including, but not limited to, the construction of detector dog training aids, will be accomplished only during the officer's normal duty hours. For example, during those times that the detector dog is resting, the [CEO] can construct training aids or roll and tape towels. Port directors and Supervisors will ensure that during all periods of downtime ..., all [CEOs] are engaged in performing official duties. Supervisors will also advise [CEOs] ... who construct training aids outside their normal duty hours that they will not be compensated for time spent performing such tasks.

Nothing in this memorandum is intended to inhibit in any way the performance of work or work-related tasks outside of normal duty hours when prior supervisory approval to work overtime has been obtained in accordance with overtime procedures.

*Id.* at 2.

After the Jacksta Memo was promulgated, Customs began implementing procedures to ensure that the laundering of towels could take place during the CEOs' workday. E.g., Tr. at 972–73 (Raleigh testifying that following the issuance of the Jacksta Memo, CEOs at the port of Miami have used machines at a

U.S. Department of Agriculture kennel to launder the towels); *id.* at 1079–80 (Luby testifying that following the issuance of the Jacksta Memo, CEOs in El Paso "were directed that there was a procedure in place to [have towels] wash[ed] . . . at the [local] prison and that that procedure was to be followed"). Since the receipt of the Jacksta Memo at each POE, CEOs have ceased laundering and processing towels off duty. *See, e.g.,* Tr. at 83, 86–87 (Bailey testifying that he washed and processed towels and constructed training aids off duty until he received the Jacksta Memo in June 2004); *id.* at 278–79 (Kruzel testifying that he stopped laundering towels at home in July 2004 when he received the Jacksta Memo and learned that this activity "would not be considered for compensation"); *id.* at 415–18, 437 (Monistrol testifying that she washed towels at home until she received the Jacksta Memo on or about July 3, 2004); *id.* at 569–70 (Stuble testifying that he stopped washing his towels at home after receiving the Jacksta Memo in July 2004); *id.* at 499–500 (Rivera testifying that his claim period for time spent washing towels ends July 31, 2004, the date he received the Jacksta Memo); *accord.* Ex.1900, Tab 12 (Rowley Dep.) at 24–25 ("Immediately after receiving the directive [on or about June 8, 2004], I instructed all the [CEOs at the port of Detroit] to launder their towels at commercial laundries during duty hours. And that we would reimburse them . . . for the price of them doing the laundry."). Some CEOs also stopped constructing training aids off duty following the issuance of the Jacksta Memo. *E.g.,* Tr. at 86–87 (Bailey testifying that he stopped "other off-the-clock work," including training aid construction, after receiving the Jacksta Memo); *cf. id.* at 306–01 (Kruzel testifying that he decreased, but did not cease, off-duty training aid construction after receiving the Jacksta Memo in July 2004 because "[t]here has been some articles that I need. . . . [I]f I come across something that's good, such as a coffee can, I may put a false bottom in it and take that into work.").

In light of the clear requirement in the Jacksta Memo that CEOs receive permission from their supervisors prior to performing any job-related tasks off duty, the court will consider plaintiffs' claims for compensation only until the date that the Jacksta Memo was promulgated at their respective POEs.

## IV. Whether Plaintiffs' Off-duty Activities Constitute Compensable Overtime Work.

Plaintiffs seek compensation for the following off-duty activities: (1) cleaning and processing training towels for the detector dogs; (2) constructing training aid containers for the detector dogs; (3) training-related activities; (4) weapons care and maintenance; (5) dog grooming activities; (6) vehicle care and maintenance; and (7) completing paperwork. Pls.' Br. at 1–2; *accord* Def.'s Br. at 2 (describing these activities as "towels[,] . . . containers[,] . . . practicing w[ith] gun[,] . . . cleaning gun[,] . . . CETC academy[,] . . . FLETC academy[,] . . . [and] other."). Whether plaintiffs performed these activities does not appear to be in dispute. Rather, the primary issue before the court is whether, as plaintiffs claim, these activities constitute compensable overtime work. *See* Pls.' Br. at 2. Defendant insists that plaintiffs have failed to carry their burden of proving that the activities listed above constitute "work," as defined by the applicable statutes, regulations and precedent, and argues in the alternative that, even if any portion of these activities were deemed "work," plaintiffs are not entitled to overtime compensation because plaintiffs had sufficient time and resources to complete the activities during the 8–hour workday. *See* Def.'s Br. at 2–3.

The court will address each off-duty activity claimed by plaintiffs in turn. The compensability of each activity is a matter of first impression for the United States Court of Federal Claims and the court has not identified a decision in another jurisdiction addressing each precise issue. However, appellate and trial courts in various jurisdictions agree that " 'a [canine] officer must be compensated for the off-duty time that he spends performing the tasks involved in caring for and training his assigned . . . dog,' " to include grooming, feeding, medicating, and bathing the dog, " 'unless the time devoted to a particular task is *de minimis.*' " *Holzapfel,* 145 F.3d at 522 (quoting the trial court)

(citations omitted); *accord N.Y. City Transit,* 45 F.3d at 652–53 ("[W]alking, feeding, training, grooming and cleaning up are integral and indispensable parts of the handler's principal activities and are compensable as work[; however, where] ... these episodes of additional compensable work are *de minimis* [, they] need not be compensated."); *Albanese,* 991 F.Supp. at 420 ("Plaintiffs claim that they should be compensated for ... grooming, cleaning, exercising, cleaning the dog's living areas, cleaning the vehicles used to transport the dogs, feeding and watering, and training.... [T]he Court finds that plaintiffs' off[-]the[-]clock time caring for and maintaining the dogs is integral and indispensable to their principal activities and were performed for defendants' benefit."); *Karr,* 950 F.Supp. at 1322–23 ("Plaintiffs' care and transportation of their respective dogs and related maintenance of the police vehicles are principal activities for which Plaintiffs are entitled to overtime compensation."); *Treece,* 923 F.Supp. at 1125 ("[P]laintiffs are entitled to partial summary judgment on the issue of whether the following activities, when and if performed during off-the-clock time, are compensable under the FLSA: (1) feeding and watering assigned police dog(s); (2) exercising assigned police dog(s); (3) grooming (e.g., brushing) assigned police dog(s); (4) cleaning (e.g.[,] bathing) assigned police dog(s); (5) cleaning the living areas (e.g.[,] kennels) of the assigned police dog(s); (6) training assigned police dog(s); and (7) arranging for and transporting assigned police dog(s) for veterinary care and providing home medical care."); *Andrews v. DuBois,* 888 F.Supp. 213, 217 (D.Mass.1995) ("[T]ime spent feeding, grooming, and walking the dogs ... is time spent working."); *Nichols v. City of Chicago,* 789 F.Supp. 1438, 1442 (N.D.Ill. 1992) ("That the City chooses to compensate the canine patrol officers for [these] dog-care activities while on-duty leads the court to conclude that the activities are integral to the officers' work as canine police officers."); *Truslow,* 783 F.Supp. at 279 ("Truslow's care of the canine unit dogs, including his attendance at dog training sessions, unscheduled emergency canine calls, and canine demonstrations ..., was plainly an integral and

indispensable part of his principal activities .... As an integral and indispensable part of the principal activities of a canine deputy, off-duty time spent caring for canine unit dogs must be compensated as hours worked in accordance with the rules established by the FLSA."); *see also* 8/11/93 DOL Opinion Letter, 1993 WL 901171 ("Certain training and 'care' of a police dog at home ... is considered a part of the officer's principal activities .... We consider the term 'care' to mean bathing, brushing, exercising, feeding, grooming, related cleaning of the dog's kennel or transport vehicle, and similar activities .... Such work is considered to be compensable under the FLSA. Care also includes time spent in administering drugs or medicine for illness and/or transporting the dog to and from an animal hospital or veterinarian. Likewise, time spent in training the dog at home is compensable.").

Although no decision addresses specifically whether the off-duty activities in plaintiffs' claim are compensable work under the FLSA, the authorities agree that tasks performed in direct and indirect support of a CEO's principal activities may be considered "work" for FLSA purposes and may be compensable, provided the time expended performing the task is not de minimis and is reasonable. Consistent with the authorities and for the following reasons, the court concludes that laundering and processing training towels, constructing training aid containers, and caring for and maintaining weapons—tasks even more intertwined with a CEOs' primary duties than, for example, the compensable activity of brushing or grooming the dog—are work under the FLSA. If done for more than a de minimis period of time, this work is just as compensable as the act of training the dog.

Finally, the court will address the dispute over the applicable statute of limitations and liquidated damages. Plaintiffs argue that defendant engaged in a "consistent pattern and practice, uniformly endorsed[ ] over a 20-year period[ ] from every level of management, to have [p]laintiffs in effect volunteer their off-duty time to perform work-related tasks without compensation." Pls.' Br. at 2. Accordingly, plaintiffs allege that defendant

willfully disregarded the applicable labor laws, entitling plaintiffs not only to avail themselves of a three-year statute of limitations, but also to receive maximum damages, including liquidated damages and attorneys' fees. See *id.* at 100. Defendant disagrees. Insisting that it acted in good faith, see Def.'s Br. at 104, defendant argues that, in the event liability is imposed, plaintiffs are only entitled to utilize a two-year statute of limitations, see id., and are not entitled to liquidated damages, *id.* at 114.

### A. Plaintiffs' Off–Duty Laundering and Processing of Training Towels Constitutes Compensable Overtime Work Under the FLSA

#### 1. Laundering and Processing Towels Constitutes Work

■ The record of trial makes clear that supervisors and CEOs agree that the use of training towels and reward towels is a principal part of training dogs to detect contraband. *See* Tr. at 753 (Newcombe), 40, 141–43 (Bailey), 477 (Monistrol stating that the laundering of towels was expected and part of the job). The record also makes clear that defendant required, "after each use," that these towels "be properly cleaned" to be re-used in future training exercises. Ex. 13 (2/96 CEO Handbook) at 241, § 5.9; Ex. 14 (8/02 CEO Handbook) at 76, § 5.9; Tr. at 40 (Bailey). It is apparent that plaintiffs would not be able to train their canines without properly laundered and processed towels. *Accord* Tr. at 306 (Kruzel) ("You need towels. You can't come to work, it's like coming to work without your uniform, you have to have it."). Further, it appears to the court that the Jacksta Memo, which specifically required CEOs to launder and process towels during the workday is, in effect, an admission that the activity is work. See Ex. 89 (Jacksta Memo) at 1. Accordingly, it is the court's view that the act of laundering and processing towels is both integral and indispensable to the training of the dog. If done for more than a minimal period of time, this work is compensable.

### a. Laundering and Processing Towels Provided a Benefit to Defendant, Which Defendant Recognized

At trial, Mr. Newcombe, the former national program manager for defendant's Canine Enforcement Program, explained to the court that laundering and processing towels provides a direct benefit to defendant:

> The cleaning of the towels benefits U.S. Customs and the government by [helping] to maintain a proficient detector dog.... [I]t [i]s reasonably related ... to the[ ] primary function [of] a CEO.... The washing of the towels is integral to maintaining the proficiency of the detector dog.

Tr. at 756–57 (Newcombe). That defendant recognizes and values this benefit is underscored by the fact that the both laundering process and its significance are part of CEOs' initial training at the Academy. *See* Tr. at 47–49 (Bailey describing the training he received at the Academy for processing and laundering towels); *id.* at 277–78 (Kruzel testifying that he "learned how to launder the training towels" at the Academy, and that he "continued to launder towels" the same way as a CEO "until around July 2004"); *id.* at 494 (Rivera) (same); *id.* at 564–65 (Stuble) (same). Mr. Newcombe explained that, at the Academy,

> [w]e go to great lengths to wash the towels, the training towels that are being used by the dog. We go to such lengths that we only use the towel once for each training exercise because we're even concerned with the dog's saliva and odor on the towel. So that towel is only used once for every exercise. So there's probably anywhere from six or sev[en] training exercises a day for each dog. We normally will have anywhere from eight to twelve dogs in a class. So you could be washing—each class could wash 72 to 100 towels a day. And when you have five or six classes running, it amounts up to a lot of washing of towels every day.

> And so because of that we basically have our own laundromat to wash towels. We have certain washing machines ... and certain dryers designated for [hard] towels.... [During training], each of the students, the canine officers ... become[s]

accustomed to this process of ensuring that the towels are being cleaned in a certain method.

*Id.* 720–21 (Newcombe). Indeed, the laundering process is sufficiently complex that its particulars are detailed in the CEO Handbook:

> After each use, the retrieving towel must be properly cleaned, and the officer must use caution to ensure that the retrieving towel is not contaminated with the odor or odors of cleaning detergents, etc. For this reason, it is required that the retrieving towel be washed in plain hot water and rinsed in cold water.

Ex. 14 (8/02 CEO Handbook) at 76, § 5.9; *accord* Ex. 15 (Detector Dog Training Manual) at 411 (same); *cf.* Tr. at 273–74 (Kruzel testifying that, to properly launder towels, he "separate[d] the hard and soft towels ... [and] wiped out the bin of the washing machine or put it just in a momentar[y] rinse cycle [to avoid] ... soap residue. And then put it on a short cycle with no detergents, basically just a hot water rinse."); *id.* at 416 (Monistrol) ("I separate the towels. Take them out of the laundry bag, separate the towels untape ... both sides, shake them out, take out any debris out of there because this is going into my personal washer. I run a clean cycle .... I try not to bunch up a lot of towels in one because they don't get too clean. I bunch up a bunch of towels in there and wash it. No detergent, no bleach, no nothing. Just hot water. Then when that's done I transfer it to the dryer. No dryer sheets, just straight into the dryer."). The specialized nature of the laundering process, and defendant's efforts to ensure that this process is followed by all CEOs indicates that adherence to the process was of benefit to the employer.

The fact that defendant compensated plaintiffs for laundering and processing towels during the workday also suggests that defendant recognized a benefit from this task. As trainees at the Academy, CEOs laundered and processed training towels during their duty shifts and received compensation. Tr. at 49–50 (Bailey), 564–65 (Stuble), *id.* at 757 (Newcombe). At various times throughout their careers, CEOs were permit-

ted to wash towels on duty. *See* Tr. at 413 (Monistrol testifying that she washed towels on duty "a couple of times"), 264–67 (Kruzel testifying that in New York, where he worked prior to his claim period, there existed a laundry facility in the U.S. Customs House, where CEOs "laundered towels ... during the workday, somewhere throughout the day, we would have time to .... drop off the towels and check them throughout the eight-hour day," were compensated for this activity, and never "had the occasion to or need to wash towels outside the normal work cycle"); *see also id.* at 975 (Raleigh testifying that on NTRT days in Miami, CEOs sometimes were permitted to leave work "an hour or two early ... [to] wash their towels"); Ex.1900, Tab 8 (Johnson Dep.) at 8:11–11:12 (same). And, in some instances, defendant reimbursed plaintiffs for off-duty laundering. *See* Tr. at 69–70 (Bailey). Some POEs attempted to implement programs to have a local prison wash towels for the CEOs. Tr. at 279 (Kruzel, testifying about such an experiment in El Paso).

In light of the foregoing, the court concludes that laundering and processing training and retrieving towels provided a significant benefit to defendant.

**b. Defendant Knew or Should have Known that Plaintiffs Laundered and Processed Towels Off Duty**

The evidence adduced at trial amply supports a conclusion that defendant actually knew or had reason to believe that plaintiffs were laundering and processing training towels off-duty for no compensation. *Accord Doe*, 372 F.3d at 1361 (requiring only that an employer "knows or has reason to believe the employee is continuing to work" for an activity to constitute "work") (quotations and citations omitted); 5 C.F.R. § 551.104 (same). First, Messrs. Bailey and Kruzel and Ms. Monistrol testified that their supervisors in Detroit and Miami possessed actual knowledge of their uncompensated off-duty towel laundering. *See* Tr. at 70 (Bailey) ("[My supervisor] explained to me that the port director was no longer accepting ... vouchers claiming the money I had spent at the laundromat. We were told to go out and he

wasn't paying us to do laundry. He was paying us to work our dogs and find narcotics."); *id.* at 119, 125 (Bailey testifying that he verbally informed two supervisors that he was washing towels at home); *accord id.* at 417 (Monistrol testifying that while she did not discuss this issue with her supervisors, "[t]hey were all aware that we were doing it.... It was needed for the dogs.... It was required. It was something that was expected of you."). The court is persuaded that supervisors in El Paso had actual knowledge that CEOs, including Messrs. Kruzel, Leuth, and Stuble, laundered towels off duty. Mr. Kruzel testified that, when arrived in El Paso for duty, he "inquired" of his supervisors concerning the process for laundering towels "because the washers and dryers were ... not working, and they said, well, everyone here just takes them home." Tr. at 272. Mr. Kruzel also testified that he discussed this issue with three supervisors and the Canine Chief in El Paso, *see id.* at 284–85, and that he observed at least four CEOs raising similar concerns to management about this uncompensated off-duty activity, *see id.* at 292, 294–95. Mr. Newcombe, the former national program manager for defendant's Canine Enforcement Program, admitted that, during his management review of one of the ports in El Paso, he was told that CEOs "were washing towels off premises" and that he understood this work to be "uncompensated and off the clock." *Id.* at 759 (Newcombe).[22] Accordingly, it appears to the court that defendant had actual knowledge that towels were being laundered and processed by CEOs during off-duty hours and without compensation.

Even in the absence of testimony tending to support a finding of actual knowledge, the evidence presented at trial plainly shows that the supervisors of all six designated plaintiffs had constructive knowledge of the designated plaintiffs' off-duty laundering of towels. *Accord* 5 C.F.R. § 551.104 (requiring only that an employer "ha[ve] reason to believe" the employee is performing an activity for it to constitute work under the FLSA). Indeed, throughout plaintiffs' claim periods there were no functioning laundry facilities at the Ports of Detroit, *see* Ex.1900, Tab 16 (Curry Dep.) at 17:9–12 ("[T]he Port did not provide washers and dryers, and we were not allowed to go to a laundromat ... on duty."), Miami, *see* Tr. at 496 (Rivera) ("There was no facilities at the worksite."), or El Paso, *see id.* at 629 (Leuth), yet no witness—CEO or supervisor—testified to a shortage of clean towels at any of plaintiffs' work sites.

Defendant contends that "[a]n awareness that towels are dirtied and then cleaned is separate from awareness from how the towels become clean." Def.'s Reply at 24. This argument is specious at best. The towels did not launder themselves. Rather, the reasonable inference from these circumstance, to which plaintiffs testified at trial, is that the CEOs routinely departed the worksite at the end of one work shift with dirty towels, and returned to the worksite at the beginning of the next shift with clean ones, which they had laundered while off duty. *E.g.*, Tr. at 129 (Bailey testifying that his supervisor likely saw him take dirty towels home and bring back clean ones), 450 (Monistrol testifying that "all of" her supervisors have observed her bringing clean towels from home to work); Ex.1900, Tab 16 (Curry Dep.) at 17:1–17 ("I assumed [my supervisor] knew ... [b]ecause the Port did not provide washers and dryers, and we are not allowed to go to a laundromat and do it on duty. So obviously I'm washing them at home.").

Defendant cannot feign ignorance of the means and methods by which the laundering and processing of towels was accomplished.

---

22. Also telling was Mr. Kruzel's description of a series of meetings among CEO team leaders, of which he was one, and supervisors, which occurred after 1998. *See id.* at 283. During the meetings, supervisors demonstrated their collective awareness that CEOs were laundering and processing towels off-duty:

> In some of the meetings, there was concern [among supervisors] that ... during our NTRT days, our training days, when [team leaders]

had a chance to speak to a wider variety of CEOs, that [team leaders instruct CEOs that] when they were washing towels at home to make sure that they weren't cross-contaminating, making sure that they were separating their towels, and taking the extra time, and not be putting any bleach in there, and expressed, you know, the hazards of cross-contamination. *Id.* at 284.

Because towels are essential to the performance of the CEOs' duties, and because no CEO or supervisor testified to a shortage of clean towels at any port, the court determines that the supervisors of the designated plaintiffs' had, at minimum, "reason to believe" that their subordinates' off-duty efforts kept each port supplied with freshly laundered and processed towels.[23] 5 C.F.R. § 551.104; *accord* Tr. at 759 (Newcombe) ("[W]ere the towels being cleaned[?] Yes, they were being cleaned. Did they have washers and dryers installed at Paso del Norte [in El Paso]? No. Yet the towels were being cleaned. So maintaining the proficiency of the dog was still being done, so that was okay."). The conclusion that defendant had reason to believe that this work was occurring off duty is further supported by the fact that most of plaintiffs' supervisors previously served as CEOs. Several supervisors revealed that, as CEOs, they themselves washed and processed training towels off duty and without compensation. *See* Tr. at 1061, 1063 (Luby) ("I washed my towels at home, and I believe that every handler washed their towels at home .... This was just part of the job you did and didn't get paid for."); *id.* at 1384 (Makolin, testifying that he "cleaned [his] towels ... off duty and without pay while ... a CEO ... [for] 14 years"); *accord id.* at 1536–38 (Smith); *id.* at 1669 (Gernaat); Ex.1900, Tab 12 (Rowley Dep.) at 29 (same); Ex.1900, Tab 14 (Wood Dep.) at 21 (same). Even Mr. Titus, the National Director of the Canine Enforcement Program, testified that he washed towels off-duty and without compensation when he was a CEO between 1980 and 1983. Tr. at 953–55, 960. In light of this longstanding practice, the court concludes that defendant must have actually known that plaintiffs were laundering and processing towels off duty.[24]

### c. Defendant Controlled and Required the Laundering and Processing of Towels

The preponderance of evidence presented at trial reveals that defendant not only controlled and required plaintiffs to launder and

**23.** Defendant argues that "knowledge cannot be imputed ... if supervisors did not know how or by whom the towels were being washed," Def.'s Br. at 35, and contends that, "[b]ecause the plaintiffs did not inform their supervisors that they were personally cleaning training towels at home while off duty, they have not presented persuasive evidence that could establish that Customs knew or should have known that plaintiffs themselves were washing the training towels while off duty," *id.* at 36. Defendant misapprehends the legal standard applicable in this case. Constructive knowledge is sufficient. Actual knowledge, while helpful, is not required. *Doe*, 372 F.3d at 1361; 5 C.F.R. § 551.104.

Defendant argues in the alternative that, even if supervisors were aware that the towels were being processed and laundered off-duty, this activity is not compensable because it is "a simple task that could easily be performed by other people, such as a roommate, spouse, housekeeper or a worker at a laundromat." Def.'s Br. at 35; *accord* Tr. at 759 (Newcombe stating that his wife washed his towels), *id.* at 1606 (Luse) (same). This argument also misses the mark. Whether another person or business could have assisted in the performance of the work is not at issue—the issue before the court is whether plaintiffs were responsible for accomplishing this task, such that it constitutes "work" under the FLSA. CEOs were responsible for having clean towels and defendant reaped the benefits of the CEOs' off-duty laundering efforts.

**24.** The court also notes that the evidence presented at trial indicates that Customs, at the national level, was aware that the uncompensated off-duty laundering of towels was occurring across the country. Mr. Bailey testified that, in 2001, he and a team of thirty canine officers from around the country were asked to revise the Canine Enforcement Directive (Directive). *See* Tr. at 187–88 (Bailey). Mr. Bailey and his colleagues specifically addressed the issue of towel laundering:

> [W]e began a discussion about that we were asking the [CEOs] to wash towels, but we weren't providing them any direction or directive to do so, so we inserted into the [D]irective that each port was required to have a washer and dryer.
>
> ....
>
> That draft was given to the canine enforcement program instructors, and I believe at the time Carl Newcombe of the [CETC].... It would [then] go through whatever process from the [CETC] through headquarters to be approved by the approving officials.

*Id.* at 189 (Bailey). Mr. Newcombe admitted at trial that he and his colleagues received the proposed amendment to the Directive, but rejected it in favor of leaving laundering requirements to the discretion of local management. *See* Tr. at 763–64. The Jacksta Memo, which was promulgated nationally, further suggests that defendant actually knew that off-the-clock work, specifically laundering, was being performed by CEOs nationwide. Ex. 89 (Jacksta Memo) at 1–2.

process towels, but also that defendant had the opportunity to prevent this task from being done and declined to prevent it. At the time these claims arose, Customs had a long-established specialized process for laundering towels, which was taught to new CEOs at the Academy and documented in Customs' manuals and training publications. *See* Ex. 13 (2/96 CEO Handbook) at 241, § 5.9 ("After each use, the retrieving towel must be properly cleaned."); Ex. 14 (8/02 CEO Handbook) at 76, § 5.9 (same); *id.* § 5.9.2 ("The port management will ensure that only clean towels are utilized. Towels will be cleaned in accordance with the Detector Dog Training Manual"); Ex. 15 (Detector Dog Training Manual) at 409; *accord* Tr. at 141–43 (Bailey describing the laundering process in detail); *id.* at 416–17 (Monistrol) (same); *id.* at 273–74 (Kruzel) (same). Failure to follow the laundering procedures could subject the CEO to a charge of neglect under the U.S. Customs Service Table of Offenses and Penalties, *see* Ex. 21 (Table of Offenses) § 7, at 529, "because it negatively impacts the ability to do your job as a trainer if you don't have towels." Tr. at 139 (Bailey). Because Customs devised a specialized process for laundering towels, mandated adherence to this process, and could penalize CEOs for not following this process, the court concludes that laundering and processing towels was both controlled and required by defendant.

The court also determines that defendant had the opportunity to prevent plaintiffs from laundering and processing towels off-duty, but declined to do so. If defendant had wanted off-duty laundering to cease, it could have installed functioning washers and driers at the ports. Instead, there either were no such facilities installed at the POEs, or facilities were installed but not functioning. *See* Tr. at 144 (Bailey); *id.* at 271–72 (Kruzel); *id.* at 413 (Monistrol); *id.* at 496 (Rivera); *id.* at 629 (Leuth); Ex.1900, Tab 5 (Kruczek Dep.) at 9:13–10:21 (testifying that there were no machines at the port of Detroit from 1997–2000); Tr. at 1364 (Makolin, a supervisor in El Paso, admitting the port had only non-functioning machines); *id.* at 1538 (Molidor testifying that he made suggestions to management about installing machines at the

port of Miami). Alternatively, defendant could have—and in some cases did—implement alternate systems allowing CEOs either to wash their towels on-duty, or to have the towels washed for the CEOs. *See* Tr. at 761 (Newcombe suggesting that ports could have contracted out the laundering services); *id.* at 1817–18 (Raleigh, a supervisor, testifying that he had attempted to have laundry machines installed at the Miami seaport since 2002); *id.* at 1538 (Smith, a supervisor, testifying that she suggested to upper management that machines be installed at the Miami airport). In El Paso, for example, Customs experimented with having a local prison wash the CEOs' towels. *See id.* 285–86, 300–02 (Kruzel); *id.* at 1370–72 (Makolin). Supervisors in El Paso also considered a commercial laundry service but discounted the option as prohibitively expensive. *See id.* 295 (Kruzel), 1370 (Makolin); *accord* Tr. at 70 (Bailey testifying that he was briefly paid for towel washing duties while in Chicago (for "several months," but payment for towel washing duties abruptly stopped when the Port Director determined that "he wasn't paying us to do laundry. He was paying us to work our dogs and find narcotics.")).

Defendant could have forbidden off-duty laundering but, prior to the promulgation of the Jacksta Memo, did not do so. *See* Tr. at 307 (Kruzel); *id.* at 500 (Rivera); *id.* at 569–70 (Stuble); *id.* at 629 (Leuth); *id.* at 1393 (Makolin admitting he never ordered a CEO under his direction not to wash towels at home); 1793 (Smiertka testifying that he never ordered Mr. Bailey not to launder towels at home). After defendant promulgated the Jacksta Memo forbidding CEOs to launder towels at home, the CEOs obeyed. *E.g.,* Tr. at 86–87 (Bailey); *id.* at 278 (Kruzel); *id.* at 415–18, 437 (Monistrol); *id.* at 500 (Rivera); *id.* at 570 (Stuble); *see also* Ex.1900, Tab 12 (Rowley Dep.) at 23:23–24:2 (testifying that he instructed officers to cease all off-duty laundering when he received the Jacksta Memo); Tr. at 972–73 (Raleigh testifying that following the issuance of the Jacksta Memo, CEOs in Miami have laundered towels at facilities located in a U.S. Department of Agriculture kennel).

In light of this persuasive evidence, the court determines that defendant controlled and required CEOs to launder and process towels off-duty, and that it remained within the power of defendant, throughout the period covered by plaintiffs' claims, to prevent this work being performed.

### 2. Plaintiffs are Entitled to Compensation for Off–Duty Time Spent Laundering and Processing Towels

■ Plaintiffs assert that they spent between 2 hours, *see* Tr. at 496 (Rivera), and 4 hours, *see id.* at 416 (Monistrol), per week laundering and processing towels off duty. Defendant counters that if liability is imposed, plaintiffs are entitled to compensation for "no more than 15 minutes per week." Def.'s Br. at 37; *see also* Def.'s Reply at 31 (same). First, the court concludes that the time spent by plaintiffs to launder and process towels off duty was not de minimis. Indeed, "the amount of time per occurrence dedicated to the activity in question," *Bobo I,* 37 Fed.Cl. at 701, *aff'd, Bobo II,* 136 F.3d at 1468, was not minimal or negligible, even under defendant's view, *accord* 5 C.F.R. § 551.412(a)(1).[25] Thus, the court concludes that compensation is warranted for reasonable time spent by plaintiffs laundering and processing towels off duty. Still at issue, however, is the amount of time reasonably required to perform this task.

Plaintiffs argue that laundry is an integrated task, entitling the launderer to compensation for the entire period from the start of the first cycle to the end of the last dry cycle, and including time spent processing the towels, i.e., unfolding and untaping dirty towels and folding and taping clean towels. *See* Pls.' Br. at 77. In this view, the launderer's "idle" time while cycles are running is time in which the employee is "engaged to wait," entitling him or her to compensation for that time. *Id.* at 77–78. Defendant argues that plaintiffs are entitled only to compensation for time spent loading and unloading the machines, and not "for the time the washing machine is agitating and the time the dryer is spinning." Def.'s Br. at 41. Defendant views the time during which the wash and dry cycles are running not as time spent "engaged to wait," but as time spent "waiting to be engaged," which is not compensable. *Id.* at 41–42 ("Plaintiffs implicitly contend that while the towels are spinning (and they are watching television), they are entitled to compensation at approximately $20.00 per hour."). Defendant argues that if plaintiffs are entitled to compensation for time spent laundering one load of towels per week, plaintiffs should be compensated for no more than 10 minutes.[26] *Id.* at 47; *accord* Tr. at 1537 (Smith testifying that loading the washer and dryer takes "seconds"). Defendant argues in the alternative that if plaintiffs are entitled to compensation for laundering two loads of towels per week, compensation for 15 minutes "might be" warranted. Def.'s Br. at 48 n. 15.

In *Skidmore v. Swift & Co.,* the Supreme Court determined that the compensability of "standby" time turned upon whether "the employee was engaged to wait, or . . . waited to be engaged." 323 U.S. 134, 137, 65 S.Ct. 161, 89 L.Ed. 124 (1944). This determination is a question of fact to be resolved by appropriate findings of the trial court . . .

---

**25.** The OPM regulations and the relevant case law generally provide a standard of "more than 10 minutes *per work day*" in order for an activity to pass the de minimis threshold. 5 C.F.R. § 551.412(a)(1) (emphasis added); *Riggs,* 21 Cl. Ct. at 682. The court is unaware of any authority suggesting that this standard requires, on a per *week* basis, that an activity must be done for an aggregate of more than 50 minutes. For activities that may or may not occur on a daily basis such as those examined in this case, the 10–minute threshold is used on a per *occasion* basis, and considered together with the three-part test set forth in *Bobo II. See Bobo II,* 136 F.3d at 1468 ("The factors that trial courts must examine when assessing whether the work underlying a compensation claim is de minimis [are:] '(1) the practical administrative difficulty of recording the additional time; (2) the aggregate amount of compensable time; and (3) the regularity of the additional work.' ") (quoting *Lindow,* 738 F.2d at 1063). In accordance with the analysis below, the court finds that the reasonable amount of time required to launder towels is more than 10 minutes per occasion.

**26.** Defendant reasons that this task requires 2 minutes to place dirty towels in washing machine; 2 minutes to transfer towels to the dryer; 2 minutes to remove the dry towels; and 4 minutes for miscellaneous tasks. Def.'s Br. at 47.

[involving] scrutiny and construction of the agreements between the particular parties, appraisal of their practical construction of the working agreement by conduct, consideration of the nature of the service, and its relation to the waiting time, and all of the surrounding circumstances.

*Id.* at 136–37, 65 S.Ct. 161. The Court applied this analysis in *Armour & Co. v. Wantock,* and determined that time spent by privately-contracted firefighters at the employer's worksite, during which they were "subject to call, but otherwise put [time] to such personal use as sleeping or recreation," was compensable under the overtime provisions of the FLSA. 323 U.S. 126, 127, 65 S.Ct. 165, 89 L.Ed. 118 (1944). Framing the pertinent inquiry as "[w]hether time is spent predominantly for the employer's benefit or for the employee's," *id.* at 133, 65 S.Ct. 165, the court reasoned that "inactive duty may be duty nonetheless," *id.,* and affirmed the award of overtime compensation to plaintiffs:

> [A]n employer, if he chooses, may hire a man to do nothing, or to do nothing but wait for something to happen. Refraining from other activity often is a factor of instant readiness to serve, and idleness plays a part in all employments in a standby capacity. Readiness to serve may be hired, quite as much as service itself . . . .
>
> . . . .
>
> We think the [FLSA] does not exclude [from] work[ ] time periods contracted for and spent on duty in the circumstances disclosed here, merely because the nature of the duty left time hanging heavy on the employees' hands and because the employer and employee cooperated in trying to make the confinement and idleness incident to it more tolerable. Certainly they

were competent to agree, expressly or by implication, that an employee could resort to amusements provided by the employer without a violation of his agreement or a departure from his duty. . . . [U]nder the circumstances and the arrangements between the parties the time so spent was working time.

*Id.* at 133–34, 65 S.Ct. 165; *accord Mo., Kan. & Tex. Ry. Co. v. United States,* 231 U.S. 112, 119, 34 S.Ct. 26, 58 L.Ed. 144 (1913) ("[The employees] were under orders, liable to be called upon at any moment, and not at liberty to go away. They were none the less on duty when inactive. Their duty was to stand and wait.").

Therefore, the critical question—one of first impression for this court—is whether time spent while the wash and dry cycles run is time in which the officers are "engaged to wait," which is compensable, or "waiting to be engaged," which is not. The court has not identified a case in which the Federal Circuit considered a claim similar to plaintiffs' under the FLSA. *Cf. Huskey v. Trujillo,* 302 F.3d 1307 (Fed.Cir.2002) (considering compensability of standby time under the FEPA). Nor do the OPM regulations addressing the compensability of "standby" or "on call" time appear to contemplate this situation. *Cf.* 5 C.F.R. § 551.431(a)(1) and (2) (providing examples of compensable and noncompensable standby time).[27] However, DOL regulations, while not controlling, address the compensability of off-duty waiting time in greater detail. These regulations provide:

> Periods during which an employee is completely relieved from duty and which are long enough to enable him to use the time effectively for his own purposes are not hours worked. He is not completely relieved from duty and cannot use the time

---

**27.** 5 C.F.R. § 551.431(a)(1) provides:

An employee is on duty, and time spent on standby duty is ... work if, for work-related reasons, the employee is restricted by official order to a designated post of duty and is assigned to be in a state of readiness to perform work with limitations on the employee's activities so substantial that the employee cannot use the time effectively for his or her own purposes. A finding that an employee's activities are substantially limited may not be based on the fact that an employee is subject to

restrictions necessary to ensure that the employee will be able to perform his or her duties and responsibilities, such as restrictions on alcohol consumption or use of certain medications.

5 C.F.R. § 551.423(a)(2) provides: "An employee is not considered restricted for 'work-related reasons' if, for example, the employee remains at the post of duty voluntarily, or if the restriction is a natural result of geographic isolation or the fact that the employee resides on the agency's premises."

effectively for his own purposes unless he is definitely told in advance that he may leave the job and that he will not have to commence work until a definitely specified hour has arrived. Whether the time is long enough to enable him to use the time effectively for his own purposes depends upon all of the facts and circumstances of the case.

29 C.F.R. § 785.16(a) (2005); *see also,* 29 C.F.R. § 785.14–.17 (2005) (adopting the standard articulated in *Skidmore,* 323 U.S. at 137, 65 S.Ct. 161, and providing examples of compensable and noncompensable "standby" and "on call" time). Although several courts have applied the DOL regulations, *e.g., Pabst v. Okla. Gas & Elec. Co.,* 228 F.3d 1128, 1132 & n. 1 (10th Cir.2000); *Martin v. Ohio Turnpike Comm'n,* 968 F.2d 606, 611 (6th Cir. 1992); *Cross v. Ark. Forestry Comm'n,* 938 F.2d 912, 916–17 (8th Cir.1991); *Halferty v. Pulse Drug Co.,* 864 F.2d 1185, 1189 (5th Cir.1989), none involved a situation analogous to plaintiffs' here.[28]

The court concludes that laundering towels in the circumstances of the case is an integrated activity and that plaintiffs are entitled to full compensation for time spent loading and unloading machines and time spent engaged to wait for the laundering cycles to end. Plaintiffs acknowledged that they enjoyed downtime during the laundry cycles, which they could use to accomplish other tasks. *E.g.,* Tr. at 380 (Kruzel agreeing that he "could do a variety of things while the towels are in the washer and dryer"). However, this was time "spent predominantly for the employer's benefit," *Armour,* 323 U.S. at 133, 65 S.Ct. 165, during which plaintiffs generally remained at or near their home laundering facilities, *see* Tr. at 241 (Bailey testifying that, while the machines were running, he did "[n]othing, just [stayed] in the basement."); *id.* at 317–18 (Kruzel) ("I can't walk away from the washer area, but I don't have to sit right there. I can do other things ... as long as I'm still within ear shot of the

washer."); *id.* at 597 (Stuble) ("[M]y washer and dryer is in the garage, so I just pretty much tinker around the garage ... [or remain] somewhere around the front of my house."); Ex.1900, Tab 18 (Ramirez Dep.) at 41:16–19 (testifying that he had never "put the towels in the wash machine, then left the house and then come back at some point later to put the towels in the dryer"). Had plaintiffs not been employed by defendant, they would not have taken the time to launder these towels. Thus, this was time spent "waiting to be engaged."

The court recognizes that plaintiffs may have used some of this time to watch television, read a magazine, or eat, *see, e.g.,* Tr. at 380 (Kruzel); *id.* at 475 (Monistrol); *id.* at 797 (Newcombe); Ex.1900, Tab 18 (Ramirez Dep.) at 40:24–41:15, 41:25–42:7, but the court will not penalize plaintiffs for making the best of a situation created by their employer. If defendant was displeased with the timing of plaintiffs' towel laundering, it was defendant's responsibility to address it. Defendant could have avoided this situation by, for example, providing the time and facilities for laundering towels during the downtime created when plaintiffs accomplished their weekly on-duty NTRT exercises. *Accord* Tr. at 1534 (Smith, a supervisor, testifying that while each CEO "is running the [NTRT] exercise for 20 minutes, ... the [other] officers who are participating in NTRT ... [are] [t]ypically standing around chatting with one another," and that "this [would be] an opportunity [for CEOs] to do other [required] duties."); *id.* at 1612 (Luse, a supervisor, testifying that groups of CEOs "stand[ ] by" while each individual CEO accomplishes the NTRT exercise). Instead, defendant, aware that off-duty laundering was taking place, allowed it to continue for years.

Although the entire time spent laundering towels may be compensated, including the time in which plaintiffs were "waiting to be engaged," plaintiffs are still only entitled to compensation for the amount of time reason-

---

**28.** The single decision addressing the compensability of off-duty laundering is procedurally inapposite and sheds no light on the issue before the court. *See Thomas v. City of Hudson,* No. 95-CV-0070, 1996 WL 280828, at *15 (N.D.N.Y. May 20, 1996) (denying summary judgment because a genuine issue of material fact existed concerning the amount of time police dog handlers spent washing uniforms, "as opposed to accomplishing other, non-job-related tasks while waiting for their uniforms to complete wash and dry cycles").

ably required to complete the laundering process. As an initial matter, the court recognizes that CEOs who are responsible for laundering towels containing several different scents may require more time to do laundry than CEOs whose dogs train with a single scent. *See* Tr. at 238–40 (Bailey explaining that he claims twice as much laundering time as some plaintiffs because was required to wash two consecutive loads each week, one for hard towels, the other for soft); *id.* at 415–16 (Monistrol) (same); *id.* at 529–31, 543 (Rivera explaining that when he switched from a narcotics dog to a currency dog, he stopped having to separate his towels because he worked with towels containing only one odor); *id.* at 617–18 (Leuth testifying that he alternated washing hard and soft towels each week, and that laundering both types in the same week would add approximately "another hour" per week to his claim). However, the court also acknowledges testimony at trial suggesting that scented towels were used rarely in the field and that, when used, not enough towels would accumulate to require weekly washing. *Id.* at 316 (Kruzel testifying that officers sometimes used scented towels and sometimes did not); *id.* at 1374 (Makolin testifying that once in the field, CEOs use scented towels only to reinforce skills when the dogs are having difficulty); *id.* at 1536 (Smith, a supervisor, testifying that officers use scented towels only in the early stages of training), *id.* at 1668–69 (Gernaat testifying that, as a CEO, he used scented towels "only once or twice a month"). In addition, the court recognizes that the number of towels requiring laundering each week—and the concomitant time required to launder those towels—may vary significantly. Indeed, in some training scenarios the same towel can be used more than once. *See* Tr. at 828–29 (Newcombe), *id.* at 1620–21 (Luse).

Finally, the court considers whether or not "processing"—the folding and taping of towels—is performed off-duty or on-duty. Folding and unfolding, taping and untaping, may not be compensable because, in contrast to the circumstance of not having machines available while on duty, there is no insurmountable impediment to CEOs processing towels while at work.[29] Several former and current CEOs did, at least on occasion, perform all or part of these pre- and post-laundering activities on-duty. *See* Tr. at 215–16 (Bailey); *id.* at 379 (Kruzel); *id.* at 597 (Stuble); *id.* at 1538 (Smith); *id.* at 1667, 1669 (Gernaat). Some plaintiffs also testified that their laundering claims do not include processing time. *E.g.*, Tr. at 506 (Rivera); *id.* at 379 (Kruzel); *But see id.* at 475 (Monistrol testifying that her laundering claim includes off-duty time spent processing).

While plaintiffs' estimates run as high as fifty towels laundered per week, the court notes that both CEOs and SCEOs testified to a number of approximately twenty-five towels per week.[30] *See* Tr. at 565 (Stuble testifying that he washed "roughly 25 or more towels a week"), *id.* at 215 (Bailey testifying that he laundered between thirty and forty towels per week); *id.* at 412 (Monistrol testifying that she laundered "from 20 to 50 towels" per week); 530 (Rivera testifying that he laundered "twenty-five to 40 towels" per week); 296 (Kruzel testifying that he laundered "a minimum of 25" towels per week); *accord id.* at 1536, 1538 (Smith, a supervisor, testifying that she used between fifteen and twenty-five towels per week); *id.* at 1619 (Luse, a supervisor, testifying that he laundered between fifteen and twenty per week); *id.* at 1666 (Gernaat, a supervisor, testifying that he laundered "about 15 to 20" towels per week). Defendant concedes that a reasonable estimate of the "number of towels that needed to be washed per week is approximately 25 towels." Def.'s Br. 38.[31]

---

29. While this might, in other circumstances, support an inference that supervisors had no "reason to believe" that CEOs were laundering towels at home, *accord* 5 C.F.R. § 551.104, given the absence of washers and dryers at the POEs, the inference is not in any way persuasive in this case.

30. Standard operating procedure in El Paso appears also to have required the use of at least five

towels per day, or twenty-five per week. Tr. at 566 (Stuble).

31. The court generally agrees with plaintiffs that the CEO performing the work is in the best position to determine the time and attention required to perform a given task. See Pls.' Br. at 72. However, the court also recognizes that variation based on personal characteristics, such as efficiency, may also exist.

Plaintiffs' laundering and processing claims generally range from 2 hrs./wk., *see, e.g.,* Tr. at 496 (Rivera), to 4 hrs./wk., *id.* at 416 (Monistrol). In El Paso,[32] Mr. Leuth claims 2.5 hrs./wk. compensation for off-duty time spent laundering training towels, and includes time removing tape or string and unrolling the towels, between September 1997 through October 2001. Tr. at 617. Mr. Stuble also claims 2.5 hrs./wk. compensation for off-duty time spent laundering training towels per week, including "folding" time, between September 1997 through July 2004. Tr. at 579.[33] Finally, Mr. Rivera claims 2 hrs./wk. compensation for off-duty time spent laundering training towels per between October 3, 1998 and July 31, 2004. Tr. at 496, 499–500, 529. It is unclear whether his time includes processing time or not. *Compare* Tr. at 497 (Rivera testifying that it includes processing time), *with* Tr. at 506 (Rivera testifying that it does not include processing time).

In Miami, Ms. Monistrol claims 4 hrs./wk compensation for off-duty time spent laundering training towels, and includes processing time, between August 1999 and July 2004. Tr. at 417–18, 437. She asserts that it takes more than 1 minute to process each towel. Tr. at 475. Mr. Kruzel claims 2 hrs./wk. compensation for off-duty time spent laundering training towels between September 6, 1997 and July 3, 2004. Tr. at 314, 362, 383; *see also* Tr. at 379 (testifying that it took 1 hour to wash and 1 hour to dry). It is unclear whether this time includes processing time or not. *See* Tr. at 315–26, 379.[34]

Finally, in Detroit, Mr. Bailey claims 4 hrs./wk. compensation for off-duty time spent laundering training towels between January 2, 1999 and approximately April 12, 2003. Tr. at 113, 116–17.[35]

32. The court rejects defendant's argument that Customs' liability for towel laundering in El Paso should necessarily end when the port began to experiment with the prison washing system prior to the Jacksta Memo. CEOs were invited, not required, to deposit dirty towels with Mr. Moraga, an administrative staff person, who transported the towels to and from the prison. See Tr. at 279–80 (Kruzel testifying that he never received a memo ordering him to use the prison system and believed, instead, that it was optional); *id.* at 1372–73 (Makolin, a supervisor, testifying that use of the prison system was not required before the Jacksta Memo). Few CEOs, therefore, took advantage of this opportunity. *Id.* at 279, 400 (Kruzel testifying that he did not participate); *id.* at 1373 (Makolin testifying that "very few, if any" CEOs participated). Even when the prison washing system was incorporated into local standard operating procedures, defendant still failed to enforce its officers' participation. See Tr. at 400 (Kruzel testifying he still opted out). Mr. Kruzel testified that many of the officers, and even some of the supervisors, frowned upon the prison system at the time out of concern for cross-contamination. Tr. at 400–03 (Kruzel, adding that he spoke to supervisors about his concern for the integrity of cleaning process at the prison, and that his dog alerted to towels in Moraga's vehicle that were supposed to be clean); *id.* at 1085 (Luby, a supervisor, testifying that he knew his officers were concerned about cross-contamination). Defendant began to require its officers to use the prison system only after the Jacksta Memo took effect in El Paso. For this reason, plaintiffs in El Paso are entitled to compensation for laundering training towels up to the time the Jacksta Memo was circulated in El Paso, in early July 2004.

33. Because Mr. Stuble admitted on cross-examination that he allowed the prison washing system to launder his towels as of approximately January 2003, Tr. at 598, the court awards him no compensation for towel laundering after January 2003.

34. Because uncontroverted evidence exists that officers Rivera, Monistrol, and Bailey were redeployed to non-canine-related duty for thirty days beginning September 11, 2001, the court awards no compensation to these plaintiffs for canine-related tasks (including washing towels and constructing training aids) for this period. See Tr. at 1810–11 (Raleigh, a supervisor in Miami, testifying about Mr. Rivera and Ms. Monistrol), 209, 211, 215 (Bailey testifying about his own activities).

35. Because Mr. Bailey testified that he was no longer working with a dog as of April 2003, Tr. at 81, the court awards no compensation to Mr. Bailey for time spent laundering towels or constructing training aids after April 1, 2003. If he was no longer working with a canine, laundering towels and constructing training aids is no longer "integral and indispensable" to his job and, to the extent that he may have done so voluntarily, the court is not persuaded that his supervisors either knew or had reason to know of his activities. *See* Tr. at 150 (Bailey testifying he built fewer training aids for use by other handlers). Moreover, he failed to establish that the time he did claim after April 1, 2003 would not have been de minimis. *See* Tr. at 81. Based on the foregoing evidence, defendant's outstanding motions, specifically, Defendant's Motion to Amend Response to Request for Admission and Defendant's Renewed Motion for Sanctions for Failing

Based on the foregoing testimony, the court finds that officers are entitled to 2 hrs./wk. compensation for the time they spent laundering, and to a minimal extent, processing, their training towels off duty.

### B. Plaintiffs' Off–Duty Construction of Training Aid Containers Constitutes Compensable Overtime Work Under the FLSA

#### 1. The Construction of Training Aid Containers Constitutes Work

The court finds that the construction of training aid containers is integral and indispensable to the training of detector dogs. The trial record makes clear that the construction, maintenance, and use of training aid containers is beneficial to defendant and required as part of a CEO's principal duties. *See* Tr. at 754–55 (Newcombe); *accord id.* at 425 (Monistrol). It is apparent that plaintiffs would not have been able properly to train their dogs without constructing such training aids, as even the 2/96 CEO Handbook states that "[t]o properly accomplish proficiency training, CEO[ ]s must assist each other ... in the construction and concealment of training aids ...." Ex. 13 (2/96 CEO Handbook) at 238, § 5.4. Thus, if known by defendant to be done off-duty and for more than a de minimis amount of time, construction of training aid containers constitutes work that is compensable under the FLSA.

#### a. The Construction of Training Aid Containers Provided a Benefit to Defendant, Which Defendant Recognized

Time spent constructing training aids is beneficial to the employer because the use of increasingly complex training aids is an integral and indispensable means by which dogs maintain their proficiency in detecting contraband. Tr. at 787 (Newcombe), 51 (Bailey); Ex. 13 (2/96 CEO Handbook) at 218, § 1.7.1 ("The primary duties of a CEO include ... maintenance of the dog's detection ability through quality proficiency training."); Ex. 14 (8/02 CEO Handbook) at 3, § 1.5.1

(same). Some plaintiffs and supervisors testified at trial that "the policy of creating and using these training aids is a job requirement for the CEO." Tr. at 754 (Newcombe); *accord id.* at 425 (Monistrol stating that she is required to build training aids as a condition of her job). This contention comports with the requirement articulated in the CEO Handbook that, to properly train narcotics dogs, "pre-constructed training aids must be prepared [by the dog's handler] several hours prior to their use. The amount of time will vary depending on the type of substance used and the concealment method." Ex. 13 (2/96 CEO Handbook) at 239, § 5.6.1; Ex. 14 (8/02 CEO Handbook) at 75 § 5.6.1.

Other provisions in the CEO handbooks also indicate that the construction of training aids is not only integral and indispensable to the training of dogs, but also required by defendant to accomplish this training. *Accord* Ex. 13 (2/96 CEO Handbook) at 238, § 5.4 ("To properly accomplish proficiency training, CEO[ ]s must assist each other ... in the construction and concealment of training aids .... A sufficient number of TRT exercises must be conducted each duty day to ensure an enthusiastic intent toward searching is maintained."); Ex. 14 (8/02 CEO Handbook) at 74, § 5.4 (same); *see also* Ex. 13 (2/96 CEO Handbook) at 236, §§ 5–5.1 ("[I]t is the CEO's responsibility to ensure the proficiency of his/her assigned dog and that it remains at an acceptable level.... Since the quality of proficiency training is the single most influencing factor affecting day-to-day performance and reliability of the dog, its importance cannot be overemphasized."); Ex. 14 (8/02 CEO Handbook) at 25 §§ 5.1–5.1.1 (same).

Defendant argues that there is a distinction between Customs' requirement that CEOs simply "maintain" their dogs' proficiency in detecting contraband and plaintiffs' claim that they constructed increasingly complex training aids to "improve" their dogs' proficiency. *See* Def.'s Br. at 27. The court finds the distinction urged by defendant untenable. Customs would not benefit from the construction of training aids unless the aids used became increasingly complex with

time. If the purpose of training is to teach dogs how to detect contraband, and smugglers are expected to employ new and varied ways to smuggle contraband, then CEOs are not "maintaining" their dogs' proficiency unless they "improve" upon the variety and complexity of the training aids. *See, e.g.,* Tr. at 619 (Leuth testifying that it is necessary to build increasingly complex training aids in order "to improve [the dog's] ability to detect what a smuggler is going to do and go through to conceal [his or her] narcotics"), 303 (Kruzel testifying that it is important to simulate what has actually been used and done by smugglers), 53 (Bailey testifying that it is important for the aids to be realistic). Mr. Newcombe, the former national Canine Program Manager, also testified that the progressive nature of training aid construction can be accurately referred to as increasing the complexity of the training aids, or creating a more complex training aid as the dog matures. Tr. at 726, 742 (Newcombe, testifying that aids must increase in complexity over time). Moreover, Customs' own internal handbooks stress the value of constructing varied and increasingly complex training aids, further supporting the court's view that defendant's proposed distinction between maintaining and improving skills is untenable. The Canine Enforcement Program Handbook provides that training aids must be "constantly varied," to prevent the dog from associating the reward towel with something other than narcotics. Ex. 13 (2/96 CEO Handbook) at 239, § 5.6.3; Ex. 14 (8/02 CEO Handbook) at 41, § 7.1.1; *accord* Tr. at 172 (Bailey). Indeed, when supervisors test the dog's performance, supervisors also use more than simple suitcases and cardboard boxes. Tr. at 227 (Bailey testifying that supervisors also test the dog's proficiency with training aids made of wood, plastic, and metal). Mr. Newcombe also testified that officers "have to provide a lot of variation to the detector dog." Tr. at 724.

The benefit to the employer is further evidenced by testimony that if training aids are not replaced, or do not increase in complexity, the dogs will be unable to maintain their proficiency. Tr. at 139 (Bailey testifying that "[t]he dog won't be as proficient as possible if you are not conducting the proper training, and part of the training is constructing training aid containers."); Ex. 13 (2/96 CEO Handbook) at 237–38, § 5.3.2 ("Variation and Different Materials"); Ex. 14 (8/02 CEO Handbook) at 73, § 5.3 (explaining that detector dogs will lose proficiency and be unable to detect the substances they are trained to detect if varied and increasingly complex training aids are not used). As one officer testified, "The ... quality of the proficiency training is one of the most important things that you do, and that affects [your dog's] day-to-day performance.... It's how much training ... [,] the type of training ..., and what you invest in that [training that affects the] end product." Tr. at 166–67 (Bailey); *see also* Ex. 13 (2/96 CEO Handbook) § 5.1, at 236 (explaining the dangers that arise if such aids are not constructed); Ex. 14 (8/02 CEO Handbook) (same). In fact, officers could also be subject to discipline for failure properly to train their dogs by constructing training aids. Tr. at 352 (Kruzel); *id.* at 165–66 (Bailey testifying that it is the officer's responsibility to make sure that the dog receives the proper training); *id.* at 736 (Newcombe testifying that a "direct connection" exists between the success of the dog in detection and the success of the handler in his job).

Indeed, training in the construction of increasingly complex training aids is part of the curriculum at Academy. *See* Tr. at 53 (Bailey), 616 (Leuth), 494 (Rivera).[36] While at the Academy, CEOs build training aid containers every day while on duty for compensation, using materials supplied to them by the Academy. *See, e.g.,* Tr. at 50, 53–55 (Bailey). The court therefore finds that the off-duty construction of training aids, whether simple or complex, is integral and indispensable to the employment of CEOs and of benefit to the employer.[37]

**36.** Although Mr. Rivera is not claiming compensation for time spent constructing training aids off duty, his testimony is helpful to the court's understanding of the issues.

**37.** This finding is analogous to the finding in *Albanese v. Bergen County,* which held that a law enforcement officers were entitled to overtime compensation for time spent as DARE officers preparing drug prevention presentations for

**b. Defendant Knew or Should have Known that Plaintiffs Constructed Training Aid Containers Off Duty**

Defendant knew or should have known that CEOs were constructing training aid containers off duty and without compensation. This finding is well-supported by credible testimony, even though plaintiffs acknowledged they constructed some training aids while on duty. *See, e.g.,* Tr. at 228–30 (Bailey), 384 (Kruzel), 456 (Monistrol), 524 (Rivera), 589 (Stuble); Ex.1900, Tab 6 (Anton Dep.) at 61:18–62:2.

Mr. Bailey asserts that his supervisors in Detroit and Buffalo had actual knowledge of his off-duty construction because he told his supervisors, Messrs. Walters and Blanchard, that he was making training aids off duty. Tr. at 121, 126–27 (Bailey testifying about conversations with his supervisors David Walters and Roger Blanchard in Detroit); *id.* at 127 (Bailey testifying about conversations with Michael Cummerford in Buffalo); *see also* Tr. at 133–34 (Bailey testifying that Michael Cummerford saw Mr. Bailey bringing in training aids and even asked to see them). Mr. Bailey also testified that his supervisors had constructive knowledge of his off-duty construction of training aids because the port provided only limited materials for construction, such as suitcases and PVC pipe, yet he often brought from home and used at work training aids made from wood. Tr. at 130, 148–49 (Bailey testifying that in Detroit it was impossible to build most training aids at work because there was no tool room, only a hammer was provided, and there were no materials other than suitcases and PVC pipe); *id.* at 151 (Bailey testifying that Buffalo provided no luggage or wood); *see also* Tr. at 1791 (Smiertka, Mr. Bailey's supervisor, testifying that "some" building materials were provided at port). And even if tools and materials had been adequate, Bailey testified that there was often insufficient on-duty time to devote to their construction. *See* Tr. at 149, 151.

Ms. Monistrol testified that, in Miami, her supervisors had actual knowledge of her off-duty construction of training aid containers. *See* Tr. at 447 (Monistrol asserting, but without specific names or corroboration, that she spoke with various supervisors between 1999 and 2004 about building training aids off the clock). Further testimony establishes that Ms. Monistrol's supervisors had constructive knowledge of her off-duty construction of training aids. Ms. Monistrol testified that supervisors provided only limited construction materials. Tr. at 427, 455 (Monistrol testifying that the port provided only damaged and unclaimed baggage from the airport). Because such limited materials were provided at work, she was required to collect materials on her own. Tr. at 427; *see also* Tr. at 1542 (Smith, a supervisor, testifying that the materials available were broken pallets from the airport and other discarded materials); *but see* Tr. at 1543 (Smith, a supervisor, testifying that tools were available in tool kits, but that tool kits were kept under lock by the supervisor and their use had to be requested); Tr. at 1805 (Raleigh, Chief of Tactical Enforcement Operations, testifying that construction materials existed, especially at the seaport, but providing no time frame for his testimony). Ms. Monistrol testified that even if she had had on-duty time to collect these materials, tools and time to construct the aids were insufficient during her shift. *See* Tr. at 426–27. Ms. Monistrol testified that she built many training aids at home and that, notwithstanding the limited resources at the port, she came to work with complex training aids and used them in training her dog. Tr. at 427, 450 (Monistrol); *see also* Tr. at 523–24 (Rivera testifying that supervisors must have known of off-duty construction of training aids because officers used materials for training aids that were not provided at the port).

In El Paso, both Messrs. Kruzel and Leuth provided persuasive evidence that their supervisors had at least constructive knowledge of their off-duty training aid construction. As in Miami, Detroit, and Buffalo, defendant must have known or had reason to know that the employees were constructing

---

school children. 991 F.Supp. at 421. The court held that "[t]hose presentations serve the [employer's] goals of reducing and fighting the use

and abuse of drugs," which the employer conceded was to its benefit. *Id.*

training aids at home because defendant did not provide officers with an adequate tool room. Tr. at 303 (Kruzel testifying that, between 1998–2004, he was not provided "with the proper material, tools, or time" to make the containers); *id.* at 308, 326, 349 (Kruzel testifying that at the port CEOs were provided only a few screwdrivers, a hammer, and at one time a saw, and that generally materials were insufficient to construct complex training aids); *id.* at 619–20 (Leuth, same); *id.* at 1618 (Luse, a supervisor, same). Customs also did not provide on-duty time for purchasing or collecting outside materials. *Id.* at 351–52 (Kruzel, testifying that it was common knowledge that officers obtained materials independently). Nevertheless, officers brought complex aids into work and supervisors observed them using these complex aids. *Id.* at 307–08 (Kruzel).

As they had testified with respect to the practice of laundering towels off duty, numerous supervisors testified that they also had constructed training aids off duty when they were CEOs. Tr. at 977, 1830 (Raleigh testifying he made containers off duty as a CEO), 1670 (Gernaat, same), 1540 (Smith, same), 1069–70 (Luby, same), 787 (Newcombe, former national Canine Program Manager, same); Ex.1900, Tab 12 (Rowley Dep.) at 20; *id.* Tab 18 (Ramirez Dep.) at 55–57; *id.* Tab 8 (Johnson Dep.) at 24–25; *id.* Tab 6 (Anton Dep.) at 38. Supervisors Wood and Anton in El Paso also testified that they had general knowledge that CEOs were building containers at home there. *See id.* Tab 14 (Wood Dep.) at 28; *id.* Tab 6 (Anton Dep.) at 42–44.

Ample testimonial evidence, as well as the actual circumstances at each POE, lead the court to conclude that defendant must have actually known that CEOs were constructing training aid containers off duty.

### c. Defendant Controlled and Required the Construction of Training Aid Containers Off Duty.

Evidence that defendant controlled and required off-duty construction of training aids is persuasive. Construction of varied and increasingly complex training aid containers was taught at Academy and CEOs construct-

ed containers while on duty and for pay while there. *See* Tr. at 53 (Bailey), 616 (Leuth), 494 (Rivera); *see also* Tr. at 319 (Kruzel testifying that he had been paid to build training aids when stationed in New York but was not paid for the same work in El Paso). Once in the field, if CEOs did not build the necessary training aids, they could be subject to a charge of neglect under the Table of Offenses. *See* Ex. 21 (Table of Offenses) § 7, at 529; Tr. at 352 (Kruzel); *see also* Tr. at 181–82 (Bailey referring to Ex. 13 (2/96 CEO Handbook) § 6.5, at 245). The court heard testimony that "[t]here is a direct connection [between] the success of the detector dog [and the success of] the officer," Tr. at 736 (Newcombe), a relationship that required that CEOs construct training aids to maintain their dogs' proficiency and their own success, *id.* Without sufficient time or materials to construct training aids on duty, Tr. at 303 (Kruzel), 619–20 (Leuth, same), plaintiffs were essentially "required" to construct them off duty.

Moreover, defendant "controlled" the off-duty construction of training aids because it had multiple opportunities to prevent the practice but never did so. Numerous plaintiffs testified that they spent off-duty time supplementing materials provided by their ports. *E.g.,* Tr. at 621–22 (Leuth testifying that he had to purchase materials from stores and found materials at garage sales and in dumpsters), 351 (Kruzel testifying that he purchased his own materials without getting reimbursed). Nevertheless, supervisors knowingly permitted these practices to continue without instructing CEOs to stop or allowing more on-duty time for material collection or construction. *E.g.,* Tr. at 1083 (Luby), 629–30 (Leuth), 308 (Kruzel), 447 (Monistrol); Ex.1900, Tab 18 (Ramirez Dep.) at 63–64, 68.

While defendant could have provided sufficient materials and tools at the ports, the court finds that it did not. Numerous plaintiffs testified that their ports had insufficient materials, in quantity and variety, to build appropriate training aids. Tr. at 619 (Leuth, El Paso), 426–27 (Monistrol, Miami), 351 (Kruzel, same). And although defendant provided testimony and evidentiary photo-

graphs of training aid storage facilities in El Paso, that evidence is insufficient to change the court's view. *See* Tr. at 1105, 1107, 1109, 1120 (Luby, a supervisor, El Paso); Ex. 1850, 1871 (photographs of the "Morgan Buildings" constructed in 1997 and located near the PDN and Ysletta kennels in El Paso, respectively). These photographs appear to have been taken in connection with trial preparation, and not contemporaneously with the claim period. Tr. at 1110, 1115, 1121 (Luby testifying that he did not know who took the photo, or when it was taken, but believes it was for litigation).[38] Moreover, while defendant's witnesses testified that the photographs are illustrative of the tools and materials the ports have always provided, Tr. at 1115 (Luby, El Paso), 1375–77 (Makolin, El Paso); Ex. 1859, 1865 (photographs of the interiors of the Morgan Buildings in El Paso); the photographs do not show the tools and materials required for construction of more complex training aids, Tr. at 303, 351–52 (Kruzel testifying that El Paso did not supply materials that he could use to make intricate containers). Instead, the photographs show mostly cardboard boxes, PVC, and suitcases. *See* Tr. at 1169–71 (Luby testifying that there are no metal, wood, or plexiglass materials in the photos). Where the occasional piece of wood, or other more complex material, is apparent in the photo, the size of the facility is so small and the volume of material provided is so limited that the court cannot reasonably believe it to be sufficient for all of the port's CEOs. *See* Tr.

at 1172–73 (Luby, a supervisor, testifying that CEOs should use a variety of materials in constructing "a minimum of two or three" training aid containers a week).[39] Defendant failed to provide any other corroboration for testimony that materials and tools did exist, such as evidence of the purchase of materials or tools.

The preponderance of the credible evidence supports plaintiff's contention that defendant controlled and required the off-duty construction by CEOs of training aid containers, thereby satisfying the third prong of the test to determine whether such construction constitutes "work" under the FLSA.

2. Plaintiffs are Entitled to Overtime Compensation for Off–Duty Time Spent Constructing Training Aid Containers

Plaintiffs' claims for compensation for constructing training aid containers off duty range from .17 hrs./wk. to 2.5 hrs./wk. Mr. Bailey, in Detroit, claims 2 hrs./wk., on average, building training aid containers off duty beginning the week of January 2, 1999 and ending the week of December 30, 2000, and 1 hr./wk., on average, beginning the week of January 6, 2001 and ending the week of July 31, 2004.[40] Tr. at 117, Ex. 136. In Miami, Ms. Monistrol claims 2.5 hours per week, on average, building training aid containers off duty beginning the week of September 4, 1999 and ending the week of September 18, 2004.[41] Tr. at 427–28, 439–40. In El Paso,

38. The photographs of work stations at the kennels, *see* Ex. 1852 (PDN kennel, El Paso), carry *no more weight* than the photographs of the storage facilities, and for much the same reasons. *See* 1126–34 (Luby testifying they were taken in connection with this litigation, after the Jacksta Memo took effect, and by an unknown photographer).

39. The limited volume of training aid materials is further evidenced by the small size of the buildings supposedly containing the materials. Tr. at 1114 (Luby testifying that the shed was either 8'x10' or 12'x12'). In addition, in El Paso, the Morgan buildings had no electricity or air conditioning. Thus, CEOs could not construct training aids at the buildings but were instead required to cart such materials and tools to the kennels, a circumstance which, in the court's view, made the already limited resources unreasonably inconvenient to use. Tr. at 1124 (Luby);

see also Tr. at 1390–91 (Makolin testifying that the CEOs could have done the construction in the parking lot area behind the Morgan Building, noting also that there were cars parked there, there was no real table, and officers would have had to run a long extension cord). Mr. Luse, a supervisor in El Paso, suggested that the "tool truck" at the port was very difficult for officers to get to. Tr. at 1618–19.

40. Mr. Bailey will not be entitled to compensation for constructing training aids for thirty days beginning September 11, 2001, or for any time on and after April 1, 2003. *See supra*, notes 34 & 35.

41. Ms. Monistrol will not be entitled to compensation for constructing training aids for thirty days beginning September 11, 2001. *See supra*, note 34.

Mr. Kruzel claims 1.25 hrs./wk., on average, building training aid containers off-duty beginning the week of September 6, 1997 and ending the week of July 3, 2004. Tr. at 362; Ex. 952 (Kruzel Damages Spreadsheet). Finally, Mr. Leuth in El Paso claims .17 hours per week, on average, building training aid containers off-duty beginning the week of September 6, 1997 and ending the week of October 20, 2001. *See* Ex. 990 (Leuth Damages Spreadsheet).

The court determines that plaintiffs' claims involve more than a de minimis amount of overtime work. The construction of training aids did not merely take up a "a few seconds, or minutes, of work beyond the scheduled working hours …." *Mt. Clemens Pottery,* 328 U.S. at 692, 66 S.Ct. 1187. Because defendant did not provide adequate time or materials to construct training aid containers during working hours, plaintiffs were forced to construct training aids at home and off duty. National or local directives require two to five training aids be used per day, *see* Tr. at 346–47, 371 (Kruzel), 1541 (Smith, a supervisor in Miami), 1613 (Luse, a supervisor in El Paso), thereby necessitating that plaintiffs regularly spend more than a de minimis amount of time per occasion constructing training aid containers. *See, e.g.,* Tr. at 326 (Kruzel testifying that training aid construction can sometimes "take several hours"); *accord Bobo II,* 136 F.3d at 1468; *Bobo I,* 37 Fed.Cl. at 701. Defendant did not present sufficient evidence to controvert this conclusion. The court must therefore determine what amount of time is reasonably required to perform this off-duty task.

In determining reasonable compensation for time spent in off-duty training aid construction, the court takes special note of Mr. Newcombe's testimony that it has always been within the discretion of the CEOs to determine the nature and extent of training aids they use with their canines. *See* Tr. at 749, 753 (Newcombe). Defendant, as the employer, relies on the CEO's professional training and judgment to prepare the proper number and mix of aids for each particular dog. The court will also be guided by the following factors which affect the determination of reasonable compensation: (1) the amount of time required to construct individual training aids; (2) how often training aids must be replaced or upgraded, which correlates to some extent with the type of response in which the dog has been trained (positive or passive), as well as the dog's general aptitude; (3) the amount and variety of materials, tools, and time available for CEOs to construct training aid containers while on duty; and (4) personal characteristics of CEOs, such as how effectively they were able to use downtime at work, or while laundering towels, for training aid construction.

Creating a simple training aid can take less than 10 minutes. Ex.1900, Tab 8 (Johnson Dep.) at 49:5–8, 50:15–17. However, complex training aids take longer to construct than simple ones, Tr. at 326 (Kruzel), though rarely over 1 hour. Ex.1900, Tab 8 (Johnson Dep.) at 49:9–13; *see generally* 326 (Kruzel testifying that construction can take several minutes to several hours depending on the material worked with). The national directive requires two training aids be used per day, or at least ten training aids per week. Tr. at 346–47 (Kruzel), 1541 (Smith, a supervisor). In El Paso, however, the local standard operating procedures require five training aids per day or twenty-five training aids per week. Tr. at 346–47, 371 (Kruzel), 1613 (Luse, a supervisor in El Paso); Ex. 1742 (Canine Enforcement Program SOP) at 547 (providing that a minimum of five task-related training aids for every 8 hours of work is highly recommended); *see also* Tr. at 620 (Leuth testifying that he built approximately twenty-five to thirty training aids per week in El Paso). In Miami, local standard operating procedures require three training aids per day or fifteen per week. Tr. at 1541 (Smith, a supervisor in Miami).

Some training aids may be re-used, depending upon the materials used in their construction and/or whether the detector dog is trained for a positive or passive response. *See* Tr. at 348–49 (Kruzel), 590 (Stuble), 1168–69 (Luby, a supervisor), 1617–18 (Luse, a supervisor), 1806 (Raleigh, a supervisor); Ex.1900, Tab 6 (Anton Dep.) at 43:4–17. However, a small percentage of training aids are reusable because most are destroyed by

the dogs during use. *See, e.g.,* Tr. at 348–50 (Kruzel, testifying that because most of the animals weigh more than fifty pounds, the dogs are able to tear containers apart with ease). CEOs need to construct at least one destructible aid per day and sometimes more when they are working on a problem with their dog. Tr. at 344 (Kruzel), 1615–16 (Luse, a supervisor in El Paso, adding that destructible aids were usually made of cardboard). Some training aid containers also "need to be made in advance if they're going to have an aid inside them. They need to permeate. The tighter the container, of course the longer it takes for that odor to become permeated .... So if you have an NTRT session coming up and it's a warehouse, you may want to have three or four boxes prepared for that at least one day or more in advance." Tr. at 346 (Kruzel). Some training aids do not require the use of a specially-made container, or do not require a container at all. Tr. at 348 (Kruzel), 1560 (Smith, a supervisor); *see also id.* at 1173 (Luby, a supervisor, testifying about variations in training aids), 1614 (Luse, a supervisor, same). For example, when contraband is found in a particular location, other handlers working in the same area allow their dogs to search for the contraband as a training exercise, without use of a training aid container. Tr. at 1618–20 (Luse, a supervisor); Ex.1900, Tab 8 (Johnson Dep.) at 47:18–23.

The court also considers whether CEOs were able to use any downtime at work or at home during laundering to construct training aid containers. Some CEOs testified they created training aids while on duty. Tr. at 228–30 (Bailey), 384 (Kruzel), 456 (Monistrol), 524 (Rivera), 589 (Stuble); Ex.1900, Tab 6 (Anton Dep.) at 61:18–62:2. On occasion, CEOs were able to return to the kennels or storage facilities during the day to pick up any materials available for construction. Tr. at 230–31 (Bailey testifying that he could sometimes pick up materials while in mid-shift in Detroit), 1377–78 (Makolin, a supervisor in El Paso, testifying that officers at the PDN or Ysleta bridges were close enough to return to the kennel to pick up

materials while on duty). And for at least some portion of the claim period, there is evidence that Customs let officers leave early on NTRT days, and that officers sometimes used this time to catch up on training aid construction, among other tasks. Tr. at 975–76 (Raleigh, a supervisor in Miami). However, many POEs provided little or no time and materials for on-duty construction of training aid containers. *E.g.,* Tr. at 351–52 (Kruzel), 620–21 (Leuth), 1618 (Luse, a supervisor).

The court has considered defendant's argument that allowing full compensation for time spent laundering towels and constructing training aids would effectively "double-bill" the United States, as some downtime during the laundry cycles can be spent constructing training aids. *See* Def.'s Br. at 43 n.14. The argument is insufficient to support the conclusion that plaintiffs were not entitled to separate compensation for both off-duty laundering and construction of training aids. It is the agency's responsibility to control how time is spent during "hours of work." 5 C.F.R. § 551.402(a); 29 C.F.R. § 785.13. Once the court finds that laundering time is "hours of work," Customs cannot complain if the downtime is not used exactly as it wishes. In addition, the court notes that most plaintiffs claim construction time in excess of any downtime which may exist during the laundering process.

On the basis of the evidence, the court finds 1.5 hrs./wk. to be reasonable compensation for time spent in off-duty construction of training aids.

C. Plaintiffs' Off–Duty Training–Related Activities Do Not Constitute Compensable Overtime Work Under the FLSA

The court now considers whether off-duty time spent training, specifically in weapons proficiency or in study at the Academy, constitutes compensable overtime work under the FLSA. OPM and DOL have promulgated, in similar terms, regulations that define compensable off-duty time spent in training. OPM has stated that off-duty time spent in training [42] shall be compensable "hours of work" if:

---

**42.** "Training" is not defined in the FLSA, *cf.* 29

U.S.C. § 203 (providing general definitions un-

(i) The employee is directed to participate in the training by his or her employing agency; and

(ii) The purpose of the training is to improve the employee's performance of the duties and responsibilities of his or her current position.

5 C.F.R. § 551.423(a)(2).[43]

An employee is "directed to participate" if "the training is required by the agency and the employee's performance or continued retention in his or her current position will be adversely affected by nonenrollment in such training." 5 C.F.R. § 551.423(b)(1).[44] "Training 'to improve the employee's performance . . . of his or her current position,'' excludes "upward mobility training or developmental training to provide an employee the knowledge or skills needed for a subsequent position in the same career field." 5 C.F.R. § 551.423(b)(2).[45]

While the OPM training regulations appear to contemplate training of an organized nature, such as a class or other activity involving an instructor, the court believes that the regulations provide an appropriate framework for analysis of the unstructured off-duty training exercises at issue here. *Cf. Dade County v. Alvarez,* 124 F.3d 1380 (11th Cir.1997) (applying the DOL regulations to a FLSA overtime claim for time spent in unstructured off-duty physical fitness training by rescue workers).[46]

### 1. Training to Maintain Weapons Proficiency Does Not Constitute Compensable Overtime Work

■ Customs requires CEOs to "maintain a minimum level of marksmanship." Tr. at 158 (Bailey); Ex. 17 (7/96 Customs Service Firearms and Use of Force Handbook) (7/06 Firearms Handbook) at 111 ("Qualification Requirements"). Marksmanship is tested three times per year. Tr. at 77 (Bailey), 1073 (Luby), 1207–09 (Lopez), 1279 (Summers); Ex. 17 (7/96 Firearms Handbook) Ch. 2, at 111. To meet the minimum qualification requirement, a CEO must score 120 out of 150 (or eighty percent). Tr. at 1212–13 (Lopez); Ex. 17 (7/96 Firearms Handbook) Ch. 2, at 112. Customs provides official on-

---

der the FLSA), or in the OPM regulations, *cf.* 5 C.F.R. § 210.12 (2005) (providing general definitions under the OPM regulations).

**43.** DOL's analogous regulations provide that "[a]ttendance at lectures, meetings, training programs and similar activities need not be counted as working time if . . . (a) attendance is outside the employee's regular working hours; (b) attendance is in fact voluntary; (c) the course, lecture, or meeting is not directly related to the employee's job; and (d) the employee does not perform any productive work during such attendance." 29 C.F.R. § 785.27.

**44.** DOL's analogous regulations provide that "[a]ttendance is not voluntary, of course, if it is required by the employer. It is not voluntary in fact if the employee is *given to understand* that his present working conditions or the continuance of his employment would be adversely affected by nonattendance." 29 C.F.R. § 785.28 (emphasis added).

**45.** DOL's analogous regulations provide that "training directly related to the employee's job" is training "designed to make the employee handle his job more effectively as distinguished from training him for another job, or to a new or additional skill." 29 C.F.R. § 785.29.

**46.** The court is unaware of any precedent specifically addressing off-duty weapons practice or studying in the context of the OPM training reg-

ulations. However, the court agrees with defendant's position that these activities are training and are therefore appropriately analyzed under these regulations. Despite timely notice of this position, plaintiffs failed to address the applicability of the OPM training regulations to these activities at any stage of the litigation. Nevertheless, even if the court found that the OPM training regulations did not apply and reviewed plaintiffs' training-related claims under the more general FLSA analysis applicable to plaintiffs' non-training-related claims, the court's ruling would not change. *Accord Dade County,* 124 F.3d at 1385 ("The conclusion we reach by applying the Department of Labor's regulations is identical to the result suggested to us by the more general principles that courts have used to define work under the FLSA."). Indeed, consistent with the analysis below, the weight of the evidence did not demonstrate that off-duty weapons practice or studying was "integral and indispensable" to a CEO's employment. *Accord Dade County,* 124 F.3d at 1383 (finding that "off-duty [physical fitness] training of the [police] officers cannot be said to be an integral and indispensable part of the principal activity for which these officers are employed" because they were "not employed to conduct physical training or even to attain certain physical fitness standards. Rather, . . . [they were employed] to provide rescue services").

duty time for practicing with the weapon before administering the qualification test. Tr. at 1211–13 (Lopez testifying that CEOs arrive at the shooting range, shoot one course of fire for practice then two courses for scoring and the higher score is recorded). If a CEO fails to meet the minimum qualification, CEOs are required to attend on-duty remedial training with Customs' firearms instructors. *See* Tr. at 473–74 (Monistrol), 593 (Stuble), 1212–13, 1215 (Lopez). After attending the remedial training, CEOs are given three opportunities to pass the qualification test. Tr. at 1212–13 (Lopez). If a CEO still fails to qualify, he or she faces termination of employment. Tr. at 158 (Bailey).

Time spent in off-duty weapons practice has been claimed by Mr. Kruzel, Tr. at 362, Ms. Monistrol, *id.* at 439, and Mr. Stuble, *id.* at 578–79. Under the OPM training regulations, a finding that plaintiffs were "directed to participate" in off-duty weapons practice requires an underlying finding that Customs required plaintiffs to participate in such weapons practice and that, if plaintiffs did not participate, their employment would have been adversely affected. 5 C.F.R. § 551.423(b)(1). The court determines that Customs did not require CEOs to engage in off-duty practice. The only pertinent requirement with respect to proficiency in marksmanship was a periodic qualification exam. *See* Ex. 17 (7/96 Firearms Handbook) at 111 ("Qualification Requirements"). CEOs testified that they received encouragement in the nature of guidance that, for example, "practice makes perfect." Tr. at 60 (Bailey). However, the court does not find that such encouragement rises to the level of a directive or requirement to act, especially in contrast to the actual directive to practice at qualification sessions three times per year. *Id.* at 77 (Bailey).[47]

Plaintiffs also failed to show that they would be adversely affected if they did not engage in off-duty weapons training. Tr. at 593 (Stuble testifying that he never tried to qualify without practicing), 394–95 (Kruzel, same), 472 (Monistrol, same); *see also* Tr. at 521 (Rivera, same, although not claiming compensation for practice time), 623 (Leuth, same as Mr. Rivera); Ex. 1550 (showing that Mr. Stuble qualified in February 2005, scoring 98 percent, even though he had ceased off-duty practice since the Jacksta Memo in July 2004). Indeed, none of the plaintiffs had difficulty meeting the minimum qualification, because of lack of off-duty training or otherwise. Rather, plaintiffs routinely earned near-perfect scores. *See* Tr. at 424 (Monistrol testifying that she was a "good shot; better than average," achieving 130 out of 150), 1235 (Lopez, a supervisory range officer, testifying that only eight to twelve out of 800 officers ever needed remedial training); *see also id.* at 395 (Kruzel, testifying that he is a "frequent shooter" and a "member of the El Paso Gun Club."); Ex. 1550 (showing that Mr. Stuble routinely scored 90–100 percent). In fact, plaintiffs could not point to a single CEO who had failed every chance at qualification, including those chances subsequent to on-duty remedial training, such that termination resulted. *See* Tr. at 1218 (Lopez testifying that no one has ever completely failed), 474 (Monistrol testifying that she was not aware of any CEO ever failing the weapon qualification test).

Finally, plaintiffs did not meet their burden of proof that "the purpose of the training was to improve the[ir] performance" in their current position. 5 C.F.R. § 551.423. CEOs are not principally employed to use a firearm, nor is off-duty firearms training necessary to improve the day-to-day performance of their work.[48] Rather, Customs required

47. While the court recognizes that Customs may have given out practice ammunition to some officers occasionally, *see* Tr. at 154 (Bailey), 396 (Kruzel), 572 (Stuble), plaintiffs have failed to show that this distribution was anything more than informal and infrequent within the relevant time period, *see* Tr. at 398–99 (Kruzel testifying that the distribution of ammunition was for officers' enjoyment and was based on the availability of funds); *see also* Tr. at 1210 (Lopez testifying ammunition is no longer distributed in El Paso);

1283 (Summers testifying that ammunition was never distributed in Miami). Moreover, it appears that ammunition was distributed by firearms instructors and testimony is inconclusive as to whether these instructors qualified as supervisors. *See* Tr. at 587 (Stuble testifying that ammunition was not distributed by supervisors).

48. Plaintiffs attempted to establish that the better a CEO's marksmanship, the less of a liability to

CEOs to maintain only a minimum weapons proficiency, which plaintiffs did not establish to be high enough to qualify as a skill unique to their employment. Several of the plaintiffs had shooting skills sufficient to meet the CEO qualification standard before they entered training to become a CEO. *See* Tr. at 561 (Stuble testifying he served as a military police officer and canine handler before becoming a CEO), 31 (Bailey, same), 255–56 (Kruzel, same), 258–59 (Kruzel, adding that, before becoming a CEO, he had received special training in the use of sidearms and awards for his marksmanship), 1411–12 (Perryman testifying that some CEO-trainees enter with "a lot of background with handguns"). Moreover, with respect to other plaintiffs who learned to shoot or further developed their skills in training, plaintiffs did not establish that they were required, once in the field, to improve upon the level achieved at training. *See* Tr. at 1411–12 (Perryman testifying that about 75 percent of CEO-trainees have no handgun experience when entering training). The court concludes that plaintiffs have failed to establish that off-duty weapons training to improve marksmanship skill above the qualification threshold required meets the OPM guidelines for a compensable training activity. *Accord Dade County,* 124 F.3d at 1386.

This conclusion is consistent with DOL standards as they have been applied by the United States Court of Appeals for the Eleventh Circuit and by the DOL Wage and Hour Administrator (Administrator) when considering an analogous question: whether off-duty time spent by police officers in maintaining physical fitness levels above a minimum qualification requirement is compensable. Both the Eleventh Circuit and the Administrator found that it is not. *Dade County,* 124 F.3d at 1386; *id.* at 1385 (citing Opinion Letter of the Wage and Hour Ad-

ministrator (June 1, 1994) (1994 Opinion Letter)); *accord* Opinion Letter of the Wage and Hour Administrator (September 12, 1985) ("Time voluntarily spent by police and fire fighters to maintain their physical fitness is not considered working time, even though fitness is a job requirement.").

Just as Customs requires its officers to maintain a minimum level of marksmanship, the Metro–Dade Police Department (Metro–Dade) required its officers to maintain "good physical fitness." *Dade County,* 124 F.3d at 1382. Initially, the plaintiffs in *Dade County,* like plaintiffs here, underwent proficiency training at an academy. *Compare id.* at 1382, *with, e.g.,* Tr. at 570–71 (Stuble), 412, 423–24 (Monistrol). Once in the field, however, only limited on-duty training was permitted, and it was primarily monitored through a qualification system much like the firearms proficiency testing in this case. *Compare Dade,* 124 F.3d at 1382, *with, e.g.,* Tr. at 153–54 (Bailey testifying that the on-duty time allotted for weapons practice was 3 days per year at qualification), 571–72 (Stuble, same). Supervisors in *Dade County,* like supervisors and firearms instructors here, encouraged officers to stay in shape, but never directed or required any officer to engage in any specific off-duty routine or training. *Compare Dade County,* 124 F.3d at 1382–83, *with, e.g.,* Tr. at 424–25 (Monistrol testifying that she was told all the time that she needed to practice to maintain her proficiency, but not told how often or for how long), 571, 573 (Stuble, same); 60 (Bailey testifying that he was told, "practice makes perfect"); Ex.1900, Tab 14 (Wood Dep.) at 32 (testifying that officers were generally encouraged to maintain proficiency).

In reversing the trial court's decision in favor of the officers, the Eleventh Circuit relied on opinions issued by the Administrator and applied the test for compensable

---

Customs he or she would be. *See* Tr. at 244 (Bailey), 424 (Monistrol testifying that "[y]ou're accountable for every bullet so they want you to be very accurate"); Ex.1900, Tab 14 (Wood Dep.) at 32. While the court does not doubt the truth of this assertion, it remains that the CEOs did not point to a single instance in which one of them was required to fire his or her gun in the line of duty. *See* Tr. at 585 (Stuble testifying he had never shot his weapon as a CEO), 249 (Bai-

ley, same). The court heard testimony suggesting that unstructured, informal off-duty practice could actually diminish, rather than improve, a CEO's marksmanship by reinforcing or at least failing to correct bad habits in shooting. Tr. at 1215–16 (Lopez testifying that practicing without instruction is not helpful), 1284 (Summers, a supervisor of firearms, testifying that off-duty practice was not encouraged because defendant did not want to reinforce bad habits).

training promulgated by DOL, concluding that time spent by officers in off-duty physical fitness training was not "required or directly related to the [officers'] job." *Dade County,* 124 F.3d at 1384 (citing 1994 Opinion Letter) (internal citation omitted). The *Dade County* court found that the officers were acting voluntarily when they engaged in their off-duty fitness regimes because supervisors required only that the officers pass periodic fitness tests.[49] *Dade County,* 124 F.3d at 1385. As here, the officers did not establish that their employment would be adversely affected if they did not participate in the off-duty training, so long as they continued to pass their fitness tests. *Id.; see also Chao v. Tradesmen Int'l, Inc.,* 310 F.3d 904, 909 (6th Cir.2002) (suggesting that even though an officer's employment depends upon passing qualification tests, the existence of the tests is not a sufficient basis to convert off-duty training into a requirement). Finally, the Eleventh Circuit found that the officers' training was not directly related to their employment because qualification exams required only that officers sustain the level of fitness established at training, not a "skill unique to their employment" as officers. *Id.* "The mere fact that fitness training must be undertaken off-duty in order to perform [their jobs] is insufficient to establish that such activity is directly related to the employee's job." *Id.* In light of the foregoing, the court concludes that plaintiffs have failed to carry their burden of proof that off-duty time spent training to improve weapons proficiency beyond the threshold qualification is compensable.

2. Studying at the Academy Does Not Constitute Compensable Overtime Work

■ Three plaintiffs at trial—Messrs. Bailey and Kruzel and Ms. Monistrol—claim compensation for off-duty time spent on activities related to training at the academies.

*See* Tr. at 115, 118 (Bailey, seeking compensation for 8 hrs./wk. of off-duty time spent studying and in practical exercises at the FLETC); *id.* at 367–69 (Kruzel, seeking compensation for 10 hrs./wk. or 140–150 hours in total of off-duty time spent at CETC training from January 1, 2000 through April 1, 2000, and 2 hours per day of off-duty time spent at FLETC training in March and April of 2001); *id.* at 440–41 (Monistrol, seeking compensation for 1.75 hrs./wk. of off-duty time spent during her initial training to become a CEO at CETC beginning May 8, 1999 and ending August 28, 1999). As with off-duty weapons practice, the court concludes that plaintiffs are not entitled to compensation for these off-duty training-related activities, whether analyzed under the OPM training regulations or the more general provisions of the FLSA. Because each plaintiff's training-related activity claim differs factually from the others, the court will analyze each individually.

Mr. Bailey failed to prove either of the elements of compensable training required by the OPM regulations. The court first notes that Mr. Bailey's study claim is part of the time he spent in training to become an inspector. Tr. at 217. Because inspector training is not required for continued retention or improved performance of duties as a CEO, *id.,* the off-duty studying, which is part of that training, is not compensable. *See* 5 C.F.R. § 551.423(a)(2)(ii) and (b)(2) (denying compensation for upward mobility training); *see also* Tr. at 967–68 (Titus, a supervisor, acknowledging that the skills learned at the inspector training course were not necessary to perform the duties of a CEO). Moreover, even if the training was undertaken to improve his performance in his current position, Mr. Bailey did not prove that he was "directed to participate" in either the training itself or in the off-duty study. Finally, Mr. Bailey did not show that his current position as CEO would have been adversely affected by

---

**49.** Moreover, the Eleventh Circuit's focus on the fact that "the method, location, and amount of off-duty [physical fitness] training were left to the officers' complete discretion," *Dade,* 124 F.3d at 1383, is also appropriate to consider here. Unlike the strictures imposed on officers regarding how and when to launder and process towels, see supra, Part IV.A, officers enjoyed complete discretion to decide how and when to practice

with their weapons off duty. If the officers chose to engage in off-duty practice, Customs neither imposed nor proscribed a particular practice regimen. See Tr. at 424 (Monistrol), 1284 (Summers, a supervisor); see generally *Dade,* 124 F.3d at 1383 (Off-duty fitness exercises "cannot be considered to have been performed predominantly for the benefit of the [employer].").

his nonenrollment in the training and/or non-participation in the study. Indeed, Mr. Bailey mentioned that four students in his training program failed the inspector training course, Tr. at 217–18, yet he did not know whether they were able to, or did, return to their previous work as CEOs, *id.* at 218–19; *cf. Ballou v. General Elec. Co.,* 433 F.2d 109, 111 (1st Cir.1970) (noting that plaintiff-apprentices would have been fired if they failed either in their capacity as workers or as trainees in the classroom program). The court therefore holds that pursuant to the OPM regulations, Mr. Bailey's claim for off-duty study time for a training course designed to advance him from his current position is DENIED.

Similarly, Mr. Kruzel's claimed off-duty study time at the CETC is not compensable. Mr. Hoisington, Mr. Kruzel's instructor at the relevant time, testified that Mr. Kruzel was training to become a "technical trainer," which is a position "a notch above CEOs." Tr. at 1773. Because there is evidence that the "technical trainer" position is a promotion to a position above CEO and because plaintiff failed to offer any evidence to the contrary, Mr. Kruzel's claim for overtime compensation during this period, like Mr. Bailey's, fails to be compensable because it is upward mobility training. 5 C.F.R. §§ 551.423(a)(2)(ii) and (b)(2). Mr. Kruzel's claim for off-duty time spent studying at the FLETC training also fails as noncompensable upward mobility training. Mr. Kruzel returned to the FLETC for a mandatory training inspector course required in connection with his promotion to team leader. Tr. at 391. Mr. Kruzel testified that CEOs and inspectors, or "team leaders," have a different employment classification than CEOs, *id.,* which supports the court's conclusion

that training for the team leader position is not required for continued retention in the position of CEO. *See* 5 C.F.R. §§ 551.423(a)(2)(ii) and (b)(2). Mr. Kruzel's claims for off-duty study time for training courses designed to advance him from his current position are DENIED.[50]

Ms. Monistrol's claim for compensation for off-duty time spent during her initial training to become a CEO fails. During this time she asserts that she fed dogs, made training aids, washed towels, and studied off duty. Tr. at 477–48. However, the court is persuaded by credible testimony that all of the activities, other than the off-duty studying, could not have been performed during off-duty time while in training. Because officers travel between their lodging and the training school as a group, coming in early or staying late was nearly impossible. Tr. at 1516 (Molidor), 1764 (Hoisington).[51] Liability for any time Ms. Monistrol asserts she spent at her initial training feeding her dogs, building training aids, or washing towels, is therefore DENIED. The court now considers whether liability exists for off-duty time spent studying.

Plaintiffs failed to establish a sufficient record from which this court can draw the inference that Ms. Monistrol was entitled to overtime pay for off-duty studying under either the OPM training regulations or the FLSA analysis of compensable work. While it is undisputed that Ms. Monistrol was "directed to participate" in the training program in order to become a CEO, she never proved that Customs required off-duty studying in order to become a CEO. *See* 5 C.F.R. § 551.423(b)(1). Nor did she assert or prove that she would have suffered adverse consequences had she not studied off duty. Ms.

**50.** Even if OPM's regulations did not apply and Mr. Bailey and Mr. Kruzel's overtime compensation was not barred by regulation, neither Mr. Bailey nor Mr. Kruzel has established that his off-duty activity at training met the threshold for compensable work under the FLSA. Because the training was not required for the officers to continue in their positions as CEOs, it cannot be found to be an "integral and indispensable" part of the principal activities for which the officers are employed. Nor does Mr. Kruzel assert that his instructors knew or should have known of his off-duty studying. Mr. Bailey bases his claim for constructive knowledge on the fact that he brought to training each day the worksheets he

completed the night before, Tr. at 131, but the court finds this to be insufficient absent some corroboration. Thus, even under the FLSA's general analysis, Mr. Bailey's and Mr. Kruzel's claims fail.

**51.** Even if the court discounted the testimony of Messrs. Molidor and Hoisington, plaintiffs failed to develop a factual record or craft a legal argument from which the court could rule on the compensability of any of the activities for which compensation is claimed by Ms. Monistrol during training, other than studying.

Monistrol also failed to testify as to the benefit Customs received from her studying, further suggesting to the court that off-duty study is not integral and indispensable to the training program. Indeed, there was testimony that all subjects on which that CEO-trainees are tested are taught during the classes. *See* Tr. at 411–412; *id.* at 1516. Mr. Molidor, Ms. Monistrol's supervisor at training, testified that he did not know that Ms. Monistrol was engaging in any off-duty work or studying, Tr. at 1516,[52] and it is difficult to imagine how any supervisor would know of such studying when it is done after-hours, irregularly, and for an unknowable period of time. Indeed, the only person to testify that defendant should have known that its officers were studying off duty during training is Mr. Clemons, plaintiffs' expert, but he failed to lay a foundation for his opinion. *See* Tr. at 902–03. Finally, even if Ms. Monistrol could overcome the knowledge requirement, she would still have to prove that her time spent studying was not de minimis and was reasonable, *Mt. Clemens Pottery*, 328 U.S. at 693, 66 S.Ct. 1187; *Bobo II*, 136 F.3d at 1468, which she has not done. For the foregoing reasons, the court finds that Customs is not liable to Ms. Monistrol for off-duty time spent studying during her training at the CETC.

Based on the foregoing analysis, the court holds that plaintiffs' off-duty training-related activities do not constitute compensable overtime work under the FLSA.

D. **Plaintiffs' Off–Duty Weapons Care and Maintenance Constitute Compensable Overtime Work Under the FLSA**

1. **Weapons Care and Maintenance Constitute Work**

█ The record of trial supports plaintiffs' argument that time spent cleaning and caring for weapons is an integral and indispensable part of the job of a CEO. *Accord Hellmers v. Town of Vestal*, 969 F.Supp. 837, 844 (N.D.N.Y.1997) (finding that a police officer's cleaning of his firearm and vehicle "were not activities performed for his own convenience, but were required by his employer and were an integral and indispensable part of the principal work activity for which he is employed"); *Albanese*, 991 F.Supp. at 421 (officers were entitled under FLSA to compensation for time spent off the clock maintaining uniforms and gun if those activities were performed for the employer's benefit and were not de minimis); *Treece v. City of Little Rock, Ark.*, 923 F.Supp. 1122, 1127 (E.D.Ark. 1996) (granting summary judgment for plaintiffs and holding that time spent by canine police officers in cleaning and caring for police equipment, such as uniforms and guns, was compensable under FLSA to the extent that it was not de minimis). As appeared at trial, weapons care and maintenance benefitted defendant, defendant knew or should have known that it was performed off duty, and defendant required that it be done. Thus, if done for a reasonable period of time exceeding the de minimis threshold, this work is compensable.

a. **Weapons Care and Maintenance Provided a Benefit to Defendant, Which Defendant Recognized**

Defendant recognized the benefit it receives from CEOs' caring for and maintaining their weapons.[53] Indeed, "[i]f your weapon is not clean, you are not prepared for duty. If you neglect your weapon, it's going to fall apart. It's not going to operate. So now you have neglected your duty in being prepared for duty at any given time." Tr. at 137–38 (Bailey), 58 (Bailey testifying that "dirty equipment usually won't work. A

---

52. Defendant also argues that even if Mr. Molidor did know that these activities were being performed, defendant cannot be held liable for this because Mr. Molidor was not in a position to approve overtime. *See* Tr. at 1512 (Molidor); *see also* 1763 (Hoisington), 631 (Leuth, Mr. Bailey's supervisor, testifying that an instructor is not a supervisor). Messrs. Newcombe and Titus have testified that only they could approve overtime, Tr. at 822 (Newcombe), 956 (Titus), and plaintiffs presented no evidence that these supervisors knew or should have known about Ms. Monistrol's off-duty activities.

53. The care and maintenance of "weapons" includes care of the gun itself, as well as its holster, belt, magazine, magazine holder, handcuff case, and the handcuffs. *See* Tr. at 319, 320 (Kruzel describing the weapon-related duty equipment issued to CEOs).

dirty weapon might not fire, so [you] keep your weapon clean"). CEOs must keep their weapons clean so that they can properly perform their duties and be prepared for work, which unquestionably benefits defendant. *See* Tr. at 356–57 (Kruzel, stating that "[y]ou'd want to be armed at all times ... [because] any time could be a possible situation"); Ex.1900, Tab 6 (Anton Dep.) at 51–52 (Anton, a supervisor, stating that "[m]aintaining the weapon clean is for your security" and acknowledging that if a CEO's weapon jammed at a time when he or she really needed it, the result could be tragic).

That defendant recognized and valued this benefit is underscored by a number of defendant's actions. First, CEOs are required to clean and maintain their weapons. *See infra,* Part IV.D.1.c; Ex. 97 (Use of Force Handbook Dec. 2001) (2001 Firearms Handbook) at 37–38; Tr. at 791 (Newcombe); Ex.1900, Tab 3 (Anaya Dep.) at 25–27, 49, 51–52. Moreover, at the Academy, defendant teaches CEOs how to clean their weapons, provides equipment for the CEOs to clean their weapons, and pays CEOs for the time spent cleaning their weapons. Tr. at 58 (Bailey), 412 (Monistrol), 566–67 (Stuble). After the Jacksta Memo was issued in July 2004, defendant began to install facilities at some ports for plaintiffs to clean their guns at work rather than at home. Tr. at 423 (Monistrol testifying that a facility became available at the airport only after the Jacksta Memo was issued), 502–03 (Rivera, same), 1301 (Summers explaining that Miami was, as of the date of trial, still researching the installation of a clearing station). The evidence convinces the court that weapons care and maintenance provided a benefit to defendant that defendant recognized.

b. **Defendant Knew or Should Have Known that Plaintiffs Cleaned and Maintained Their Weapons Off Duty**

While evidence that supervisors had actual knowledge of off-duty cleaning is weak,[54] con-

structive knowledge is readily apparent. The strongest evidence that Customs had constructive knowledge of off-duty cleaning can be drawn where ports did not provide the proper materials for cleaning or a safe place to disassemble the weapon at the worksite.[55] *See e.g.,* Tr. at 423 (Monistrol, Miami), 502–03 (Rivera, Miami), 1247 (Lopez, a supervisor, El Paso). *But see, e.g.,* Ex.1900, Tab 7 (Blanchard Dep.) at 46:17–48:11; (testifying that clearing barrels existed in Detroit). Since the experiences of officers and their supervisors differ on this point, the court will analyze each officer's claim within the context of the city where he or she was stationed.

i. El Paso

There is ample evidence that supervisors in El Paso had constructive knowledge that their officers were cleaning their weapons and related equipment off-the-clock. It should first be noted that El Paso's climate prompted a need for frequent cleaning. "[El Paso] is a desert environment, very dry, very little greenery, very sandy. At times during the year, very windy, which you'll see frequent sandstorms which you have to work outside in ...." Tr. at 624 (Leuth), 568, 610 (Stuble, same), 321–22 (Kruzel testifying that "[i]t can be difficult to breathe if you are facing the wind or almost feels like rubbing sandpaper on you. You come home and you've got black soot-like sand in your nose, in your ears, eyes."). This windy season lasts approximately two to three months. Tr. at 624–25 (Leuth), 610 (Stuble), 1233 (Lopez, adding that sandstorms last a "few hours" and occur approximately twice a week throughout the two– to three-month season); *see* Tr. at 1622 (Supervisor Luse testifying that the windy season lasts one, maybe two, months); *see also* Tr. at 1234 (Supervisor Lopez testifying that the sandstorms occur a few times each week).

---

54. Plaintiffs generally testified that they never spoke directly with their supervisors about their off-duty weapons cleaning. Tr. at 526 (Bailey); 596 (Stuble); *see* Tr. at 1254–55 (Lopez), 1380 (Makolin). Any exceptions are discussed in further detail in the text.

55. It is especially important that a Glock is cleaned in a safe facility using a clearing barrel because its design requires an officer to pull the trigger in the process of disassembling it. Tr. at 1240 (Lopez).

Generally, even when not in the windy season, "[t]he entire environment is very dirty, a lot of ... [motor oil], anti-freeze, liquids from the vehicles." Tr. at 320 (Kruzel testifying that "[t]hese things are so bad that [Customs has to have] a cleaning service come in and steam clean the roadway at least once a month .... It's just very grimy work. Come to work ... you are going to go home dirty, very dirty."). Indeed, officers spend a lot of time climbing underneath vehicles because smugglers often hide contraband inside gas tanks. Tr. at 320–21 (Kruzel) ("When the dog is alert and tries to crawl underneath [a vehicle], [the officer has] got to get down there with him and make sure—see what they are doing, see what they are alerted to, and also to make sure that they are going to stay safe ...."), 568 (Stuble, same); *accord* Tr. at 901 (Clemons, same). Uniforms cannot be worn more than a single day, Tr. at 321 (Kruzel); *see id.* at 568 (Stuble testifying that, at the end of the day, officers are "completely filthy").

El Paso CEOs' weapons, cleaned with lubricant, also attract dust and sand, which can get into the weapons. Tr. at 625 (Leuth testifying that if "[y]ou keep the firearm lubricated ... dirt and sand is going to stick to that lubricant"). Mr. Lopez, a supervisor, confirms that weapons get dirty at the port. Tr. at 1257 (Lopez); *see also* Tr. at 1393 (Makolin, a supervisor, same); Tr. at 322 (Kruzel testifying that the officers joke that they "have extra rounds in the form of sand in the weapon"). "If large grains of sand get inside your weapon, [it is] the quickest way to get a jam." Tr. at 323 (Kruzel), 1435–36 (Perryman testifying that in places like El Paso, it is important for the officer to take his gun apart, wipe off dust, and re-oil it). During the windy season, officers might have to clean their weapons every day. Tr. at 323 (Kruzel), 625 (Leuth testifying that "there were times I would have to clean it after each shift to be ready for the next shift"). Managers are also required to provide sufficient on-duty time for officers to clean their

weapons. Ex. 97 (2001 Firearms Handbook) at 37–38; *see also* Tr. at 324 (Kruzel).

Despite this, there was no "safe room" or clearing barrel[56] at the port to protect against accidental discharge while cleaning, nor were there cleaning aids such as rags, solvents, pipe cleaners, brushes, tables, or on-duty time to engage in the cleaning process. Tr. at 354–59 (Kruzel), 596 (Stuble); *cf.* Tr. at 1381 (Makolin, a supervisor in El Paso, testifying a "cleaning kit" existed, but not testifying as to the presence of a safe room or clearing barrel). Instead officers cleaned their weapons off duty, at home, and purchased their own cleaning materials. *See* Tr. at 354–55 (Kruzel), 616 (Leuth); *see also* Tr. at 1385 (Makolin, a supervisor, testifying that, when he was a CEO, he cleaned his weapon off duty). Mr. Leuth testified that, while he was employed with Customs, he was never told not to clean his weapon while off duty, Tr. at 630, and never received instruction on the frequency of cleaning required, *id.* at 636; *see also id.* at 568, 596 (Stuble, same, adding that officers were also never instructed on how much time to spend on each occasion to clean a weapon).

Mr. Kruzel testified that he once observed a fellow officer, Elmer Johnson, attempt to clean his weapon while on duty. Tr. at 355–56. However, their supervisor, Mr. Anton, immediately told him that he was not authorized to clean it at work and that, "[i]f needed [he should] do that at home if he wanted to do it." *Id.* at 356. Mr. Kruzel further testified that, on this occasion, the chief canine officer weighed in with approval of Mr. Anton's directive. *Id.* Mr. Kruzel also testified that, since 1995, instructors Kalukus, Herrera, and Ghant, have consistently re-enforced the notion that weapons need to remain clean. Tr. at 324–25 (Kruzel); *see also* Tr. at 596 (Stuble testifying that his range officers told him to maintain a clean weapon at all times). Based on the foregoing, the court finds that defendant had at least constructive knowledge that plaintiffs in El Paso were performing off-duty weapons cleaning and maintenance.

---

**56.** A clearing barrel is a "50–gallon barrel in[] the ground full of sand where an officer can point his weapon after he withdraws the magazine, injects the round. That way the weapon is in a safe direction. It can't hurt anyone. If it accidently goes off, the round goes into the sand." Tr. at 59 (Bailey).

### ii. Miami

As to Miami, there was testimony that no facility for weapons cleaning existed between 1999 and 2004. Tr. at 423 (Monistrol testifying that a facility only became available at the airport after the Jacksta Memo was issued), 502–03 (Rivera, same), 1301 (Summers, a supervisor, explaining that Miami is, as of the time of trial, still researching the installation of a clearing station); *see also* Tr. at 1838–42 (Raleigh testifying that a clearing barrel and materials do exist and acknowledging, Tr. at 1839, that the materials were purchased "[s]ometime after the [July 2004] Jacksta [M]emo"). Customs also failed to make readily available any materials for gun cleaning, such as solvents, brushes, or rags. Tr. at 424 (Monistrol); *see* Tr. at 501–02 (Rivera testifying that he had to clean his weapon at home using solution, brushes, and oil he purchased himself). In response to the testimony of supervisors Makolin and Smith that Customs did provide cleaning supplies at the kennels, Tr. at 1380–81 (Makolin), 1552 (Smith), Ms. Monistrol explained that while she was aware cleaning kits were supposedly available, they were kept locked away and she was never informed where they were kept. Tr. at 483.[57] Moreover, even if these materials were made available and a safe facility for cleaning had been established, Customs in Miami still failed to reserve any on-duty time for weapons cleaning other than the three times per year when officers qualified at the range. Tr. at 502–03 (Rivera); *but see* Tr. at 1279 (Summers stating that as a CET supervisor he would allow his officers to clean their weapons on duty if they asked), 1533–35, 1554 (Smith, a supervisor, same).

The testimony at trial supports the claim that the conditions in which Ms. Monistrol and Mr. Rivera worked required the officers to clean their weapons more often than three times per year. *See* Tr. at 977 (Raleigh, a supervisor, stating that "it is possible to get dirty in Miami, especially if you[ ] work at the seaport"), 1278–79 (Summers, a supervisor, testifying that he cleaned his weapon more often when he was a CEO because his weapon got dirty in the field), 1833 (Raleigh, a supervisor, testifying that it was possible for officers' weapons to get dirty in time periods outside of qualifications). Ms. Monistrol testified that her work generally kept her outside both at the airport and seaport, and that at the seaport she rummaged through cargo, exposing her weapon to the elements and requiring that it be frequently cleaned. Tr. at 420 (adding that when working at the seaport, her time spent around fish exacerbated the need for frequent cleaning); *see also* Tr. at 1527–28 (Supervisor Smith confirming that Ms. Monistrol worked at both the airport and the seaport, although her seaport rotation was short). Mr. Rivera also worked under these conditions at the airport or the seaport, depending on where he was needed. Tr. at 1528 (Supervisor Smith), 1660 (Supervisor Gernaat).

Supervisors knew or should have known that CEOs in Miami were required to clean their guns more than three times per year, because they themselves admit to cleaning their weapons off-duty. Tr. at 1299 (Summers testifying he cleaned his weapon at home as a CEO); *see* Tr. at 1833 (Raleigh, Miami, same), 1571 (Smith stating she cleaned her weapon off-duty when she was a CEO), 1671–73 (Gernaat stating he cleaned his weapon while off-duty every three months the night before qualification).[58]

The court recognizes and weighs the conflicts in testimony. The court finds that, by a preponderance of the credible evidence, as to El Paso and Miami, plaintiffs have adequately supported their claim that defendant

---

**57.** Supervisors Smith and Titus testified that a clearing barrel was available at Customs' office in the "CCC" building. Tr. at 1552–56 (Smith); Ex. 1805 (photograph of clearing barrel); *see also* Tr. at 965 (Titus testifying that a clearing barrel existed at least in 1988).

**58.** Defendant asserts, however, that the mere fact that supervisors clean their own weapon off-duty does not show that supervisors knew that CEOs were cleaning their weapons off duty. Def.'s Br. at 83 (citing *Newton,* 47 F.3d at 749). In fact, defendant asserts, supervisors in Miami did not know that CEOs were cleaning their weapons while off duty. Tr. at 1551 (Smith), 1674–75 (Gernaat); Ex.1900, Tab 8 (Johnson Dep.) at 58:1–12. While the court agrees that this evidence might not be dispositive proof of actual notice, it has probative value that, together with other evidence, leads the court to find that constructive knowledge existed.

knew or should have known that plaintiffs were cleaning and maintaining their weapons off-duty.

### iii. Buffalo and Detroit

However, the court finds that Mr. Bailey's claim for overtime compensation for weapons cleaning in Buffalo and Detroit fails this prong of the test for compensable overtime work. *See* Tr. at 78, 80, 113–14, 151. Mr. Bailey did not establish that his supervisors knew or should have known that he was cleaning his weapon off duty. After Mr. Bailey testified that he personally told his supervisors in Detroit, David Walters and Roger Blanchard, about his off-duty weapon cleaning at home, the defense brought out on cross-examination that he stated in deposition testimony that he had not notified his supervisors directly. *See* Tr. at 123–25, 220–221 (Bailey stating in his deposition that "I never told them I was [cleaning my weapons while off-duty]"). As to constructive knowledge, Mr. Bailey states that defendant should have known about his off-duty cleaning because generally he "would get dirty climbing into a container, a tractor-trailer underneath, when you got wet, you had to clean your weapon because whatever was on you was on your weapon. If you got all wet, you had to wipe your weapon down." Tr. at 130–31. Furthermore, Mr. Bailey testified that Customs in Detroit provided no on duty time to clean his weapon, other than at qualifications, Tr. at 152, and that that Detroit did not provide materials for cleaning, which he was forced to purchase independently and stored at home, *id.; see also id.* at 161 (Bailey testifying that he cleaned with solvents because he was taught to clean with solvents while at Academy). However, unlike ports in Miami and El Paso, Detroit did provide clearing stations for safe weapon cleaning at each work location. Ex.1900, Tab 7 (Blanchard Dep.) at 46:17–48:11; *id.* Tab 3 (Anaya Dep.) at 10:3–11; *id.* Tab 12 (Rowley Dep.) at 57:9–58:2, 58:12–21, 73:4–22; *id.* Tab 18 (Ramirez Dep.) at 73:25–74:17. Mr. Blanchard, a supervisor, also testified that he would have granted CEOs on-duty time to clean their weapons had they ever requested it. Ex.1900, Tab 7 (Blanchard Dep.) at 47:21–48:11. *But see id.* at Tab 16 (Currey Dep.) at

32:18–23 (testifying that supervisors never gave instruction not to clean weapons off duty); *id.* at Tab 18 (Ramirez Dep.) at 89:25–90:8 (same). Mr. Bailey did not controvert the supervisors' assertion that a proper clearing station did in fact exist. With a clearing station at the port, supervisors would have little reason to know that officers were choosing not to use it, opting instead for home cleaning. Mr. Bailey's claim for compensation for off-duty weapon cleaning in Detroit is DENIED.

As to Buffalo, where Mr. Bailey has been stationed since May 19, 2003, Tr. at 78–79, he testified that Customs did not provide materials for cleaning and he was forced, as in Detroit, to purchase cleaning materials independently, *id.* at 153. However, Mr. Bailey provided no testimony from which to infer that his supervisors in Buffalo had actual or constructive knowledge of his off-duty cleaning activities. Mr. Bailey does not assert that his supervisors had actual knowledge of his off-duty activities, Tr. at 123–24 (testifying he did not remember if he had ever spoken to anyone), and the only testimony from which to draw an inference of constructive knowledge is based on the assertion that Mr. Bailey reported to the range (three times a year) with a clean weapon and was never counseled or disciplined for sub-standard maintenance, *id.* at 132. At trial, Mr. Bailey did not testify as to why he required more than the on-duty time allotted at qualifications to clean his weapon in Buffalo. It is also unclear whether Mr. Bailey worked primarily indoors or outdoors. There is also no testimony asserting either that a clearing barrel did or did not exist. The court finds the foregoing insufficient to support Mr. Bailey's claim for compensation for off-duty weapon cleaning in Buffalo and therefore his claim is DENIED.

### c. Defendant Controlled and Required the Cleaning and Maintenance of Weapons Off–Duty

Defendant required plaintiffs to clean their weapons off-duty. Section 8 of the 2002 Firearms Handbook, states: "Managers will provide officers with sufficient time and supplies to clean their authorized firearms."

Ex. 97 (2001 Firearms Handbook) § 8, at 38; Tr. at 352–54 (Kruzel referring to the same statement in the 2001 Firearms Handbook). Referring to Section 3.2 of the 1996 Firearms Handbook, Ex. 17, Mr. Bailey testified that an officer is required to "do everything [he or she] can to protect [his or her] weapon from being exposed to anything that is going to corrupt the weapon's function: dirt, mud, saltwater, sand. It says that it needs to be thoroughly cleaned if you are ever exposed to that." Tr. at 159. Section 3 of the 1996 Firearms Handbook also requires that a weapon be cleaned after each instance of firing. Tr. at 160 (Bailey) (discussing Ex. 17 (7/96 Firearms Handbook)). The weapon must be cleaned after it is fired or "carbon will build up in it and the grime will build up in it, and the weapon will begin not to work properly. The functions won't work right." Tr. at 155 (Bailey); *see also* Tr. at 1422–23 (Perryman, same, adding that he recalled an incident at qualifications where a gun did not work properly because it had not been cleaned well); *see also* Ex. 17 (7/96 Firearms Handbook) § 3, at 147 ("Cleaning and Preventive Maintenance"). Customs requires that officers remain armed while on duty, and supervisors testified that CEOs' weapon must "remain clean, to remain serviceable, [because] [y]our weapon is not only a life-taker but it's a life-saver. It needs to be serviceable." Tr. at 325 (Kruzel); *see also* 791 (Newcombe), 1073 (Luby), 1419 (Perryman). However, in order to meet Customs' requirement and keep their weapons "remain[ing] clean, remain[ing] serviceable" at all times while on duty, CEOs are required to clean their guns *off* duty. *See* Tr. at 356–57 (Kruzel, stating that "[y]ou'd want to be armed at all times … [because] any time could be a possible situation").

Throughout plaintiffs' claim periods, Customs also maintained control over the weapons cleaning process. At training, officers were taught how to clean their weapons, provided with cleaning materials and a safe place to do the cleaning, and were paid for time spent cleaning. Tr. at 58 (Bailey), 412 (Monistrol), 566–67 (Stuble). In the field, Customs allotted on-duty time for weapons maintenance as part of the weapons qualification process. Tr. at 77 (Bailey), 354 (Kruzel),

419–20 (Monistrol), 567 (Stuble). Policy requires managers to provide time and supplies for weapons cleaning at these qualification sessions. Ex. 97 (2001 Firearms Handbook) at 33, 37–38; Ex. 90 (2003 Firearms Handbook) at 38, Tr. at 117 (Bailey), 354 (Kruzel), 1251 (Lopez). Customs also provides a standard set of instructions on how to clean the weapon, Tr. at 57–58 (Bailey), 636 (Leuth), 839–40 (Newcombe), 1403–07 (Perryman), and weapons are subject to inspection at qualification sessions. Tr. at 132 (Bailey); Ex. 17, (7/96 Firearms Handbook) Ch. 6 §§ 2.1.2–2.1.3, at 147 ("Inspection, Cleaning and Repair").

However, the qualification sessions occurred only three times per year, and, this was not frequent enough that CEOs could keep their weapons clean in preparation for work each day. *See supra*, Part IV.D.1.b. Defendant therefore "controlled" plaintiffs' off-duty cleaning by not providing enough time or materials for cleaning while on duty, cleaning which it benefitted from, knew needed to occur, and required to take place. Indeed, "[u]nder the table of offenses, [an officer could be charged with] neglect" for failure to properly care for his or her weapon. Tr. at 132–33, 138 (Bailey); Ex.1900, Tab 8 (Johnson Dep.) at 56–57; *see* Ex. 17 (7/96 Firearms Handbook) Ch. 6 § 1.1, at 146 ("Inspection, Cleaning and Repair") ("Failure [to care for weapon] may result in disciplinary action"); *see also* Ex. 21, Customs Directive, January 9, 1990, "Table of Offenses and Penalties," No. 7, at 529 (stating that is an offense to fail to comply with any job-related inspection of duties and responsibilities). Yet Customs provided only limited instructions as to how often a weapon should be cleaned, instead establishing an expectation that it be clean whenever CEOs were on duty. *See* Tr. at 422, 481–82 (Monistrol testifying that supervisors never directed her on how often to clean her weapon, only to keep it clean all the time), 324–25 (Kruzel, same), 525 (Rivera, same), 596 (Stuble, same), 220 (Bailey, same), 791 (Newcombe, the former national program manager for canine enforcement within Customs, testifying that Customs did not specify how frequently the Glock needs to be cleaned, other

than to require a cleaning after every shooting), 1154 (Luby, a supervisor, same), 1379–80 (Makolin, a supervisor, same), 1504 (Perryman, same). The court finds that defendant controlled and required the cleaning and maintenance of weapons off duty. Plaintiffs have satisfied the third and final prong of the test to determine whether such cleaning and maintenance constitutes "work" under the FLSA.

Plaintiffs have therefore established that off-duty weapons cleaning is "integral and indispensable" to the performance of and preparation for their duties as CEOs. *Accord Dunlop,* 527 F.2d at 400–01 ("The test [ ] to determine which activities are 'principal' and which are 'an integral and indispensable part' of such activities, is not whether the activities in question are uniquely related to the predominant activity of the business, but whether they are performed as part of the regular work of the employees in the ordinary course of business. It is thus irrelevant whether fueling and unloading trucks is 'directly related' to the business of electrical wiring; what is important is that such work is necessary to the business and is performed by the employees, primarily for the benefit of the employer, in the ordinary course of that business.").

2. Plaintiffs are Entitled to Overtime Compensation for Reasonable Off-Duty Time Spent Caring for and Maintaining Their Weapons

The court now examines whether reasonable time required for off-duty gun cleaning in El Paso and Miami was not so "insubstantial and insignificant" as to bar recovery under the "de minimis doctrine." *Mt. Clemens*

*Pottery,* 328 U.S. at 693, 66 S.Ct. 1187. The court finds that, on the whole, it was not. First, it should be noted that as a result of differing work conditions, more frequent cleaning is required for some officers in Miami and El Paso than in Detroit or Buffalo. *See* Tr. at 1092 (Luby, a supervisor, testifying that "the best [port] would be some other port, the worst would be El Paso"). It appears that more frequent cleaning is required in El Paso than in Miami. *Id.;* Tr. at 977 (Raleigh, a supervisor, testifying that conditions in Miami are not as bad as conditions in El Paso, but work in Miami can get dirty at the seaport). Plaintiffs generally testified that they cleaned their weapons once per week. Tr. at 578 (Stuble), 624–26 (Leuth), 323, 362 (Kruzel), 498 (Rivera), 420 (Monistrol); *see* Tr. at 1434 (Perryman, a firearms instructor at the training academy, recognizing that conditions in El Paso may require officers to clean their weapons once a week); Ex.1900, Tab 6 (Anton Dep.) at 52–54 (Supervisor Anton testifying that it is not unusual to clean a weapon more than once a month).[59]

In El Paso, Mr. Stuble claims .5 hrs./wk. of compensation for off-duty time spent cleaning his weapon and related equipment between September 1997 and July 2004. Tr. at 578–79. Mr. Leuth claims .75 hrs./wk. for similar time spent between March 1997 and October 2001. Tr. at 614, 623. Mr. Kruzel claims 2.5 hrs./wk. between September 6, 1997 and July 3, 2004. Tr. at 362. In Miami, Mr. Rivera claims .5 hrs./wk. between October 3, 1998, and July 31, 2004, Tr. at 498–500; Pls.' Br. at 33, while Ms. Monistrol claims compensation for 1 hr./wk. from September 4, 1999 to September 18, 2004. Tr. at 437–39.[60]

---

**59.** The court heard testimony from other supervisors who did not clean their weapons between qualification sessions, which are more than three months apart. Tr. at 842, 844 (Newcombe), 1072–73, 1094, 1153 (Luby), 1622, 1673 (Luse); Ex.1900, Tab 7 (Blanchard Dep.) at 30:16–25; *see also id.* Tab 8 (Johnson Dep.) at 32:1–37:7, 38:15–39:10 (Johnson, same, however distinguishing between breaking his weapon apart to clean it and wiping it down with a rag). However, since it is not clear to the court that supervisors spent as much time in the field as CEOs, supervisors' weapons may not have warranted the same cleaning regime.

**60.** The court is unclear as to how Ms. Monistrol came to conclude that 1 hr./wk. is accurate. Ms. Monistrol testified that she spent 20 minutes each week performing a "wipe down" of her weapon, Tr. at 420, and 1 hour per month engaged in a more thorough cleaning, Tr. at 483–84; *but see* Tr. at 419–20 (Monistrol testifying that she did a thorough cleaning, or "field stripping," at least every other month and always before going to the range to qualify). Ms. Monistrol also testified that she also spent time cleaning other items on her gun belt. Tr. at 420. Allowing for a small amount of time for gun belt cleaning, properly calculated, Ms. Monistrol's

According to supervisors, 5–10 minutes is a reasonable amount of time for a dry cleaning, or a "wipe down." Tr. at 982 (Raleigh, Miami), 1673–74 (Gernaat, Miami). *But see* Tr. at 1277–78 (Summers testifying that a wipe down takes only a minute). Supervisors also testified that they believed a more thorough cleaning, or "field stripping," should take 10–15 minutes.[61] *See* Tr. at 984 (Raleigh, Miami), 1551 (Smith, Miami, same); Ex.1900, Tab 14 (Wood Dep.) at 46:6–8; Tr. at 1395 (Makolin, El Paso), 1268 (Lopez, El Paso); *see also id.* at 1412 (Perryman testifying that he has observed officers clean their weapons in 10 minutes). *But see* Tr. at 1278, 1285 (Summers, in Miami, testifying that field stripping takes no more than 10 minutes, but adding that he observed officers take 15–20 minutes to clean their weapons after firing at qualifications), 1673 (Gernaat, in Miami, testifying that cleaning after firing takes 20–30 minutes); Ex.1900, Tab 3 (Anaya Dep.) at 50–57 (testifying that the minimum time required is 10–15 minutes, but more time may be required when an officer works in a dirty environment, adding that the cleaning frequency is at the sole discretion of the officer); Ex.1900, Tab 6 (Anton Dep.) at 50 (Anton testifying that it takes him 30 minutes to clean his weapon).

The court also considers two visual demonstrations on videotape of Mr. Kruzel and Ms. Monistrol cleaning their weapons and related equipment. In the demonstrations, both Ms. Monistrol and Mr. Kruzel cleaned their weapons and related equipment in about 30 minutes. Ex. 951 (Kruzel videotape); Tr. at 388; *see also* Ex. 1171 (Monistrol videotape); Tr. at 453–54. Mr. Perryman, a firearms cleaning expert, testified that both Mr. Kruzel and Ms. Monistrol engaged in numerous redundant and/or unnecessary steps when

they cleaned their weapons, and that it should have taken them less time. Tr. at 1440, 1442–43, 1446 (testifying about Monistrol), 1481–83 (testifying about Mr. Kruzel); *see also* Tr. at 1411 (Perryman, testifying that at the Academy it "[g]enerally [ ] takes about 10 minutes" for officers to clean their weapons). Defendant therefore asserts that to the extent that the court will award compensation to plaintiffs for time spent cleaning their weapons, "no more than ten minutes (.16 hour) of compensation one week per month for nine months of the year," is reasonable. Def.'s Br. at 94.

The court determines that, based on the foregoing evidence, for those weeks of the year in which officers were not attending a qualification session, the officers in Miami, Ms. Monistrol and Mr. Rivera, are entitled to 15 minutes per week of compensation for the time they spent cleaning their weapons off duty.

Given the dirtier working conditions in El Paso and need to clean their weapons more frequently, the court finds that, for the weeks of the year in which officers were not attending a qualification session, the officers in El Paso, Messrs. Stuble, Leuth, and Kruzel, are entitled to 30 minutes per week of compensation for the time they spent cleaning their weapons off duty.

### E. Plaintiffs' Off–Duty Care for Detector Dogs Does Not Constitute Compensable Overtime Work Under the FLSA

Ms. Monistrol is the only representative plaintiff to claim compensation for off-duty dog care. The court now considers her claim. This court, as well as the Second, Fourth, and Eighth Circuits, have found that as a general matter " '[a canine] officer must

---

testimony would support a total of no more than 40 minutes per week, rather than 60.

**61.** To the extent the court distinguishes between daily wipedowns and the more thorough "field-stripping" which generally occurred once per week, the court finds that the former is de minimis. However, consistent with the analysis below, the weight of the evidence indicates that "the amount of time per occurrence dedicated to" the latter is not de minimis. *Bobo I*, 37 Fed.Cl. at 702, *aff'd, Bobo II*, 136 F.3d at 1468; *compare* Tr. at 151–52 (Bailey ("[E]very day I

would at least … wipe [my weapon] down when I came home. It was a habit I got into. Before I put my weapon away in a lock box, I would drop the magazine and I cleared the round, put my finger down the magazine well and into the barrel, and then I would lock it down. It would only take a few minutes ….") *with* Tr. at 151 (Bailey testifying about the more elaborate process for thorough cleaning once a week, involving breaking the weapon down into its component parts and cleaning each part separately).

be compensated for the off-duty time he spends performing tasks involved in caring for and training his assigned police dog ....'" *Holzapfel*, 145 F.3d at 522 (internal citation omitted); *New York City Transit Auth.*, 45 F.3d at 650–51 (stating, in dicta, that walking, feeding, grooming, training, and cleaning up after police dogs are integral and indispensable parts of handler's principal activities and are compensable under the FLSA); *Truslow*, 783 F.Supp. at 279 (finding that, as a matter of law, time expended by deputy sheriff assigned to canine unit in the care (including kennel cleaning), training, and required demonstration of a canine unit dog is compensable under FLSA), *aff'd*, 993 F.2d 1539 (4th Cir.1993) (Table); *Rudolph v. Metro. Airports Comm'n*, 103 F.3d 677, 681 (8th Cir.1996) (implicitly acknowledging that feeding, grooming, and exercising are compensable work while denying compensation on alternate grounds); *Udvari v. United States*, 28 Fed.Cl. 137, 139 (1993) (stating, in dicta, that a secret service agent was entitled to overtime compensation for dog care "like all the other employees were paid as a settlement"); *see also Albanese*, 991 F.Supp. at 420 (granting summary judgment on the compensability of dog care activities because the canines are "essential pieces of equipment that assist the officers in the efficient enforcement of the laws" and plaintiffs would not "suffer" such work if they were not canine officers); *Town of Vestal, N.Y.*, 969 F.Supp. at 848 (holding that dog care activities are compensable); *Karr*, 950 F.Supp. at 1322–23 (same); *Treece*, 923 F.Supp. at 1125 (same); *Andrews*, 888 F.Supp. at 216–17 (same); *Levering v. District of Columbia*, 869 F.Supp. 24, 26–27 (D.D.C.1994) (same); *Jerzak v. City of South Bend*, 996 F.Supp. 840, 846 (N.D.Ind.1998) (same); *Nichols*, 789 F.Supp. at 1442 (citing *Truslow* with approval); DOL Opinion Letter, 1993 WL 901171 (Aug. 11, 1993) (finding that canine related care and training was work as defined under 29 C.F.R. § 785.7). However, while not dispositive, the court notes that most of these cases involved officers who brought their dogs home with them and were responsible

for round-the-clock care, unlike the plaintiffs here.

As to off-the-clock dog grooming, Ms. Monistrol's testimony persuaded the court that it was a benefit to her employer and controlled or required by it. She testified that officers are required to keep their canines clean. Tr. at 429 (Monistrol testifying about general cleanliness required), 470 (Monistrol testifying that Customs requires grooming every day). Moreover, dog care and grooming is taught during training, and CEOs care for their dogs on duty and for compensation while in training. Tr. at 63–65 (Bailey). Once in the field, Ms. Monistrol has continued to perform the same dog care activities, but she has been denied compensation. Tr. at 428–29.[62] And to the extent that her supervisors knew or should of known of her off-the-clock activities, she was never forbidden to engage in them and Customs failed, generally, to issue any policies on how often dogs should be cleaned in the field. *See* Tr. at 468–69 (Monistrol), 1566 (Smith, a supervisor, same).

However, Ms. Monistrol has failed to establish that her supervisors knew or should have known of her off-duty grooming. Ms. Monistrol claims she spent 20–30 minutes per week grooming her canine, yet grooming could occur at the port, where facilities and brushes for basic grooming are stored. Tr. at 448 (Monistrol); *see also* Tr. at 1564–68 (Smith, a supervisor, testifying grooming can and does occur on duty); 469 (Monistrol testifying that she has on-duty time on NTRT days to bathe her dog and testifying that she bathed her dog at the kennel where the bathtub was located). On a daily basis, officers also enjoyed downtime while on duty at the port in which they could groom their dogs, especially on NTRT days. *See* Ex. 13 (2/96 CEO Handbook), § 5.7 at 240 (Non–Task Related Training); Ex. 14 (8/02 CEO Handbook), § 5.7 at 75 (Non–Task Related Training); Tr. at 173–77 (Bailey); 1091 (Luby), 1533 (Smith). Time also exists at the beginning or end of the day at the kennel. Tr. at 1089–90 (Luby), 1531–32 (Smith). The court therefore cannot conclude that Ms.

---

**62.** Ms. Monistrol also asserts that she sometimes paid the kennel to groom her dog, but does not seek compensation for that expense. Tr. at 430, 432.

Monistrol's supervisors knew or had reason to know that Ms. Monistrol used her off-duty hours to groom her dog. As an initial matter, therefore, the court denies Monistrol's claim for off-duty time spent on daily grooming.

As to bathing and drying her dog, Ms. Monistrol also does not make a sufficient case for constructive knowledge. Ms. Monistrol testified that, while she did not know if her supervisors realized she was grooming off-the-clock, they should have known that she bathed and dried her dog because such an activity must happen and "takes time." Tr. at 448. The court finds this to be insufficient evidence to support constructive knowledge. Moreover, even if defendant had constructive knowledge that off-duty washing and drying of Ms. Monistrol's dog was occurring, the time that Ms. Monstrol claims, 20 minutes per week for washing and 60 minutes per week for drying, is not reasonable. Indeed, on cross-examination Ms. Monistrol admitted that she occasionally used on-duty time during NTRT days to wash and dry her dog before she went home. *See* Tr. at 469. Moreover, Ms. Monistrol acknowledged that some dogs do not need to be dried once per week, Tr. at 469, and that when she had a labrador from January 2004 through October or November 2004, she did not dry it for 1 hour every week, *id.* at 469–70; *see also* Tr. at 1565 (Smith, a supervisor, testifying that when she worked with a canine, she only dried him when it was chilly out, which happened infrequently in Miami), 1682 (Gernaat, a supervisor, same). Ms. Smith, a supervisor, testified that bathing and drying takes only 5–10 minutes. Tr. at 1566. Finally, the court notes that Ms. Monistrol is the only representative plaintiff making an off-duty dog care claim, a circumstance in which the court finds support for an inference that the time she claims is not reasonable.[63]

Thus, the court holds that plaintiffs' off-duty care for detector dogs does not consti-

tute compensable overtime work under the FLSA.

F. Plaintiffs' Off–Duty Vehicle Care and Maintenance Does Not Constitute Compensable Overtime Work Under the FLSA

■ Courts that have found off-duty dog care to be compensable work have incorporated into the concept of "dog care" the time spent in the care and maintenance of the dog's living quarters and the vehicle used to transport the dog. *See, e.g., New York City Transit Auth.,* 45 F.3d at 651; *Albanese,* 991 F.Supp. at 420. The court is aware of only one case considering the compensability of dog-related vehicle maintenance, including vacuuming and clean up after a dog is ill, as a separate item of work. *Treece,* 923 F.Supp. at 1125; *see also Dunlop,* 527 F.2d at 401 (finding that time spent in vehicle care by electric company employees was part of the broad range of principal activities for which they were employed).

As with her off-duty dog care claims, Ms. Monistrol, the only plaintiff who seeks compensation for vehicle care, presented little specific evidence that her supervisors knew or should have known that she was maintaining her vehicle off duty. While she testified that she spoke to her supervisor, Mr. Gernaat, about washing her vehicle off duty, Tr. at 449–51, Mr. Gernaat asserts they never spoke about the subject. Tr. at 1685; *see also* Tr. at 1563–69 (Supervisor Smith testifying she was unaware that Ms. Monistrol was maintaining her vehicle off duty). Ms. Monistrol's claim of constructive knowledge rests primarily on an inference to be drawn from Customs' failure to assign on-duty time other than NTRT days for the care and maintenance of vehicles. However, the evidence is insufficient to support this inference because Ms. Monistrol has not explained why her supervisors knew or had reason to know that the time allotted on NTRT was insufficient, such that Ms. Monistrol would have needed

---

63. Plaintiffs cite many cases holding that plaintiffs should be compensated for off-duty dog care. *See* Pls.' Br. at 64–65 (citing *Rudolph,* 103 F.3d at 684) ("Any time beyond the half hour ... we presume stemmed from [the canine caretakers'] personal devotion to the dogs, and was, therefore, not 'predominantly for the benefit of the employer' ...."); *Levering,* 869 F.Supp. at 26–27

(holding that 30 minutes a day was compensable); *Jerzak,* 996 F.Supp. at 846–47 (finding that 1 hr./wk is compensable). However, in these cases the plaintiffs/officers were responsible for around-the-clock care, making the courts' determinations of reasonableness inapposite to this case, in which plaintiffs did not live with their canines.

additional time off duty.[64] In addition, while not dispositive, the fact that Ms. Monistrol is the only representative plaintiff to claim off-duty time to perform vehicle maintenance undercuts, to some extent, her allegation of constructive knowledge. Mr. Rivera, who was a CEO in Miami with Ms. Monistrol, testified that he always cleaned his vehicle while on duty. Tr. at 519–20; *see also* Tr. at 1568–69 (Supervisor Smith, same, adding that the port had wet and dry vacs available for officers' use and that officers were given $15 per month for car washes); *but see* Tr. at 1683 (Supervisor Gernaat testifying that he cleaned his government vehicle off duty when he worked as a CEO). Supervisor Smith also testified that she had granted requests from other officers who wanted to leave their shifts early in order to take care of their vehicles. Tr. at 1567–68. Thus, Ms. Monistrol has failed to prove that defendant had actual or constructive knowledge of her off-duty vehicle care activities.

For the foregoing reasons, the court concludes that, off-duty vehicle care and maintenance does not constitute compensable overtime work under the FLSA.[65]

### G. Plaintiffs' Off–Duty Paperwork Does Not Constitute Compensable Overtime Work Under the FLSA

■ Ms. Monistrol claims compensation for 8 hours per month for off-duty time spent completing paperwork. Tr. at 462–63. Ms. Monistrol, like other CEOs, is required to submit certain paperwork at the end of each month. *See, e.g.,* Tr. at 987–90 (Raleigh), 1557–63 (Smith). The paperwork consists of four different forms: a CF–177, a vehicle activity report listing miles driven each day; a CF–240, a detective dog utilization report; a CF–251 recording training aids used; and a "daily sheet," which serves as the foundation for the CF–240 and the CF–251. Tr. at 1567–63 (Smith). While this paperwork may have been required by and beneficial to defendant, *see Dunlop*, 527 F.2d at 401 (finding that starting time chores performed by electricians and helpers, such as filling out of necessary time and material sheets and requisition papers, "were within the broad range of 'principal activities' performed at their employer's behest and for the benefit of the business" because they were "part of the regular work of the employees in the ordinary course of business"), Ms. Monistrol presented little specific evidence from which to infer that her supervisors knew or should have known that she was completing the paperwork off duty. Ms. Monistrol never told them directly, Tr. at 464, nor did she ever seek compensation for this activity prior to this suit, Tr. at 448–49, 463. Supervisors also confirmed they were not aware of Ms.

---

**64.** Before September 11, 2001, supervisors did not require CEOs to report back to their work stations after completing 4 hours of NTRT. Tr. at 444 (Monistrol), 518–20 (Rivera), 1580–81 (Smith), 1813–15 (Raleigh). CEOs were free to perform activities related to their jobs for the balance of their shifts, which was approximately 2–4 hours. Tr. at 444 (Monistrol), 518–20 (Rivera), 1535, 1580 (Smith), 1813–15 (Raleigh). After September 11, 2001, although CEOs were required to report to work locations after NTRT, a new CEO handbook provided time for maintaining equipment within the 4 hours of NTRT. Ex. 14 (8/02 CEO Handbook), § 5.7 at 75.

**65.** Even if Ms. Monistrol could overcome the knowledge requirement, compensation is not warranted because Ms. Monistrol has not proven that the activity was not de minimis. Though Ms. Monistrol claims more than 2 hours of compensation per week in vehicle care, *see* Tr. at 441–43 (Monistrol testifying that she spends 4 hrs./wk. maintaining dog equipment and the vehicle, vacuuming, car washing, and report writing, more than half of which is devoted to car-related activities), under the three-part test pro-

scribed by *Lindow*, 738 F.2d 1057, and adopted by the Federal Circuit, *Bobo II*, 136 F.3d at 1468, Ms. Monistrol's irregular off-duty activities are de minimis. As the Federal Circuit stated in *Bobo II*, activities are not compensable if they are conducted irregularly, for minimal periods of time, and are administratively difficult to record. *Bobo II*, 136 F.3d at 1468. That description fits the activities here. *See* Tr. at 1683 (Supervisor Gernaat testifying that he washed his vehicle only once per month); *accord Aguilar v. United States*, 38 Fed.Cl. 431, 435 (1997) (holding that cleaning cars once or twice per month for anywhere from 15–45 minutes was de minimis because of the irregularity of its occurrence, the administrative difficulties of recording the incidences and the inconsistency in the amount of time it takes the clean-up to occur) (citing *Lindow*, 738 F.2d at 1063); *see also Levering*, 869 F.Supp. at 29 (D.D.C.1994) (determining that, among other dog care activities officers encounter on commute, cases in which the dogs became ill or soiled their handler's cars were infrequent).

Monistrol's off-the-clock preparation of paperwork. *See* Tr. at 1563–69 (Smith), 1679–85 (Gernaat).

While Ms. Monistrol asserts that supervisors must have known that she was completing paperwork off-duty because they "know it takes time" to complete the paper work, Tr. at 448, Supervisors Smith and Gernaat testified that they completed their paperwork on duty when they were CEOs, Tr. at 1561 (Smith), 1679 (Gernaat). Without more, therefore, Ms. Monistrol's claim that constructive knowledge can be imputed from the fact that her shift simply did not provide enough time to complete the paperwork while on duty is insufficient. Tr. at 448. Ms. Monistrol's claim for off-duty completion of paperwork does not constitute compensable overtime work under the FLSA and is DENIED.

## V. Statute of Limitations

█ The statute of limitations is an affirmative defense that acts to bar plaintiffs'

claims for any period of time more than two years before the date plaintiffs first filed their consents with this court, except in cases of a willful violation, where the statute of limitations is three years. 29 U.S.C. § 255(a); 5 C.F.R. §§ 551.104, 551.702(b). Plaintiffs bear the burden of proving defendant's willfulness.[66] *Adams,* 350 F.3d at 1229; *Bankston,* 60 F.3d at 1253. The court now examines whether plaintiffs have met this burden with respect to the claims which the court has determined constitute compensable work under the FLSA.

In order to prove willfulness, plaintiffs must prove that defendant "knew its conduct was prohibited by the Act or showed reckless disregard of the requirements of the Act. All of the facts and circumstances surrounding the violation are taken into account in determining whether a violation was willful." 5 C.F.R. § 551.104; *see also McLaughlin,* 486 U.S. at 133, 108 S.Ct. 1677; *Adams,* 350 F.3d at 1229 (quoting *McLaughlin*). "Reckless disregard" is further defined as the "failure

---

**66.** Plaintiffs argue that because defendant failed to raise the statute of limitations as an affirmative defense, it waived it at trial and therefore plaintiffs are not required to prove defendant's willfulness in order to recover for three years prior to commencing suit. Pls.' Br. at 90 (citing, *inter alia, Vela v. City of Houston,* 276 F.3d 659). Defendant responds that "although the restriction against being able to recover compensation for more than two years is usually labeled a 'statute of limitation,' it is not really a statute of limitation. Plaintiffs are entitled to receive three years of compensation when plaintiffs prove the element of willfulness. A defendant does not have to plead 'lack of willfulness,' just like a defendant does not have to plead 'lack of causation' in a claim for breach of contract." Def.'s Reply at 61. Furthermore, defendant contends that even if it was required to plead the defense, any failure was not prejudicial. *Id.*

The court agrees with defendant. This court has rejected an argument similar to plaintiffs', noting that

> RCFC 8(c) sets out a nonexclusive list of affirmative defenses, concluding the list with a phrase "and any other matter constituting an avoidance or affirmative defense." While there is generally lack of definitive guidance as to what constitutes an affirmative defense, it is viewed as encompassing "two types of pleadings: ones that admit the allegations of the complaint but suggest some other reason why there is no right to recovery, and ones that concern allegations outside of the plaintiff's prima facie case that defendant therefore can-

not raise by a simple denial in the answer." "In determining what defenses other than those listed in Rule 8(c) must be pleaded affirmatively, resort often must be had to considerations of policy, fairness," and to "whether plaintiff will be taken by surprise by the assertion . . . of a defense not pleaded affirmatively by the defendant."

*Statham v. United States,* No. 00699C, 2002 WL 31292278, at *10, 2002 U.S. Claims LEXIS 264, at *31 (Fed.Cl. Sept.11, 2002) (rejecting the plaintiff's claim that the defendant waived its defense of good faith by not pleading it in its answer) (quoting 5 Wright and Miller, *Federal Practice and Procedure,* § 1271 at 80, 444, 446 (2002 Supp.)). The defense of "lack of willfulness" is separate from the defense that a claim is barred because of the statute of limitations. *Accord* Def.'s Reply at 60. The former is not an affirmative defense, the latter is. Indeed, a finding of willfulness simply changes the statute of limitations on a valid claim from two to three years, whereas a finding that the statute of limitations bars a claim is a "reason why there is no right to recovery." *Statham,* 2002 WL 31292278, at *10, 2002 U.S. Claims LEXIS 263, at *31 (quoting 5 Wright and Miller § 1271 at 80). Thus, the burden remains on plaintiff to prove defendant's willfulness and defendant did not waive its defense by not asserting it in its answer. The court also notes that plaintiffs offer no evidence of unfairness generally, or that they were unfairly surprised by defendant's use of this defense.

to make adequate inquiry into whether conduct is in compliance with the Act." 5 C.F.R. § 551.104; *see also Alvarez v. IBP, Inc.,* 339 F.3d 894, 908–909 (9th Cir.2003) ("For § 255's extension to obtain an employer need not knowingly have violated the FLSA; rather, the three-year term can apply where an employer disregarded the very 'possibility' that it was violating the statute, although we will not presume that conduct was willful in the absence of evidence.") (citing *Herman v. RSR Sec. Servs. Ltd.,* 172 F.3d 132, 141 (2d Cir.1999))

Courts have found willful violations of the FLSA where an employer disregards the DOL's Wage and Hour Division warnings, *Reich v. Bay, Inc.,* 23 F.3d 110 (5th Cir. 1994), ignores the advice of its own legal department, *Bankston,* 60 F.3d at 1254, or has been penalized previously for violating the FLSA. *Chao v. A–One Medical Services, Inc.,* 346 F.3d 908, 918–19 (9th Cir.2003). The Federal Circuit has held that relying in good faith on the advice of the Secretary of Labor did not constitute a willful violation of the FLSA. *Cook v. United States,* 855 F.2d 848, 850 (Fed.Cir.1988).

Here, the court finds that plaintiffs have proven that defendant acted in willful violation of the FLSA by allowing CEOs to launder and process towels and construct training aids while off duty without compensation, but not in allowing CEOs to clean their weapons while off duty without compensation. Defendant knew that plaintiffs were washing and processing towels and constructing training aids off duty, yet the weight of the evidence indicates that it "disregarded the very 'possibility' that it was violating the statute." *Alvarez,* 339 F.3d at 908–909. Thus, at the very least, defendant "showed reckless disregard of the requirements of the Act." 5 C.F.R. § 551.104; *McLaughlin,* 486 U.S. at 133, 108 S.Ct. 1677.

Indeed, the court heard ample testimony that defendant knew plaintiffs were laundering and processing towels and constructing training aids off duty. *See* Tr. at 70 (Bailey) ("[My supervisor] explained to me that the port director was no longer accepting ... vouchers claiming the money I had spent at the laundromat. We were told to go out and

he wasn't paying us to do laundry. He was paying us to work our dogs and find narcotics."); *id.* at 119, 125 (Bailey testifying that he verbally informed two supervisors that he was washing towels at home); *id.* at 417 (Monistrol) ("[Supervisors] were all aware that we were doing it. ... It was needed for the dogs. ... It was required. It was something that was expected of you."); *id.* at 272 (Kruzel testifying that when arrived in El Paso for duty, he "inquired" of his supervisors concerning the process for laundering towels "because the washers and dryers were ... not working, and they said, well, everyone here just takes them home"); *id.* at 284–85, 292, 294–95 (Kruzel testifying that he discussed this issue with three supervisors and the Canine Chief in El Paso, and that he observed at least four CEOs raising similar concerns to management about this uncompensated off-duty activity); *id.* at 759 (Newcombe, the former national program manager for defendant's Canine Enforcement Program, admitting that during his management review of one of the ports in El Paso he was told that CEOs "were washing towels off premises" and that he understood this work to be "uncompensated and off the clock"); *supra,* Part IV.A.1.b; *see also id.* at 121, 126–27 (Bailey, testifying that he had conversations with his supervisors in Detroit about constructing training aids off duty); *id.* at 447 (Monistrol asserting that she spoke with various supervisors between 1999 and 2004 about building training aids off the clock); *id.* at 524 (Rivera testifying that supervisors knew CEOs were constructing training aids off duty); *id.* 351–52 (Kruzel testifying that it was common knowledge that officers obtained materials independently); *id.* at 1618 (Luse, a supervisor, testifying that very limited materials were available to build training aids on duty); *supra,* Part IV.B.1.b.

Nevertheless, defendant did nothing to remedy the situation, showing reckless disregard for the illegality of benefitting from and requiring plaintiffs' uncompensated off-duty towel-washing and training aid construction. Defendant "fail[ed] to make [an] adequate inquiry into whether [its] conduct [was] in compliance with the Act." 5 C.F.R. § 551.104.

As early as January of 2001, when this suit was filed, defendant knew of the potential illegality of its practices. In March of 2001, an El Paso audit report stated that "[a]ll CEOs are currently washing their training towels at their private residences.... [This] could open Customs management to future compensation issues because the CEOs are using their off duty time to meet Customs requirements." Ex. 10; Pls.' Resp. at 46. Moreover, the court heard testimony from the director of position classification and compensation for Customs that "it is not our policy to not compensate employees for work performed over their eight hours or over their 40 hours. It's our policy to pay them in accordance to our interpretation of the statute and regulations." Tr. at 1875 (Rotterman). Nevertheless, defendant did *not* compensate CEOs for their overtime work, but rather willfully allowed them to continue performing it, evidencing "reckless disregard for the matter of whether its conduct was prohibited by the statute." *McLaughlin*, 486 U.S. at 133, 108 S.Ct. 1677.

The court finds that it was not until July of 2004, when the Jacksta Memo was issued, *see* Ex. 89, that defendant addressed the "very *possibility* that it was violating the statute" by allowing uncompensated off-duty towel-washing and training aid construction to continue, *Alvarez*, 339 F.3d at 908–909 (emphasis added). In effect, the Jacksta Memo is an admission by defendant that it knew it had been engaging in activity in possible violation of the FLSA.[67] The court is unpersuaded that defendant "believed that COPRA was the exclusive statute authorizing overtime compensation for canine enforcement officers." Def.'s Reply at 66; *see also* Tr. 1859–60 (Rotterman). Indeed, even if defendant did believe this, the weight of the evidence illustrates that it was still in reckless disregard of the possibility that the FLSA covered plaintiffs, and that its actions were in violation of the FLSA, until defendant finally changed its practices in July 2004. *See, e.g.,* Tr. at 1873–74 (Rotterman, a director, admitting that Customs never prohibited "suffer or permit" overtime from being performed or instructed CEOs on the difference between FLSA and COPRA overtime); *id.* at 778, 782, 787–89 (Newcombe, a director, acknowledging the "2001 audit problem," the "compensation issue with these CEOs," and the fact that he does not "recall any statement or directive saying you cannot make training aids off the clock").

■ For the foregoing reasons, the court finds that, with respect to the cleaning and processing of training and towels and the construction of training aids, defendant willfully violated the FLSA by failing to compensate plaintiffs for their off-duty work. Plaintiffs will therefore be entitled to a three-year statute of limitations on their claims involving these activities. 29 U.S.C. § 255(a); 5 C.F.R. §§ 551.104, 551.702(b). However, because the weight of the evidence indicates that defendant only had constructive, not actual, knowledge of plaintiffs' off-duty weapons cleaning, the court cannot find that defendant's conduct with respect to this activity rises to the level of "reckless disregard of the requirements of the Act." 5 C.F.R. § 551.104. Thus, the statute of limitations remains at two years for plaintiffs' weapons-cleaning claims.

## VI. Liquidated Damages [68]

■ An employer who has violated the FLSA "shall be liable" to employees affected for "unpaid overtime compensation ... and

---

**67.** The Jacksta Memo specifically directs that "washing and drying training towels" be done during "all or part of a normal duty shift" and that "the construction of detector dog training aids ... be accomplished only during the officer's normal duty hours." Ex. 89. This is further evidence that defendant was "willful" in its violation of the FLSA with respect to the washing and processing of training towels and the construction of training aids. However, cleaning and maintenance of weapons is not mentioned in the Jacksta Memo, indicating to the court that plaintiffs have not met their burden of proving defendant's willfulness with respect to this off-duty activity.

**68.** Defendant argues that "*Doyle*, 931 F.2d 1546 (Fed.Cir.1991), prevents this Court from awarding liquidated damages." Def.'s Reply at 56. The court disagrees. *Doyle* simply holds that there is no statutory basis for recovery of interest, even if *labeled* as liquidated damages. *Doyle*, 931 F.2d at 1551; *accord supra*, note 15. The recovery of liquidated damages is expressly provided for in 29 U.S.C. § 216(b).

in an additional equal amount as liquidated damages." 29 U.S.C. § 216(b). The court, in its sound discretion, may mitigate or deny liquidated damages "if the employer shows to the satisfaction of the court that the act or omission giving rise to such action was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation of the [FLSA]." 29 U.S.C. § 260; *see also Beebe,* 640 F.2d at 1295 (1981).[69] "The burden rests on the government to establish its good faith and the reasonable grounds for its decision." *Adams,* 350 F.3d at 1226 (citing § 260) (footnote omitted); *accord Laffey,* 567 F.2d at 464–65 (describing this burden as "substantial"); *Bankston,* 60 F.3d at 1254 ("It is easier for a plaintiff to receive liquidated damages under the FLSA than it is to extend the statute of limitations for FLSA claims . . . .").

"The 'good faith' referred to in section 260 means 'an honest intention to ascertain what the [FLSA] requires and to act in accordance with it.'" *Beebe,* 640 F.2d at 1295 (quoting *Addison,* 204 F.2d at 93); *see also* 29 C.F.R. § 790.15 ("'Good faith' requires that the employer have honesty of intention and no knowledge of circumstances which ought to put him upon inquiry."). Whether an honest intention existed involves a subjective inquiry by the court. *Beebe,* 640 F.2d at 1295 (citing *Addison,* 204 F.2d at 93, and *Laffey,* 567 F.2d at 464). The "reasonable grounds" requirement in section 260 "calls for a determination as to whether the employer had reasonable grounds for believing that his act or omission was in compliance with the Act, and this is a requirement that involves an objective standard." *Id.* (citing *Laffey,* 567 F.2d at 464). "Proof that the law is uncertain, ambiguous or complex may provide reasonable grounds for an employer's belief that he is in conformity with the Act, even though his belief is erroneous." *Id.* (citing *Laffey,* 567 F.2d at 466, and *Kelly v. Ballard,* 298 F.Supp. 1301 (S.D.Cal.1969)). However, "[i]f . . . the employer does not show to the satisfaction of the court that he has met the two conditions mentioned above, the court is giv-

en no discretion by the statute, and it continues to be the duty of the court to award liquidated damages." 29 C.F.R. § 790.22(b).

Defendant argues that it should not be required to pay liquidated damages because its "reliance upon its interpretation of CO-PRA and its interpretation of the collective bargaining agreement constitutes a good faith basis for not compensating canine enforcement officers pursuant to the FLSA." Def.'s Br. at 114. For many of the same reasons and factual findings for which the court used to find defendant's willfulness, *see Adams,* 46 Fed.Cl. at 620, *aff'd,* 350 F.3d at 1229, the court disagrees. Instead, the court finds that defendant has failed to meet its substantial burden in proving that it acted in good faith with respect to all activities which the court has determined constitute compensable work under the FLSA, including off-duty weapons cleaning and maintenance. *Accord Bankston,* 60 F.3d at 1254 ("It is easier for a plaintiff to receive liquidated damages under the FLSA than it is to extend the statute of limitations for FLSA claims . . . .").

Defendant did not prove that it had a good faith basis or reasonable grounds for believing that requiring CEOs to perform uncompensated overtime work was in compliance with the FLSA. Despite its purported belief that COPRA exclusively applied to CEOs, of which there is little evidence, *see* Tr. at 1859–60 (Rotterman), defendant did not show that it had "honesty of intention and no knowledge of circumstances which ought to put [it] upon inquiry." 29 C.F.R. § 790.15. On the contrary, the overwhelming weight of the evidence cited above indicates that defendant had full knowledge of such circumstances, yet did nothing to redress them until the Jacksta Memo in July 2004. *See supra,* Part IV. A.1.b, Part IV.B.1.b, Part IV.D.1.b, Part V. Defendant was "at least aware that the plaintiffs may have been covered by the FLSA," *Bankston,* 60 F.3d at 1255 (holding that this was enough to rebut the defendants' claim that they were acting in good faith in violat-

---

**69.** The inquiry into "good faith" is different from the inquiry into "willfulness," although the same facts may be relevant to both inquiries. *Adams v. United States,* 46 Fed.Cl. 616, 620 (Fed.Cl. 2000), *aff'd,* 350 F.3d at 1229 (affirming the trial court's determination that employer's FLSA violation was in good faith and not willful based on the same facts).

ing the FLSA), yet it did nothing to "'ascertain what the [FLSA] requires and to act in accordance with it,'" *Beebe,* 640 F.2d at 1295 (quoting *Addison,* 204 F.2d at 93). The court therefore determines that defendant failed to prove that it acted in good faith or with reasonable grounds to avoid a violation of the FLSA. Defendant shall be liable to plaintiffs for "unpaid overtime compensation ... and in an additional equal amount as liquidated damages." 29 U.S.C. § 216(b).

## VII. Conclusion

For the foregoing reasons, the court finds that the representative plaintiffs are entitled to compensation under the FLSA as follows:

1. Laundering and processing training towels: 2 hrs./wk.

2. Constructing training aids: 1.5 hrs./wk.

3. Training-related activities: 0 hrs./wk

4. Weapons care and maintenance: 15 minutes per week for plaintiffs in Miami, and 30 minutes per week for plaintiffs in El Paso

5. Dog grooming activities: 0 hrs./wk

6. Vehicle care and maintenance: 0 hrs./wk.

7. Paperwork: 0 hrs./wk.

With respect to compensation for laundering and processing training towels and constructing training aids, the statute of limitations on recovery shall be extended from two to three years. Each representative plaintiff shall receive liquidated damages equal to the total amount of compensation awarded under provisions 1, 2, and 4 of this Conclusion. Plaintiffs shall also recover from defendant "a reasonable attorney's fee, and costs of the action." 29 U.S.C. § 216(b).

The parties shall, on or before October 18, 2005, jointly calculate and present to the court the amount of compensation to which each representative plaintiff is entitled in accordance with the foregoing provisions of this Conclusion. If for any reason the parties do not agree on any part of such calculations, the parties shall, on or before October 18, 2005, also present to the court such calculations as to which they do not agree accompanied by specific and complete statements explaining their respective positions and the bases therefor.

IT IS SO ORDERED.